IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19- 12670 (JTD) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF SHAUN MARTIN IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, Shaun Martin, declare under penalty of perjury as follows:

1.      I am a Member and Managing Partner with Winter Harbor LLC ("Winter Harbor"). I have worked at Winter Harbor since I helped found the firm in 2012. As part of my duties with Winter Harbor, I also serve as the Chief Restructuring Officer ("CRO") for Vector Launch Inc. ("Vector" and together with its debtor subsidiary Garvey Spacecraft Corporation ("Garvey"), the "Debtors"), a corporation incorporated under the laws of Delaware. I have served in this capacity for Vector since October 12, 2019, and I am familiar with the Debtors' businesses and financial affairs.

2.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtors' commencement of these chapter 11 cases (the "Cases") and in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the pleadings filed by the Debtors on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Court"). I have reviewed the factual support set forth in each of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc. [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is: PO Box 14928, Long Beach, CA 90853-4928.

Debtors' "First Day" pleadings (described below) and attest to the accuracy thereof. Except as indicated otherwise, all facts set forth herein are based on my personal knowledge, discussions with current and former members of the Debtors' senior management and professional advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on the Debtors' behalf.

3.      The Introduction of this Declaration provides a brief summary of the Debtors and the events precipitating their chapter 11 filings. Sections I through III of this Declaration provide additional details and information on the Debtors' businesses, organizational and capital structure, and events giving rise to these Cases. Section IV summarizes the relief requested with respect to, and the support for, the Debtors' motions for entry of interim and final orders authorizing post-petition financing and certain other "First Day" pleadings.[2] Section V summarizes the relief requested in certain other pleadings that were filed on the Petition Date but that will be heard by the Court at a later date, including the Debtors' motion for an order approving bidding procedures for a sale of the Debtors' GalacticSky (defined below) assets and motions and applications for the retention of the Debtors' professionals.

## INTRODUCTION

4.      Having been funded with over $100 million in venture capital equity raises, the Debtors owe only about $1 million in prepetition secured debt and $4-5 million in unsecured debt, with a stalking horse bid to purchase the Debtors' intellectual property related to GalacticSky for $4.25 million. The Debtors will use the chapter 11 process to auction all their assets and provide a

---

[2] "First Day" pleadings mean the pleadings filed by the Debtors on the Petition Date or referred to in section IV herein.

ratable return to the unsecured creditors. To facilitate the case, the Debtors have obtained a $2.5 million DIP Loan from the stalking horse bidder that rolls up a $500,000 prepetition secured advance.

5.       Vector is a space technology company that was developing rockets and satellite computing technology when it unexpectedly lost support from one of its key equity sponsors, Sequoia Capital ("Sequoia"). Before the loss of Sequoia's support, Vector maintained engineering and software development facilities in California and fabrication and research facilities in Arizona. As of August 1, 2019, Vector employed over 150 rocket scientists, engineers, and other staff.

6.       In early August 2019, a member of Vector's board of directors (the "Board") appointed by Sequoia, Bill Coughran (the "Sequoia Member"), abruptly resigned and informed Vector that Sequoia had decided to no longer support Vector via funding for future operations. Almost immediately after the Sequoia Member's resignation, the Debtors' CEO resigned. The fallout from Sequoia's decision and the CEO's resignation spooked the investor community and doomed the Debtors' efforts to raise additional capital.

7.       These events could not have been timed more poorly for the Debtors. In addition to preventing the Debtors from attracting new capital, they occurred when the Debtors had almost expended all of the capital from their prior capital raises. Indeed, the Debtors' cash balances barely exceeded their secured debt, which principal amount totaled $11.5 million. After evaluating its options, the Board determined that if it did not immediately cease operations, the Debtors would be unable to pay their employees if their secured lenders declared a default and froze the Debtors' cash (which is precisely what occurred). With no access to capital to fund ongoing business needs and to satisfy the Debtors' outstanding secured debt, the Board voted to cease operations and to

terminate most of the Debtors' employees and pay all owed wages, as of August 9, 2019.[3]

8.    Less than two weeks later, the Debtors' secured lenders froze the approximately $12 million in cash deposited in the Debtors' bank accounts as expected. The Debtors' secured lenders subsequently swept the cash from Debtors' bank accounts, leaving the Debtors with no cash, a single employee (the acting CEO), and, after assessing fees and other charges, approximately $500,000 in secured debt. The Debtors' remaining assets essentially consisted of three leased facilities, transporter-erector launcher, launch vehicle parts (including rocket engines and ground support equipment), satellite computer technology, patents, and other intellectual property.

9.    Between mid-August 2019 and the end of October 2019, the Debtors sought additional capital from investors to re-start operations. Although several potential investors expressed interest, no actionable offers materialized, and the offers that did materialize were not substantial enough to be actionable. The Debtors also hired investment bankers with relevant expertise to find a strategic transaction, but they were unable to produce any partners or buyers. The Debtors also reached out to existing equity sponsors but were unable to raise the capital needed to re-start the development. Ultimately, members of the Board were able to independently obtain two offers for certain of the Debtors' assets.

10.    After evaluating those offers, the Board determined that the higher offer from Lockheed Martin Corporation ("Lockheed") for a bankruptcy sale of Vector's GalacticSky assets (which also provided for a bridge loan and debtor-in-possession financing) would return a dividend to unsecured creditors, while permitting additional higher and better bids was in the best interest

---

[3]  A small number of employees did not negotiate their final checks prior to the Debtors' secured lenders freezing the Debtors' cash, which resulted in those checks being denied. The Debtors subsequently paid these wages with the proceeds of the bridge loan discussed below.

of the Debtors, their creditors, and all parties in interest. Additionally, the proposed sale with Lockheed leaves the Debtors free to pursue other options for a sale of, or reorganization around, their launch vehicle business to a purchaser or other investor, which may provide other opportunities for Vector's launch business to move forward and additional recoveries by the estates.

## I.    OVERVIEW OF THE DEBTORS' BUSINESSES

### A.    History of Vector Launch and GalacticSky

11.    Vector was established in 2016 with the goal of extending access to space and transforming the space economy by developing a family of small launch vehicles designed for the rapid and frequent launch of payloads ranging from 60 kg – 315 kg to low-Earth orbit ("LEO"). Vector was also developing a space-grade cloud-computing platform known as GalacticSky.

12.    The Vector launch vehicle family consists of the Vector-R (Rapid) and the Vector-H (Heavy) launchers. Both vehicles are designed for rapid and frequent launch capabilities of more than 100 flights per year. Vector-R would launch payloads weighing up to 60 kg, and Vector-H would be capable of launching payloads of up to 315 kg to LEO or 200 kg to a Sun-synchronous orbit over 500 km above Earth. The two launch vehicles share common technology including pressure fed ablative engines, carbon fiber fuselage, Vector patented LOX/Propylene propellant combination and mobile launch capabilities. The launch system is dedicated to micro spacecraft, allowing customers to launch their satellite anywhere, anytime. As of now, however, both launch vehicles remain under development, and, as such, neither has reached orbit. Vector was still working towards its first orbital launch when Sequoia pulled funding.

13.    GalacticSky was designed to transform the space satellite industry from its current focus on hardware-centric systems and capabilities to a focus on satellites with software-defined systems and capabilities. Vector's ultimate vision was to provide a platform that would allow

developers to develop satellite applications on their desktop computer and then upload their applications to an already orbiting satellite constellation, thus yielding nearly instant data and revenue. GalacticSky would have provided companies the ability to extend satellite capabilities by processing and computing data in space. Again, Vector was still developing the system when the equity sponsor ceased to fund further development.

## II.    DEBTORS' CAPITAL STRUCTURE

14.    Vector, which was formed as a Delaware corporation in 2016, is the primary operating entity and since 2016 has been the only Debtor entity with significant operations or assets. Vector owns a 100% interest in Garvey, which is a direct subsidiary of Vector. Outside of Garvey, Vector has no other subsidiaries or affiliates.

### A.    Secured Debt

15.    As of the Petition Date, the Debtors have secured debt obligations in the approximate aggregate amount of $1 million, which is composed of the following, (i) approximately $500,000 in obligations to TriplePoint Capital LLC ("TriplePoint") pursuant to that certain Plain English Growth Capital Loan and Security Agreement dated as of October 19, 2018 by and between Vector, Garvey, and TriplePoint (the "TriplePoint Agreement") and (ii) not less than $500,000 in obligations to Lockheed pursuant to that certain Bridge Loan and Security Agreement dated November 20, 2019, by and among Vector, Garvey, and Lockheed (the "Bridge Loan Agreement").

### i.    *TriplePoint Agreement*

16.    Vector and Garvey, as borrowers, entered into the TriplePoint Agreement on October 19, 2018. The TriplePoint Agreement provided for up to $15 million in secured loans in two $7.5 million installments, although TriplePoint only made the first $7.5 million installment. TriplePoint made that $7.5 million installment on April 23, 2019 in the form of two $3.75 million

advances to the Debtors, each of which was made in exchange for separate promissory notes. The obligations under the TriplePoint Agreement are secured by a first priority, continuing, security interest in and lien against the collateral described below. The value of such collateral exceeds the amount outstanding under the TriplePoint Agreement.

17.     On September 30, 2019, TriplePoint swept $7,471,210.83 from Vector's account at Silicon Valley Bank ("SVB"), *i.e.*, the remaining funds in the account, and asserted that as of October 8, 2019, it was owed $492,851.67 in principal, $876.16 in interest, and $25,000.00 in legal fees (a total of $518,727.83). Additional details surrounding TriplePoint's sweep of Vector's account at SVB are set forth in section III, below.

ii.     *Bridge Loan Agreement*

18.     Vector and Garvey, as borrowers, entered into the Bridge Loan Agreement on November 20, 2019. The Bridge Loan Agreement provides for a loan in the principal amount of $500,000, which was provided to the Debtors on November 21, 2019. As of the Petition Date, the principal amount of the Bridge Loan, interest accrued thereunder, and other fees and obligations payable under the Bridge Loan Agreement are outstanding. The obligations under the Bridge Loan Agreement are secured by a first priority, continuing, security interest in and lien against the collateral described below but are subordinate to the security interests and liens granted in the TriplePoint Agreement. The value of such collateral exceeds the amount outstanding under the Bridge Loan Agreement.

iii.     *Collateral*

19.     As discussed, the Debtors' obligations under the TriplePoint Agreement and the Bridge Loan Agreement are secured by (on a first priority basis with respect to the TriplePoint Agreement and second priority basis with respect to the Bridge Loan Agreement) substantially all of the Debtors' assets.

20.     Pursuant to the TriplePoint Agreement, the Debtors granted TriplePoint a first priority, continuing, security interest in all of the Debtors' receivables, equipment, fixtures, general intangibles, proceeds of intellectual property, inventory, investment property, deposit account, goods and personal property, and proceeds of the foregoing (collectively, the "TriplePoint Collateral").

21.     Under the Bridge Loan Agreement, the Debtors granted Lockheed a first priority, continuing, security interest in all of the Debtors' assets (the "Bridge Loan Collateral"). The liens attaching to the Bridge Loan Collateral are subject to (and thus, subordinate to) the liens securing the obligations under the TriplePoint Agreement. The Bridge Loan Collateral, however, is broader in scope than the TriplePoint Collateral, so to the extent that the Debtors' assets do not constitute TriplePoint Collateral, they are encumbered by first priority liens under the Bridge Loan Agreement and constitute Bridge Loan Collateral.

### B.     Convertible Notes

22.     In connection with Vector's Series C fundraising round (discussed below in section III), Vector intended to issue up to $15 million in unsecured convertible promissory notes (the "Convertible Notes"). The Convertible Notes accrued simple interest at the rate of 5.0% per annum from the date of issuance until repayment or conversion and were scheduled to mature on February 5, 2021. The Convertible Notes were subject to mandatory, optional, or voluntary conversion to preferred stock under several scenarios, which were dependent on Vector's Series C fundraising round. Prior to Sequoia informing the Debtors that it would no longer continue as an equity sponsor for Vector (discussed in section III below), the company had issued approximately $1.6 million in Convertible Notes, all of which remain outstanding. Immediately after Sequoia informed the Debtors of its decision, Vector ceased issuing Convertible Notes. The Debtors reserve all rights as to whether the Convertible Notes should be characterized as debt or equity.

### C.    Preferred Stock

23.     Vector is authorized to issue 20,611,037 shares of preferred stock with $0.00050 par value per share (the "Preferred Stock"), which was divided into two series. The first series is composed of 8,442,253 shares and was designated "Series A Preferred Stock." The second series was composed of the remaining 12,168,784 shares authorized and was designated "Series B Preferred Stock." As of the Petition Date, based on the information contained in the Debtors' books and records,[4] Vector had issued 8,240,727 shares of Series A Preferred Stock (all of which remain outstanding) and 11,341,938 shares of Series B Preferred Stock (all of which remain outstanding). Additionally, Vector had reserved an aggregate of 100,763 shares of Series A Preferred Stock for issuance to TriplePoint pursuant to an outstanding warrant agreement in association with the TriplePoint Agreement.

### D.    Common Stock

24.     Vector is authorized to issue 31,500,000 shares of common stock with $0.00050 per share (the "Common Stock"). As of the Petition Date, Vector had issued 6,304,980 shares of Common Stock (all of which remain outstanding). Pursuant to Vector's 2016 Stock Incentive Plan (the "SIP"), Vector had reserved an aggregate of 4,336,516 shares of Common Stock for issuance to its employees, directors, and consultants. Of that reserve, Vector had issued 27,647 shares of Common Stock as a result of exercises of options granted under the SIP. Additionally, Vector had reserved an aggregate of 70,236 shares of Common Stock for issuance to SVB pursuant to a

---

[4] Although I have no reason to believe any of the information contained in the Debtors' books and records in inaccurate, due to the fact that the Debtors do not have ongoing operations or any employees with relevant knowledge, I have not been able to confirm that all of the information related to the Debtors' Preferred Stock and Common Stock (as defined herein) is 100% accurate. If I become aware that any of this information is incorrect, I will promptly update the Court.

warrant agreement entered into in connection with Vector's prior secured financing with SVB. Prior to and as of the Petition Date, Vector's Common Stock was not publicly traded.

### III.    EVENTS GIVING RISE TO THESE CHAPTER 11 CASES

25.    The satellite launch business requires millions of dollars in capital invested over a period of years before a company can begin its primary operation—launching satellites to orbit. The Debtors were no different. Vector started in 2016 and began raising funds to develop launch vehicles to put payloads ranging from 60 kg to 315 kg to LEO. Since its founding, Vector raised approximately $100 million in funding and funding commitments, including $6 million in seed funding, $21 million in a Series A round led by Sequoia with participation from Lightspeed Venture Partners and Shasta Ventures, and a Series B round of approximately $70 million from Kodem Vector Investment LP entities, DNX Ventures, and Morgan Stanley. In addition, Vector had begun to see some commercial success in the form of selections for contracts from government customers, including NASA and DARPA, and small deposits from commercial customers. Vector had also completed two successful sub-orbital flights of prototypes of its Vector-R launch vehicle and was working to launch its first satellite to LEO.

26.    In the spring of 2019, Vector began its Series C round of funding with the goal of raising approximately $80 million to complete its first orbital launch, begin commercial operations, and start development of its Vector-H launch vehicle.

27.    Despite these successes, on or about August 5, 2019, the Sequoia Member, without prior warning, informed certain members of the Board that he was "planning to step off the [B]oard." The following day, the Sequoia Member informed Vector's current Board chair that Sequoia would no longer participate in any future Vector funding. On August 7, 2019, the Sequoia Member formally resigned his seat on the Board via email. On August 8, 2019, the Debtors' then

chief executive officer and Board chair, James Cantrell, resigned effective as of noon on August 9, 2019.[5]

28.     At the time of Sequoia's withdrawal, the Debtors had approximately $13.3 million in cash on deposit with SVB, which exceeded (i) the amount of Vector's secured debt with SVB[6] and (ii) the Debtors' secured debt with TriplePoint by several hundred thousand dollars. Those excess funds, however, were insufficient to continue operations. Accordingly, the Board determined that it was in the company's best interest to immediately halt all operations and seek alternative sources of capital.[7] As a result of this determination, the Debtors laid off substantially all of their employees on August 9, 2019.

29.     Sequoia's withdrawal as an equity sponsor for Vector led to a determination by SVB and TriplePoint that Vector had a lack of investor support—an event of default under both secured loan agreements. Specifically, TriplePoint issued a notice of default on August 20, 2019 and SVB followed with its own notice on September 12, 2019. As noted, although the Debtors had approximately $13.3 million in cash on deposit with SVB at the time of Sequoia's withdrawal, those funds were subject to a deposit account control agreement ("DACA"). Due to TriplePoint's notice of default and pursuant to the DACA, on August 21, 2019, SVB froze the approximately $12 million[8] on deposit, which left the Debtors with no access to cash or other liquidity.

---

[5] Mr. Cantrell subsequently filed a lawsuit against Vector claiming that he was terminated. The Debtors dispute Mr. Cantrell's claims regarding his departure. Moreover, the Debtors believe they hold claims against Mr. Cantrell that they intend to pursue for the benefit of the Debtors' creditors.

[6] At the time of Sequoia's withdrawal, the aggregate principal amount Vector owed to SVB was $4.0 million.

[7] John Garvey, one of the Debtors' founders, a member of the Board, and current acting CEO of Vector, agreed to provide an emergency cash infusion of $100,000 to allow the Debtors to keep a small number of employees on staff while the Debtors were seeking alternative sources of capital in exchange for equity on terms that were to be subsequently agreed upon. Because the additional capital was never realized, the contemplated agreements for this infusion were never finalized.

[8] This amount had been reduced from the approximately $13.3 million noted above by the payment of employee wages and other operating expenses.

30.    On September 27, 2019, SVB exercised its rights under the SVB Facility agreement and withdrew $4,558,812.55 from the Debtors' accounts at SVB. No further amounts remain outstanding under the SVB Facility. Shortly thereafter, on September 30, 2019, TriplePoint exercised its rights under the TriplePoint Agreement and withdrew the remaining $7,471,210.83 from the Debtors' accounts at SVB. As of October 8, 2019, TriplePoint asserted that it was owed $518,727.83 in remaining amounts due under the TriplePoint Agreement.

31.    Although the Board explored many other avenues to raise capital, Sequoia's abrupt and unexplained withdrawal of support effectively made it impossible for the Debtors to raise additional capital in the market. By the end of September 2019, it was clear that additional equity infusions were not going to be available. As a result, the Debtors began to explore other alternatives to raise capital. In September 2019, the Debtors entered into discussions with an entity interested in pursuing a sale of substantially all of the Debtors assets. As the discussions progressed, the Debtors determined that a restructuring professional would be needed to manage the Debtors' business affairs in connection with a sale of their assets. To that end, I was contacted by the Debtors, and after discussions, agreed to serve as Vector's chief restructuring officer and manage its business affairs relating to a sale of its assets. As set forth below, I have been closely involved with the Debtors during the period immediately preceding the Petition Date negotiating terms of a sale of the Debtors' GalacticSky assets and debtor-in-possession financing.

32.    In evaluating their options, the Debtors considered a chapter 7 filing, but that option was ruled out for multiple reasons. First, the Debtors had no liquidity. As such, they did not even have the funds to file a chapter 7 petition, much less to retain professionals to prepare the necessary pleadings, schedules of assets and liabilities, statement of financial affairs, and other necessary documents. In addition, Lockheed did not indicate that it was willing to advance funds prior to a

bankruptcy filing for any purpose other than a chapter 11 sale process. Also, certain of the Debtors' assets are highly technical and subject to complex export-control, foreign investment, and other governmental regulations that must be complied with in any sale or other transfer. Finally, the Debtors determined that chapter 11 was a superior option than chapter 7 because (1) the nature of the Debtors' assets and businesses, launch vehicles, satellite technology, intellectual property, etc. make it likely that the Debtors' will receive higher or better offers in a controlled chapter 11 sale rather than a chapter 7 liquidation and (2) chapter 11 provides an opportunity for a reorganization. For these reasons, the Debtors determined that a chapter 11 process as described herein will yield the greatest value for the Debtors' assets and is in the best interest of the Debtors and their estates, creditors, and other stakeholders.

33.     During the Debtors discussions regarding a sale of substantially all of their assets with another third party, Lockheed submitted an offer for the Debtors' GalacticSky assets in amount exceeding the amount the other entity had offered for all of the Debtors' assets. Accordingly, the Debtors determined that pursuing an agreement with Lockheed for a sale of the Debtors' GalacticSky assets pursuant to Bankruptcy Code section 363 in a chapter 11 bankruptcy, which would provide the Debtors with much-needed liquidity and the opportunity to market and sell their launch-vehicle-related assets or reorganize, was in the best interests of the Debtors, their creditors, and other stakeholders.

34.     The proposed sale of the Debtors' GalacticSky assets will provide distributions to the Debtors' creditors that would be greater than a forced liquidation in chapter 7, where the vast majority—if not all—of such creditors would likely receive nothing. Indeed, while the Debtors have not yet conducted a valuation of their assets in a chapter 7 liquidation scenario, Lockheed's offer for the GalacticSky assets is substantially higher than any other offers the Debtors have

received. In addition, due to restrictions in Vector's articles of incorporation regarding asset sales, the Debtors determined that a sale outside of bankruptcy was not a viable option.

35.     Other than the offer from Lockheed, the Debtors received two offers for the GalacticSky assets and one offer for substantially all of the Debtors' assets. The first offer for the GalacticSky assets was submitted by an existing Board member and included $250,000 in cash consideration.[9] The second offer for the GalacticSky assets was from a purported group of individual investors and was submitted by a former Vector employee and also included $250,000 in cash consideration (which was subsequently raised to $500,000) plus certain other contingent amounts.[10] Finally, the Debtors received an offer for substantially all of the Debtors' assets from an investment group in an amount that was substantially less than Lockheed's offer for the GalacticSky assets. Because none of the foregoing offers would have provided more of a return for the Debtors' creditors than Lockheed's offer, the Debtors entered into negotiations regarding an orderly sale of the GalacticSky assets to Lockheed.

36.     Throughout October 2019 and most of November 2019, the Debtors and Lockheed, through their respective business principals and professionals, engaged in a series of negotiations on several term sheets and agreements. These extensive negotiations resulted in a $500,000 bridge loan to provide the Debtors with the necessary liquidity to enter chapter 11, as well as, agreed term sheets for (i) a debtor-in-possession loan of up to $2.5 million to fund the Debtors' chapter 11 cases and (ii) the sale of the GalacticSky assets to Lockheed as the "staking horse"—subject to higher or better offers—pursuant to Bankruptcy Code section 363 for $4.25 million (the "GalacticSky Sale").

---

[9]  The offer also included non-cash consideration, including equity in the purchasing entity.

[10] Both of the offers for the GalacticSky assets also included certain incentives or consideration for current Vector investors.

37.     The Debtors also intend to pursue a sale or sales of their non-GalacticSky assets (the "Excluded Assets Sale") in a manner that will maximize their value whether as a whole business segment, *e.g.*, the launch vehicle business or individual asset sales, *e.g.*, the Debtors' mobile launch platform. The Debtors may also pursue sales of certain *de minimus* assets (the "De Minimus Asset Sales" and together with the GalacticSky Sale and the Excluded Assets Sale, the "Sales") and may request Court authority to do so in the near term.

38.     If consummated, the Debtors believe that the proceeds from Sales will provide for payment in full of the Debtors' secured obligations, administrative expense claims, and priority claims. In addition, the Debtors believe there will be sufficient funds for (i) a liquidation trust to pursue the Debtors' claims against certain parties, including its former CEO and (ii) distributions to general unsecured creditors.

39.     The Debtors believe that the GalacticSky Sale and the transactions contemplated thereunder are in the best interest of the Debtors, their estates, their creditors, and all parties in interest. Specifically, the Debtors have reached this conclusion because the GalacticSky Sale will provide (i) debtor-in-possession financing to provide liquidity for the Debtors during the Cases; (ii) net proceeds from the Sales that will yield recoveries greatly in excess of the potential liquidation value of the Debtors' assets under a chapter 7 liquidation; (iii) the potential for the Debtors' launch vehicle business to be sold intact, which could allow certain of the Debtors' creditors to continue to provide goods and services to the purchaser of the business and former employees to return to their jobs; and (iv) the United States to retain an important, strategic capability: low-cost access to LEO.[11]

---

[11] As evidence of the strategic importance of this capability, the Missile Defense Agency is still holding open a $2.5 million contract offer for Vector to conduct flight tests, even with all the issues facing the Debtors described herein.

## IV.    FIRST DAY PLEADINGS[12]

40.    Contemporaneously with the filing of this Declaration, the Debtors have filed several First Day pleadings in their Cases seeking orders granting various forms of relief. I believe that the relief requested in the First Day pleadings is necessary to, among other things, enable the Debtors to operate with minimal disruption during the pendency of the Cases and achieve the favorable outcomes set forth above.

**A.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, (I) APPROVING DEBTOR-IN-POSSESSION FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 362, AND 364, FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 AND LOCAL BANKRUPTCY RULE 4001-2; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, AND 363; (III) GRANTING ADEQUATE PROTECTION AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF (the "DIP Motion").**

41.    By the DIP Motion, the Debtors request entry of (i) an interim order (a) authorizing the Debtors to obtain postpetition financing on a secured, super-priority basis pursuant to Bankruptcy Code sections 105, 362, 363, and 364 on an interim basis and granting certain related relief, (b) authorizing the use of cash collateral pursuant to Bankruptcy Code sections 105, 361, 362, and 363 on an interim basis, and (c) scheduling a final hearing on the DIP Motion pursuant to Bankruptcy Rules 4001 and 9014 and (ii) a final order (a) authorizing the Debtors to obtain postpetition secured, priming, super-priority financing on a final basis and granting certain related relief and (b) authorizing the use of cash collateral pursuant to Bankruptcy Code sections 105, 361, 362, and 363 on a final basis.

---

[12] Capitalized terms used in this section not otherwise defined have the meaning ascribed to such terms in the applicable pleading.

42.    Pursuant the DIP Motion, the Debtors seek authority to obtain the DIP Facility from the DIP Lender consisting of postpetition financing in an aggregate principal amount of up to $2,500,000.

43.    The Debtors have been unable to obtain any of the following: (1) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, (2) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b), (3) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or (4) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Facility and set forth in the DIP Motion. The DIP Facility provides the financing necessary to provide the Debtors sufficient liquidity to operate their Cases as they advance their sale efforts.

44.    Additionally, the rights of the Debtors' existing secured lender, TriplePoint, with respect to its claim of approximately $500,000, are adequately protected. As an initial matter, Lockheed's Stalking Horse Bid (as defined below) constitutes an offer to purchase the GalacticSky assets for $4.25 million (subject to higher or otherwise better bids at an auction and Court approval), an amount that will more than satisfy the $2.5 million DIP Facility and leave ample surplus proceeds for TriplePoint. Also, there is no question that Lockheed has more than sufficient cash on hand to consummate the sale.

45.    Also, the DIP Facility provides that TriplePoint will maintain its liens on the Debtors' assets, including rocket parts, equipment, and other hard assets not being sold in the GalacticSky assets sale. As such, even after the auction of the GalacticSky assets, there will be additional assets to satisfy TriplePoint. On a related note, because the DIP Loans will be satisfied

in connection with the closing of the sale of the GalacticSky assets, TriplePoint's liens will be primed only temporarily, approximately the first two months of the Debtors' Cases.

46.    Finally, prior to the Petition Date, TriplePoint repaid itself $7,471,210.83, all but $28,789 of the principal amount borrowed by the Debtors. Notwithstanding its repayment, TriplePoint asserts that it is still owed approximately $500,000 and will undoubtedly assert that the Debtors will continue to owe additional default interest (in addition to other miscellaneous fees and legal fees) during the Debtors' Cases—interest that it is entitled to only if it is over-secured. Accordingly, TriplePoint is adequately protected by an equity cushion (as further demonstrated by the stalking horse bid).

47.    I am familiar with the terms of the DIP Facility and the proposed adequate protection. Based on my general experience in the restructuring industry and my experience with the Debtors' businesses, I believe that interim approval of the DIP Facility is necessary and appropriate to allow the Debtors access to liquidity and prevent irreparable harm. I worked closely with the Debtors' management team and advisors to develop a budget and to determine the amount of interim funding required to meet the Debtors' short-term liquidity needs pending approval of the DIP Motion on a final basis. Access to cash collateral will provide the Debtors with sufficient liquidity to ensure that the Debtors have the capital necessary to fund these cases and the Debtors' sale and marketing efforts.

48.    The Debtors have entered bankruptcy with nearly no cash on hand and require immediate post-petition financing to sustainably operate until such time that a sale of all or substantially all of the Debtors' assets can be consummated. As set forth more fully above, prior to filing for chapter 11 protection, the Debtors and their investment bankers conducted a pre-petition marketing process to identify potential lenders who might extend post-petition financing

to the Debtors. After such marketing process was completed, the Debtors, in an exercise of their sound business judgment, determined that the offer from Lockheed was superior to all competing offers.

49.     Early in the process (August 2019), the Debtors began researching options to fund operations and explore the possibility of a chapter 11 filing and an auction process. Unfortunately, there was no cash on hand to fund either. The Debtors and their professionals contacted various sources of potential funding, including asset-backed lenders and other financial partners. The Debtors also contacted former investors, current secured lenders, and potential competitors. No significant and real funding from any of these sources was available. In addition, the Debtors' current Board chair had solicited and received multiple offers from Lockheed for an out-of-court sale of the GalacticSky assets. Unfortunately, the Debtors were unable to execute on any of Lockheed's offers because Vector's prohibited such a sale without an affirmative majority vote of the holders of Vector's Preferred Stock.

50.     Indeed, the Debtors were unable to find solid, significant, and actionable funding from any source until an entity extended an offer for debtor-in-possession financing and to purchase of substantially all of the Debtors' assets in a chapter 11 bankruptcy (both of which were in amounts substantially less than the corresponding amounts offered by Lockheed). After multiple rounds of negotiations, the Debtors determined that the entity's offer was not the best option and to contact Lockheed to inquire as to whether it would be interested into converting its out-of-court offer for the GalacticSky assets to one that would provide bridge financing to permit the Debtors' to prepare for and file these Cases and debtor-in-possession financing to consummate a sale process for the GalacticSky assets. After multiple negotiations and discussions between the Debtors and Lockheed (and their respective professionals), Lockheed eventually determined that

a Bridge Loan, DIP Loan, and an auction of the GalacticSky assets in chapter 11 were the best options for obtaining the GalacticSky assets.

51.     As noted, the Debtors and Lockheed traded term sheets for weeks and terms were consistently and significantly altered for the Debtors' benefit. The interest rate was reduced, the fee reimbursement was capped, the milestones were extended, prepetition releases were narrowed, the loan amount was increased, the budget expanded, and the stalking horse purchase price increased. After the Debtors decided that they had struck the best deal they could get, the Debtors agreed to the proposed DIP Facility, subject to Court approval.

52.     Accordingly, the Debtors, in consultation with their professionals and advisors, negotiated the terms and conditions of the DIP Facility with the DIP Lender at arms' length and in good faith. I believe that the terms and conditions of the DIP Facility are fair and reasonable under the circumstances and are necessary inducements to secure the DIP Facility.

53.     Absent immediate access to the DIP Facility, the Debtors will not have the liquidity to ensure and maintain their assets, which will damage the Debtors' assets and impair the Debtors' ability to maximize value for all stakeholders. Indeed, without the DIP Facility, the Debtors' Cases will immediately fail. The DIP Facility, however, will provide the Debtors the necessary liquidity to preserve assets long enough to market the assets and consummate a sale of all or substantially all of their assets pursuant to Bankruptcy Code section 363 or, potentially, reorganize, in an effective manner that maximizes value for all stakeholders.

54.     Further, after diligent consideration, I believe that the proposed budget accompanying the DIP Facility will allow the Debtors to effectively consummate the sale of the GalacticSky assets to the bidder with the highest or otherwise best offer.

55.     Under the present circumstances, I believe that the terms and conditions of the DIP

Facility are fair, reasonable, and consistent with market terms. The Debtors must have a robust

auction process to maximize the value of the assets being sold. That process requires a chapter 11

auction with the attendant costs. As discussed, the Debtors have a crucial need for the DIP Loans

and no other sources of funds for the auction.

**B.      DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 1015 REQUESTING JOINT ADMINISTRATION OF CHAPTER 11 CASES**

56.     The Debtors in these Cases are closely related entities, sharing common

management and ownership and are affiliates as defined in Bankruptcy Code section 101(2). There

is also significant overlap among the various Debtors' creditors. Accordingly, the Debtors believe

that joint administration will ensure that all parties receive notice of all critical events and is a more

efficient and cost-effective use of the Debtors' resources. Moreover, joint administration of the

Debtors' Cases will also avoid the preparation, replication, service, and filing, as applicable, of

duplicative notices, applications, and orders in each of the Debtors' cases, thereby saving the

Debtors' estates, and the Court, considerable time and resources.

**C.      DEBTORS' APPLICATION FOR AN ORDER APPOINTING EPIQ CORPORATE RESTRUCTURING, LLC AS NOTICING AND BALLOTING AGENT FOR THE DEBTORS PURSUANT TO 28 U.S.C. § 156(C), EFFECTIVE FROM THE PETITION DATE (the "Epiq 156(c) Application")**

57.     Epiq has been recognized by this court and many others for its capacity to perform

its job as balloting and noticing agent. Epiq is one of the country's leading chapter 11

administrators, with experience in noticing, claims administration, solicitation, balloting, and

facilitating other administrative aspects of chapter 11 cases. Epiq has substantial experience in

matters of this size and complexity and has acted as administrative advisor in many large

bankruptcy cases in this district and other districts nationwide. Given the complexity of these cases

and the number of creditors and other parties in interest involved, I believe that appointing Epiq

as the Claims and Noticing Agent in these Cases will maximize the value of the Debtors' estates for all their stakeholders.

58.     The Debtors respectfully submit that Epiq's rates are competitive and comparable to the rates its competitors charge for similar services. Indeed, the Debtors conducted a review and competitive comparison of other firms and reviewed the rates of other firms before selecting Epiq as Administrative Advisor and negotiated reductions to the Epiq rates. The Debtors believe Epiq's rates are more than reasonable given the quality of Epiq's services and its professionals' bankruptcy expertise. Additionally, Epiq will seek reimbursement from the Debtors for reasonable expenses in accordance with the terms of the Engagement Agreement.

59.     Because of the time critical nature of Epiq's role as noticing agent and the need to provide prompt notice both electronically and in paper form, and to avoid prejudice to those who are entitled to notice, Debtors request consideration of the Epic 156(c) Application at the first day hearing and approval thereof *nunc pro tunc* to the Petition Date.

**D.    UTILITIES AND INSURANCE**

60.     The Debtors have only a handful of utilities, and, to conserve resources, the Debtors have not filed a traditional motion under Bankruptcy Code section 366. Accordingly, the Debtors intend to make arrangements with each utility individually as contemplated by Bankruptcy Code section 366.

61.     The Debtors' maintain a prepaid liability insurance policy. The Debtors' casualty insurance policy has expired but will be purchased upon approval of the DIP Loan. Prior to the Petition Date, the Debtors did not finance their insurance policies or make periodic monthly payments for insurance. As such, the Debtors are not seeking relief related to their insurance policies (other than seeking the Interim DIP Order to permit the Debtors to procure a casualty insurance policy).

22

## V.    SECOND DAY RELIEF REQUESTED

A.    **DEBTORS' MOTION FOR (I) AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 364, 365, AND 541, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS FOR THE SALE OF CERTAIN ASSETS OF THE DEBTORS; (B) APPROVING THE STALKING HORSE BIDDER PURCHASE AGREEMENT; (C) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT REJECTION OF DESIGNATED EXECUTOR CONTRACTS AND UNEXPIRED LEASES; (E) SCHEDULING THE AUCTION AND SALE HEARING; AND (F) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT, ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF (the "Bidding Procedures and Sale Motion")**

62.    By the Bidding Procedures and Sale Motion, the Debtors seek entry of an order (a) approving the Bidding Procedures and Bid Protections in connection with the sale of the GalacticSky Assets; (b) authorizing the Debtors to accept Lockheed's Stalking Horse Bid and enter into the Stalking Horse Bidder Purchase Agreement; (c) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (d) approving procedures for the assumption and assignment and rejection of designated executory contracts and unexpired leases; (e) scheduling the Auction and the Sale Hearing to approve the sale of the GalacticSky Assets and assumption of certain liabilities of the Debtors and (f) granting related relief, by which the Debtors will solicit and select the highest or otherwise best offer for the purchase of the GalacticSky Assets and assumption of the Assumed Liabilities. The Debtors further request that, at the Sale Hearing, the Court enter the Sale Order, the proposed form of which will be filed before the Sale Hearing, (i) authorizing the Sale of the GalacticSky Assets free and clear of all liens, claims, interests and other encumbrances; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.

23

63.     The facts and circumstances constituting the need and basis for the sale of the GalacticSky Assets are set forth extensively above and are incorporated here by reference. Based on the pre-petition marketing process and the Debtors' negotiations with the Stalking Horse Bidder, I believe the Break-Up Fee and Expense Reimbursement are an integral and necessary component of Lockheed's overall offer for the GalacticySky Assets (*i.e.*, the Bridge Loan, DIP Facility, and Stalking Horse Purchase Agreement). Accordingly, based on my experience in similar situations, I do not believe a smaller amount for the Break-Up Fee or Expense Reimbursement would have been sufficient to obtain the Stalking Horse Bidder based on the risk, effort, and expenses involved in this Sale.

**B.     DEBTORS' MOTION FOR AN ORDER (I) EXTENDING TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES, SCHEDULES OF CURRENT INCOME AND EXPENDITURES, SCHEDULES OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND STATEMENTS OF FINANCIAL AFFAIRS AND (II) GRANTING RELATED RELIEF PROFESSIONAL RETENTION APPLICATIONS (the "Schedules and Statements Extension Motion")**

64.     By the Schedules and Statements Extension Motion, the Debtors seek entry of an order extending the deadline by which the Debtors must file their Schedules and Statements by thirty (30) days beyond the deadline provided by Local Rule 1007-(b) or fifty-eight (58) days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown and granting related relief.

65.     As described above, the Debtors were forced to cease all operations and lay off substantially all of their employees in August 2019 due to Sequoia informing the Debtors that it would no longer provide funding, which led to the Debtors' secured lenders declaring events of default and freezing all of the Debtors' cash. The Debtors' were finally able to gain access to liquidity in late November 2019, which liquidity was provided by Lockheed in the Bridge Loan.

66.     As of the Petition Date, the Debtors are in the process of (i) bringing the necessary personnel on board who have the requisite knowledge and background of the Debtors' books and records to complete the Schedules and Statements; (ii) confirming that the Debtors' can access the accounting and financial systems that have been essentially dormant since the Debtors' liquidity crisis; and (iii) identifying and gathering all of the financial records, *e.g.*, invoices, bank statements, etc., between the liquidity crisis and the Petition Date. Completing all of these items and the Schedules and Statements within the next twenty-eight (28) days is simply not achievable given the tremendous time and resources it would require of the Debtors, their employees, and their professionals and the Debtors' proposed sale of the GalacticSky assets, which must be completed on a tight timeline to avoid a default under the Debtors' proposed debtor-in-possession financing, especially considering upcoming holidays.

67.     Although the Debtors have commenced the process that will enable them to prepare their Schedules and Statements and are working diligently to move the process forward, the Debtors anticipate that they will require thirty additional days to complete the Schedules and Statements (and possibly more depending on the state of the Debtors books and records and accounting systems). I believe that the extensive amount of information that must be assembled and compiled, the multiple places where the information is located, and the hundreds of employee and professional hours required to complete the Schedules and Statements constitute good and sufficient cause for granting the requested extension of time. Furthermore, an extension will not harm creditors or other parties in interest because the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these Cases. For these reasons, I believe that the requested extension warranted and in the best interest of the Debtors, their estates, and other parties in interest.

## C.    PROFESSIONAL RETENTION APPLICATIONS

68.    I believe that the retention of chapter 11 professionals is essential to the Cases. Accordingly, in connection with these Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Winter Harbor LLC, chief restructuring officer; (b) Pillsbury, Winthrop, Shaw Pittman, co-counsel; (c) Sullivan Hazeltine Allinson LLC, co-counsel; and (d) Epiq Corporate Restructuring, LLC, claims and noticing agent and as administrative advisor. I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of these Cases, and the professionals will coordinate their services to avoid duplication of efforts. I understand that the Debtors may find it necessary to seek retention of additional professionals as the Cases progress. Therefore, on a non-emergency basis, the Debtors seek the following relief to engage these necessary professionals:

a)    *Debtors' Motion for Entry of an Order Pursuant to U.S.C. §§ 105 and 363 Authorizing and Approving the Debtors' Agreement with Winter Harbor LLC to Provide Shaun Martin to Serve as Chief Restructuring Officer Nunc Pro Tunc to the Petition Date* (the "Winter Harbor 363 Motion");

b)    *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Pillsbury Winthrop Shaw Pittman LLP as Counsel for the Debtors and Debtors-In-Possession Effective from the Petition Date* (the "Pillsbury Retention Application");

c)    *Debtors' Application Pursuant to Bankruptcy Code Sections 327(a) and 1107, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1 for an Order Authorizing the Employment and Retention of Sullivan Hazeltine Allinson LLC as Counsel for the Debtors and Debtors-In-Possession Nunc Pro Tunc to the Petition Date* (the "SHA Retention Application"); and

d)    *Debtors' Application for Authority to Retain and Employ Epiq Corporate Restructuring, LLC as Administrative Advisor Effective as of the Petition Date* (the "Epiq 327 Application")

## CONCLUSION

69.     The Debtors believe that the Sales provide the best path forward for the Debtors and will provide a foundation for an exit strategy in the Cases and, together with the relief requested in the First Day pleadings, are in the best interests of the Debtors, their estates, their creditors and other parties in interest.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 13, 2019.

*/s/ Shaun Martin*

Shaun Martin
Chief Restructuring Officer
Vector Launch Inc.