**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19-12670 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS,
(I) APPROVING DEBTOR-IN-POSSESSION FINANCING PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(a), 362, AND 364, FEDERAL RULES OF
BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 AND LOCAL BANKRUPTCY
RULE 4001-2; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT
TO BANKRUPTCY CODE SECTIONS 105, 361, 362, AND 363; (III) GRANTING
ADEQUATE PROTECTION AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") respectfully submit this motion (the "<u>Motion</u>") for entry of (i) an interim order, the form of which is attached hereto as **<u>Exhibit A</u>** (the "<u>Interim DIP Order</u>"),[2] (a) authorizing the Debtors to obtain postpetition financing on a secured, super-priority basis pursuant to sections 105, 362, 363, and 364 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on an interim basis and granting certain related relief, (b) authorizing the use of cash collateral pursuant to Bankruptcy Code sections 105, 361, 362, and 363 on an interim basis, and (c) scheduling a final hearing on this Motion pursuant to Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); and (ii) a final order (the "<u>Final DIP Order</u>") (a) authorizing the Debtors to obtain postpetition secured, priming, super-priority financing on a final basis and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is: PO Box 14928, Long Beach, CA 90853-4928.

[2] Capitalized terms used but not defined herein shall have the meaning set forth in the Interim DIP Order or the DIP Term Sheet (attached to the Interim DIP Order as **<u>Exhibit I</u>**).

granting certain related relief and (b) authorizing the use of cash collateral pursuant to Bankruptcy Code sections 105, 361, 362, and 363 on a final basis. In support of this Motion, the Debtors rely on the *Declaration of Shaun Martin in Support of First Day Pleadings* (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to Bankruptcy Rules 7008 and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in the Bankruptcy Court is proper pursuant to 28 U.S.C. § 1408.

3.      The predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364, Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 4001 and 9014.

## RELIEF REQUESTED

4.      The Debtors request entry of the Interim DIP Order and the Final DIP Order, pursuant to Bankruptcy Code sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), and 364(e), Bankruptcy Rules 2002 and 4001, and Local Rule 4001-2, granting the following relief:

> a.      Accessing the DIP Loans — Authority for the Debtors, on the terms set forth in the DIP Term Sheet, to obtain the DIP Facility from the DIP Lender consisting of postpetition financing in an aggregate principal amount of up to $2,500,000, which includes (i) the aggregate principal amount of not more than $2,000,000 in new borrowings (the "DIP Loan"), of which the aggregate principal amount of not more than $500,000 will

be available to the Debtors on an interim basis in one or more draws in accordance with the Budget and pursuant to the Interim DIP Order; (ii) $500,000 in aggregate principal amount loaned by Lockheed Martin Corporation ("Lockheed Martin") to the Debtors prior to the Petition Date, plus all accrued but unpaid interest, fees and other expenses outstanding thereon (collectively, the "Bridge Loan"), which shall be rolled up (such loan, the "Roll-Up Loan," and together with the DIP Loan, the "DIP Loans") and become DIP Loans hereunder on a final basis upon entry of the Final DIP Order; and (iii) $37,500 constituting the initial commitment fee (the "Initial Commitment Fee"), which shall be approved by the Interim DIP Order and deemed fully earned on the closing date of the Interim DIP Facility (defined below) and ratably added to the outstanding principal balance of the DIP Loans on such date and constitute additional DIP Loan principal for all purposes (the DIP Loans and Initial Commitment Fee approved pursuant to this Interim DIP Order constituting the "Interim DIP Facility").

b.      Entry into the DIP Loan Documents — Authority for the Debtors to execute, deliver, and perform their obligations under the DIP Term Sheet and to execute and deliver all additional documentation consistent with the terms of (or as may be required by) the DIP Term Sheet and the other DIP Loan Documents, and to perform all such other and further acts as may be required under or in connection with the DIP Loan Documents, which documents shall be in form and substance satisfactory to the DIP Lender in its sole discretion and filed with the Bankruptcy Court;

c.      Use of Proceeds — Authority for the Debtors to use the proceeds of the DIP Facility as permitted in the DIP Term Sheet and in accordance with the Interim DIP Order, Final DIP Order, and the Budget attached to the Interim DIP Order as **Exhibit II**, and any and all other Budgets approved thereafter from time to time in accordance with the DIP Term Sheet and Bankruptcy Court orders (the "Chapter 11 Orders");

d.      Grant of Liens and Super-Priority Claims — Authority for the Debtors to grant automatically perfected (i) security interests in and priming liens on all of the DIP Collateral that is subject to prepetition security interests, including, for the avoidance of doubt, any valid, non-avoidable and enforceable Lien that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b), such that the DIP Lender shall have liens senior in all respects to any security interests in the DIP Collateral on the terms set forth in the DIP Term Sheet and Chapter 11 Orders and (ii) senior security interests in and liens on all DIP Collateral that is not subject to an existing Lien, and granting super-priority administrative expense status to the DIP Obligations, in each case subject to the Carve-Out and on the terms and subject to the relative priorities set forth in the DIP Term Sheet;

e.      Provision of Adequate Protection — Authority for the Debtors to grant adequate protection to the Prepetition Lien Holders including (i) effective and perfected upon the entry of the Interim DIP Order, a security interest in and lien on Collateral which liens and security interests are junior and subordinate only to (a) the Carve-Out, (b) the DIP Liens, (c) the DIP Obligations, and (d) the super-priority claim of the DIP Lender, and (ii) effective upon the entry of the Interim DIP Order, an allowed

super-priority Claim, subject to (a) the Carve-Out and (b) junior only to the super-priority claims granted to the DIP Lender;

f.      <u>Payment of Obligations Under DIP Facility</u> — Authority for the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Term Sheet as such amounts become due and payable;

g.      <u>Use of Cash Collateral</u> — Authority for the Debtors to use cash collateral within the meaning of Bankruptcy Code section 363(c)(2);

h.      <u>Modification of Automatic Stay</u> — Vacating and modifying the automatic stay imposed under Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Term Sheet, Interim DIP Order and Final DIP Order;

i.      <u>Section 506(c) and "Equities of the Case" Waiver</u> — Subject only to and effective upon entry of the Final DIP Order, waiving the Debtors' ability to surcharge against any DIP Collateral pursuant to Bankruptcy Code section 506(c) and any right of the Debtors under the "equities of the case" exception in Bankruptcy Code section 552(b);

j.      <u>Schedule Interim Hearing</u> — Scheduling of an emergency hearing (the "Interim Hearing") on this Motion for the Bankruptcy Court to consider entry of the Interim DIP Order, authorizing the Debtors to borrow the Interim DIP Facility, in accordance with the terms of the DIP Term Sheet and Interim DIP Order;

k.      <u>Schedule Final Hearing</u> — Scheduling a final hearing (the "<u>Final Hearing</u>") on the Motion to consider entry of the Final DIP Order authorizing the DIP Loans and DIP Facility on a final basis and approving notice procedures with respect thereto; and

l.      Certain related relief.

## **BACKGROUND**

**A.    General Background**

5.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (these "<u>Chapter 11 Cases</u>"). The Debtors continue to operate their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.      The Debtors were established with the goal of extending access to space and transforming the space economy by developing a family of small launch vehicles designed for the

rapid and frequent launch of payloads ranging from 60 kg – 315 kg to low-Earth orbit. In addition, the Debtors were also developing a space-grade cloud-computing platform known as GalacticSky. Additional details regarding the Debtors' businesses and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration and are incorporated herein by reference.

7.      The Debtors estimate that the book value of their saleable assets total approximately $9 million and consist of cash, inventory, intellectual property, vehicles, furniture, office equipment, and other personal property.

**B.      Debtors' Prepetition Borrowings**

8.      The Debtors entered into that certain Plain English Growth Capital Loan and Security Agreement, dated as of October 19, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Prepetition Senior Loan Agreement"), by and between the Debtors and TriplePoint Capital ("the Prepetition Senior Lender").

9.      Prior to the Petition Date, Lockheed Martin provided bridge financing (in such capacity, the "Bridge Lender") to the Debtors in the principal amount of $500,000. As of the Petition Date, the Debtors were liable to Bridge Lender in the amount of $500,000, plus accrued but unpaid interest, fees, and expenses incurred under and in connection with the Bridge Loan Agreement as provided therein.

C.     **The Proposed DIP Facility**

10.     Prior to the Petition Date, the Debtors' management determined that the Debtors would have a need for additional working capital after the commencement of these Chapter 11 Cases. While the Debtors did their best to conserve their available cash prior to the Petition Date, due to the Prepetition Senior Lender and another of the Debtors' prepetition lenders freezing and subsequently sweeping all of the Debtors' deposited cash in September 2019, the Debtors' available cash is limited to the remaining proceeds of the Bridge Loan and approximately $87,000 in funds the Debtors received after their deposited cash was swept, which as of the Petition Date, total approximately $40,000. Accordingly, the Debtors require access to additional liquidity to ensure their ability to fund their limited operations and chapter 11 administrative expenses during the pendency of these Chapter 11 Cases.

11.     Accordingly, following extensive negotiations regarding the Debtors' working capital needs and the means by which the Debtors will seek to reorganize, the Bridge Lender has offered to provide to the Debtors the DIP Facility to address the Debtors' anticipated working capital needs during the pendency of these Chapter 11 Cases.

12.     As noted, the terms of the DIP Facility require the Debtors to complete a sale of certain of their assets in accordance with specified milestones. To maximize the value of their estates, and in compliance with the milestones under the proposed DIP Facility, the Debtors will file a motion seeking authority to conduct an auction process by which the Debtors will solicit offers and ultimately seek approval to sell substantially all of their assets to the bidder with the highest or otherwise best offer. The Debtors also will seek authority to retain Shaun Martin of Winter Harbor LLC to serve as chief restructuring officer who will assist with the Debtors with conducting the marketing and sale of their assets.

13.     Following extensive negotiations regarding the Debtors' working capital needs and the means by which the Debtors will seek to maximize the value of their assets, the DIP Lender ultimately agreed to provide the DIP Facility to address the Debtors' anticipated working capital needs during the pendency of these Chapter 11 Cases.

14.     Prior to the Petition Date, the Debtors, at times with the assistance of their professionals, worked diligently to identify other sources of working capital financing, including potential strategic buyers and the Debtors' existing investors, to determine if they could obtain postpetition financing on terms or conditions more favorable than those contained in the proposed DIP Facility. None of those proposed lenders, however, were able to provide an offer for financing on terms that were as or more favorable than those contained in the DIP Facility. Accordingly, the Debtors believe that the proposed DIP Facility represents the best alternative available to address their postpetition working capital needs.

15.     The Debtors' efforts to seek the necessary postpetition financing from additional third parties, as well as vigorous negotiations with the DIP Lender were reasonable and satisfy the statutory requirements of Bankruptcy Code section 364(c) and (d). The Debtors require access to liquidity from the DIP Facility, and use of cash collateral, to facilitate a smooth transition into chapter 11 and fund the administrative expenses necessary to implement an auction and consummate a sale of the Debtors' GalacticSky assets to maximize the value of the Debtors' estates.

## MATERIAL TERMS OF THE DIP FACILITY

16.     The terms of the DIP Facility are set forth in the DIP Term Sheet, attached to the Interim DIP Order as **Exhibit I** and are incorporated herein by reference. Bankruptcy Rule 4001(c)(1)(B) requires that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit

agreement and form of order, including interest rate, maturity, events of default, liens, borrowing

limits and borrowing conditions. Fed. R. Bankr. P. 4001(c)(1)(B). For ease of reference, the

material terms of the DIP Facility are as follows:[3]

| Required Disclosure | Summary of Material Terms |
|---|---|
| **Parties**<br><br>DIP Term Sheet, p. 1 | Borrowers: Vector Launch Inc. and Garvey Space Corporation (the "Borrowers").<br><br>Guarantor: None<br><br>Administrative Agent: None<br><br>Lender: Lockheed Martin Corporation, and/or its affiliates who elect to participate in the DIP Facility, or who are designated as Purchasers of the Purchased Assets, and any of their respective successors and assigns (the "DIP Lender"). |
| **DIP Commitments**<br><br>DIP Term Sheet, pp. 1-3 | **Bridge Loan/DIP Facility**. A non-amortizing multi-draw secured term loan facility (the "DIP Facility," and all loans under such DIP Facility, collectively, the "Loans," and each, a "Loan") in the maximum principal amount of up to $2.5 million (the "Total Commitment Amount"), in each case subject to and in accordance with the Budget (as defined below), including the Budget Variance (as defined below). All Loans outstanding under the DIP Facility (together with all accrued and unpaid interest, fees, expenses and other amounts outstanding) shall become due and payable on the Maturity Date (as defined below).<br><br>**Roll-up**. Subject to entry of the Final DIP Order (as defined below), the DIP Facility shall include a roll-up of all amounts loaned by the DIP Lender to Borrowers prior to the Petition Date (as defined below), plus all accrued but unpaid interest, fees and other expenses outstanding thereon pursuant to that certain Bridge Loan and Security Agreement by and between the DIP Lender and Borrowers (the "Bridge Loan" and such agreement, the "Bridge Loan Agreement"). The obligations owing under the Bridge Loan shall be deemed to be a Loan hereunder for all purposes.<br><br>**Borrowing Procedure**. Borrowing of the Loans shall be made every two weeks, if necessary, and in accordance with the Budget (as defined below), upon at least three (3) business days' prior notice to the DIP Lender by the Borrowers and shall be in an amount up to $500,000, or such lessor amount as may then be available for borrowing under the Total Commitment Amount.<br><br>**Availability**. Prior to the Petition Date, the Borrowers shall be permitted to borrow an initial aggregate principal amount of up to $500,000 under the |

---

[3]  This summary of the DIP Facility is intended to assist the Bankruptcy Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the DIP Term Sheet. For the avoidance of doubt, the DIP Lender is referred to in the DIP Term Sheet as the "Lenders."

|  | Bridge Loan for the purposes set forth below and in accordance with the Budget (as defined below).

Subject to entry by the Bankruptcy Court of an interim order satisfactory to the DIP Lender in its sole discretion approving the DIP Facility on an interim basis (the "Interim DIP Order"), and until entry by the Bankruptcy Court of a final order satisfactory to the DIP Lender in its sole discretion approving the DIP Facility on a final basis (the "Final DIP Order," and, together with the Interim DIP Order, the "DIP Orders"), the Borrowers shall be permitted to borrow an additional amount up to $500,000 (the "Initial Borrowing") and use cash on hand remaining from the Bridge Loan proceeds, if any, for the purposes set forth below and in accordance with the Budget (as defined below) and Interim DIP Order.

Subject to entry of the Final DIP Order, the Borrowers shall be permitted to borrow up to an additional $1,500,000 (the "Subsequent Borrowing") for the purposes set forth below and in accordance with the Budget (as defined below) and Final DIP Order, and, for the avoidance of doubt, the Borrowers may not draw down more than $500,000 of the Subsequent Borrowing in any two week period.

**Term**. Unless otherwise extended in writing by the DIP Lender in its sole discretion, the period from the Funding Date (as defined below) to the earliest of: (i) the Scheduled Maturity Date (as defined below); (ii) an Event of Default (as defined below) (iii) the consummation of a sale of the Purchased Assets to Purchaser pursuant to section 363 of the Bankruptcy Code or otherwise; or (iv) three (3) days from a bidder other than the Purchaser being selected as the prevailing bidder at the Auction for the Purchased Assets (such date, the "Maturity Date").

"Scheduled Maturity Date" shall mean the date that is 120 days after the Funding Date (as defined below).

**Funding Date**. The date on which the Initial Borrowing Conditions below shall have been met (the "Funding Date"). |
|---|---|
| **Use of Proceeds**<br><br>DIP Term Sheet, p. 3 | Proceeds of the Loans shall be used by the Borrowers solely to: (i) fund expenditures during the Bankruptcy Cases, including the Sale Process, in accordance with the Budget (as defined below); and (ii) to pay reasonable fees and expenses of Shaun Martin of Winter Harbor LLC to serve as Borrowers' chief restructuring officer ("CRO") or other similar advisors engaged for managing, protecting, and conducting inventory of the Collateral (as defined below), including such amounts arising before and after the Petition Date (as defined below), in each case in accordance with the Budget (as defined below). |
| **Interest Rates**<br><br>DIP Term Sheet, pp. 3-4 | Loans under the DIP Facility will bear interest at a rate equal to 15% *per annum* based on a 360-day year on the outstanding principal amount of all outstanding obligations under the DIP Facility, compounded monthly. All interest shall accrue and be paid on the Maturity Date; *provided,* that if the DIP Lender or one or more of its affiliates are the successful bidder for the |

| | |
|---|---|
| | Purchased Assets, some or all accrued but unpaid interest may be applied by the DIP Lender on the closing date of the 363 Sale toward the purchase price of the Purchased Assets. All interest accruing after the Maturity Date shall be payable in cash, upon demand by the DIP Lender.<br><br>During the continuance of an Event of Default (as defined below), any amounts outstanding under the DIP Facility will bear interest at an additional 2.0% *per annum*. |
| **Fees**<br><br>DIP Term Sheet, p. 4 | As a material inducement to the DIP Lender to make the Loans to the Borrowers, the Borrowers shall pay the DIP Lender the following fees:<br><br>1.  A fee equal to 1.5% of the Total Commitment Amount, which shall be fully earned upon entry of the Interim DIP Order (the "<u>Initial Commitment Fee</u>", and (ii) a fee equal to 1.5% of the Total Commitment Amount, which shall be fully earned upon entry of the Final DIP Order (the "<u>Final Commitment Fee</u>", and together with the Initial Commitment Fee, the "<u>Commitment Fees</u>"); and<br><br>2.  A fee equal to 1.5% of the Total Commitment Amount, which shall be fully earned upon entry of the Final DIP Order and payable to the DIP Lender in the event the Borrowers do not repay all outstanding obligations under the DIP Facility on the Maturity Date (the "<u>Facility Extension Fee</u>", and together with the Commitment Fees, the "<u>DIP Facility Fees</u>").<br><br>Once earned, the DIP Facility Fees shall accrue interest at the non-default or default interest rate, as applicable. All Commitment Fees (together with accrued interest) shall be payable upon the Maturity Date and the Facility Extension Fee shall be payable upon demand; *provided, however,* that if the DIP Lender is the successful bidder for the Purchased Assets, some or all DIP Facility Fees may be applied by the DIP Lender on the closing date of the 363 Sale toward the purchase price of the Purchased Assets. |
| **Priority**<br><br>DIP Term Sheet, p. 5 | All amounts owing by the Borrowers under the DIP Facility at all times will constitute allowed superpriority administrative expense claims in the Bankruptcy Cases, having priority over all administrative expenses of the kind specified in sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code.<br><br>All liens authorized and granted pursuant to the DIP Orders entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date (as defined below), and no further filing, notice or act will be required to effect such perfection.<br><br>The DIP Lender shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under state law in order to reflect the security, perfection or priority of the DIP Lender's claims described herein, including prior to the Petition Date (as defined below) in connection with the Bridge Loan. |

| | |
|---|---|
| **Security**<br><br>DIP Term Sheet, pp. 5-6 | Any amounts advanced prepetition pursuant to the Bridge Loan will be rolled up into the DIP Facility upon filing of the Bankruptcy Cases and constitute obligations thereunder in all respects.<br><br>All obligations of the Borrowers under the DIP Facility shall be secured by the following: (i) pursuant to section 364(d)(1) of the Bankruptcy Code, first priority, priming liens on and security interests in all assets of the Borrowers (including, without limitation all intellectual property) that are subject to validly-perfected, existing liens on the Petition Date (as defined below), including, for the avoidance of doubt, any valid, non-avoidable and enforceable Lien that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b), such that the DIP Lender shall have liens senior in all respects to any security interests in the DIP Collateral; and (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, first-priority liens on and security interests in all assets of the Borrowers (including, without limitation all intellectual property) that are not subject to existing liens on the Petition Date (as defined below), including, subject to entry of the Final DIP Order, all proceeds of Chapter 5 avoidance actions, wherever located, and whether existing now or after the date of entry of the Interim Order ((i) and (ii), collectively, the "<u>DIP Liens</u>" and such assets subject to the DIP Liens, the "<u>Collateral</u>").<br><br>The Borrowers shall use a cash management system that is the same as or substantially similar to its prepetition cash management system; *provided, however,* that the Borrowers shall only be allowed to withdraw or transfer from their accounts amounts necessary to fund expenses of the Borrowers in accordance with the Budget (as defined below), unless otherwise authorized in writing by the DIP Lender and an order of the Bankruptcy Court. Any changes from such prepetition cash management system must be approved in writing by the DIP Lender and approved by an order of the Bankruptcy Court. The DIP Orders shall provide the DIP Lender with a valid, perfected and enforceable first priority security interest and lien on the cash held in the Borrowers' bank accounts. |
| **Carve-Out**<br><br>DIP Term Sheet, p. 6 | The DIP Liens shall be subject to a carve-out only for payment of (i) accrued and unpaid U.S. Trustee and Bankruptcy Court fees incurred prior to the Event of Default (as defined below), plus (ii) Allowed (as defined in the Bankruptcy Code) fees and expenses of professionals retained in the Bankruptcy Cases (other than ordinary course professionals) that are incurred after the occurrence of an Event of Default (as defined below), in an amount not to exceed $50,000, in the aggregate for all professionals, plus (iii) allowed accrued but unpaid fees and expenses of professionals retained in the Bankruptcy Cases that were accrued before the occurrence of an Event of Default (as defined below) but solely to the extent consistent with the Budget (the "<u>Carve-Out</u>"), and each of the professionals retained shall have separate line item carve-outs for their fees and expenses as provided in the Budget (as defined below). |

| Conditions Precedent to Effectiveness and Initial Borrowing | The following shall be conditions (the "Initial Borrowing Conditions") precedent to the effectiveness of the DIP Facility and the funding of the DIP Facility during the Interim Period: |
|---|---|
| DIP Term Sheet, pp. 6-8 | 1.  The filing of the Bankruptcy Cases with the Bankruptcy Court on or before December 12, 2019 (such date, the "Petition Date");[4] |
| | 2.  The preparation, authorization and execution of the DIP Loan Documents with respect to the DIP Facility, in form and substance satisfactory to the DIP Lender; |
| | 3.  The Bankruptcy Cases shall have not been dismissed or converted to Chapter 7 cases; |
| | 4.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Bankruptcy Cases; |
| | 5.  Within two (2) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the DIP Lender in its sole discretion authorizing and approving (a) the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of valid, enforceable, non-avoidable and fully perfected superpriority security interests and liens and superpriority claims in favor of the DIP Lender and (b) the current cash payment of expenses under any Bridge Loan, including such amounts arising before and after the Petition Date and without the necessity of filing motions, to the extent such expenses have actually been incurred. The DIP Orders, as applicable, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender; |
| | 6.  Within two (2) business days after the Petition Date, the Bankruptcy Court shall have approved the release of the DIP Lender provided for in section 10.13 of the Bridge Loan Agreement; |
| | 7.  All necessary governmental and third-party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated hereby shall have been obtained and shall remain in effect; |
| | 8.  The making of the initial Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; |

---

[4]  This provision of the DIP Term Sheet originally provided for a Petition Date of December 7, 2019 but was amended by the Debtors and the DIP Lender to provide for a filing of the Bankruptcy Cases on or before December 12, 2019.

|  | 9. The delivery of a 13-week cash flow projection in form and substance mutually agreeable to the Borrowers and the DIP Lender (the "Initial Budget");<br><br>10. The DIP Lender shall be satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by the Borrowers, and the DIP Lender shall have received endorsements naming the DIP Lender as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the Borrowers forming part of the Collateral. To the extent the DIP Lender is unsatisfied with the amount, types and terms and conditions of Borrowers' insurance and bonding, the DIP Lender shall include any amounts necessary to procure or modify Borrowers' insurance or bonding in the Budget (as defined below) and advance those amounts under the DIP Facility;<br><br>11. The DIP Lender shall have a valid and perfected lien on and security interest in the Collateral with the priority described in such section. All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid. Deposit account control agreement shall be entered into with respect to each deposit account and security account of the Borrowers, establishing "control" under the applicable state Uniform Commercial Code, in favor of the DIP Lender;<br><br>12. The Borrowers and DIP Lender have agreed to a form asset purchase agreement in connection with the Section 363 Sale, subject only to Bankruptcy Court approval; and<br><br>13. All of the "first day orders" entered around the time of the Petition Date shall be consistent with this DIP Term Sheet and the Sale Term Sheet and be reasonably satisfactory in form and substance to the DIP Lender in all respects. |
| **Conditions Precedent to Each Subsequent Borrowing**<br><br>DIP Term Sheet, pp. 8-10 | Unless otherwise indicated, the obligation to provide each Loan (including the Initial Borrowing) shall be subject to the satisfaction of the Initial Borrowing Conditions and each of the following:<br><br>1. No default shall exist under the DIP Loan Documents;<br><br>2. The representations and warranties of the Borrowers under the DIP Loan Documents shall be true and correct immediately prior to, and after giving effect to, such funding, except to the extent such representations and warranties specifically relate to an earlier date;<br><br>3. The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; |

|  | 4. | The Borrowers shall be in compliance with all of the provisions of the 363 Sale Documents and Bid Procedures Order, and the Milestones (as defined below) required to be satisfied by such funding date; |
|---|---|---|
|  | 5. | If after giving effect to a request for, and the borrowing of, such Loan, the Total Commitment Amount would not be exceeded; |
|  | 6. | For any Subsequent Borrowing, the Bankruptcy Court has approved the roll-up of the Bridge Loan into the DIP Facility; |
|  | 7. | The DIP Lender will receive (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code. In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral; |
|  | 8. | For any Subsequent Borrowing, the Bankruptcy Court has approved the Bid Protections; |
|  | 9. | For any Subsequent Borrowing, each of the Final DIP Order and the Bid Procedures Order, in form and substance satisfactory to the DIP Lender, shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal; |
|  | 10. | No Event of Default (as defined below) and no condition which would constitute an Event of Default (as defined below) with the giving of notice or lapse of time or both shall exist; |
|  | 11. | Receipt of a borrowing notice from the Borrowers in form and substance reasonably satisfactory to the DIP Lender; |
|  | 12. | All other conditions to the funding of the Subsequent Borrowing in the DIP Loan Documents shall have been satisfied or waived by the DIP Lender; and |
|  | 13. | Such other customary conditions reasonably required by the DIP Lender and set forth in the DIP Loan Documents. |
| **Borrowers' Affirmative Covenants**<br><br>DIP Term Sheet, pp. 11-12 | Until payment and satisfaction in full of all DIP Obligations and termination of the DIP Facility, the Borrowers covenant and agree as to the following: | |
|  | 1. | Preserve, renew and maintain in full force and effect their legal existence and good standing under the laws of their organizations and maintain, preserve and protect all of their properties and equipment necessary to the operation of their businesses in good working order and condition, ordinary wear and tear permitted; |
|  | 2. | Promptly (i) upon (but no later than three (3) business days after) request therefor by the Lender, deliver such information regarding the business or the financial or corporate affairs of Borrowers or the compliance by |

14

| | Borrowers with the terms of the DIP Loan Documents as the Lender may from time to time reasonably request; (ii) upon any officer of Borrowers becoming aware thereof, notify the Lender in writing of (a) the occurrence of any default, and (b) any matter that has resulted or could reasonably be expected to result in a material adverse effect; and (iii) upon (but no later than three (3) business days after) request therefor by the Lender, permit the Lender to visit and inspect any of Borrowers' properties and to have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the operation of Borrowers' businesses;<br><br>3.  Utilize the proceeds of the DIP Loan solely for (i) the payment of bankruptcy administrative expenses and working capital needs solely for the purposes of and up to the amounts set forth in the Budget (subject to the Budget Variance); and (ii) the payment of interest, fees and expenses relating to the DIP Loan;<br><br>4.  Use good faith and commercially reasonable efforts to implement a sale process consistent with the terms of the Sale Term Sheet; and<br><br>5.  As soon as reasonably practicable, upon any information becoming available to the Borrowers, provide the DIP Lender copies of any informational packages provided to potential bidders, and any draft order pertaining to the Auction, all draft agency or sale agreements, the deadlines established as to receipt of bids and, upon request of the DIP Lender, a status report and updated information relating to such motions and copies of any bids received from any proposed bidder for all or any portion of the Borrowers' assets and any updates, modifications or supplements to such information and materials. |
|---|---|
| **Borrowers' Negative Covenants**<br><br>DIP Term Sheet, pp. 12-13 | The Borrowers further covenant and agree that, so long as any Lender shall have any DIP Obligation outstanding, they shall not: |

<table>
<tr>
<td></td>
<td>

1. Create or permit to exist (i) any administrative expense, unsecured claim, or other claim or Lien on the DIP Collateral, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out or as may be included in the Budget, and (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than the adequate protection with respect to the Prepetition Credit Agreement;

2. Make any change, amendment or modification, or any application or motion for any change, amendment or modification, to the DIP Orders or Bid Procedures Order (defined below), other than as agreed in writing by the DIP Lender;

3. Make any payment of principal or interest or otherwise on account of any prepetition debt or payables, other than as included in the Budget and agreed to by the DIP Lender;

4. Declare or make any dividend, payment or other distribution directly or indirectly of cash or a non-cash asset on account of equity or ownership interests; and

5. File with the Bankruptcy Court a motion to approve, or otherwise seek approval of or pay, any incentive or retention plan, except as otherwise as agreed in writing by the DIP Lender.

</td>
</tr>
<tr>
<td>

**Events of Default**

DIP Term Sheet, pp. 13-15

</td>
<td>

The following shall be events of default (each an "<u>Event of Default</u>") under the DIP Loan Documents:

1. the Borrowers' failure to make any payment when due;

2. the Borrowers' noncompliance with covenants, including the Budget Variance, or breaches of representations and warranties in the DIP Loan Documents or the 363 Sale Documents;

3. any representation or warranty made by Borrowers in the DIP Loan Documents or the 363 Sale Documents shall prove to have been incorrect in any material respect when made or at any other times specified therein;

4. any other material breach of the DIP Loan Documents or 363 Sale Documents;

5. the Borrowers' failure to satisfy or stay execution of judgments in excess of specified amounts;

6. except as otherwise contemplated by the Budget, Borrowers shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables;

7. the existence of certain materially adverse employee benefit or environmental liabilities;

</td>
</tr>
</table>

16

8.   material impairment of the rights provided the Borrowers under the DIP Loan Documents;

9.   dismissal of any of the Bankruptcy Cases or conversion of any of the Bankruptcy Cases to a Chapter 7 case or one or more of the Borrowers files a motion seeking such relief;

10.   termination or reduction of the exclusivity period for any of the Borrowers to file a Chapter 11 plan in the Bankruptcy Cases;

11.   appointment of a Chapter 11 trustee in the Bankruptcy Cases;

12.   appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrowers;

13.   granting of relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any assets of the Borrowers in excess of an amount to be determined, in the aggregate;

14.   entry of a Final DIP Order that does not approve the Roll-up of the Bridge Loan;

15.   entry of an order granting any superpriority claim which is senior to or *pari passu* with the DIP Lender's claims under the DIP Facility;

16.   entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

17.   entry of an order staying, reversing, vacating or otherwise modifying, without the prior consent of the DIP Lender, the DIP Facility or the DIP Orders;

18.   the Borrowers' failure to comply with the DIP Orders in any material respect;

19.   a change of control with respect to any of the borrowers shall occur (other than as a result of any sale of the Purchased Assets);

20.   any material provision of the DIP Loan Documents, the 363 Sale Documents (as defined below), the Bid Procedures Order (defined below) or Sale Approval Order shall cease to be valid and binding on the Borrowers, or the Borrowers shall so assert in any pleading filed in any court;

|  | 21. an order is entered determining that (i) any of the Purchased Assets are not property of the Borrowers' bankruptcy estates (ii) the Purchased Assets are not capable of being sold pursuant to Section 363 of the Bankruptcy Code or (iii) there is a lien or other encumbrance on the Purchased Assets;<br><br>22. payment of or granting adequate protection with respect to prepetition debt (other than as approved by the DIP Lender and the Bankruptcy Court or as otherwise contemplated by the DIP Loan Documents);<br><br>23. entry of an order denying or terminating use of cash collateral by the Borrowers;<br><br>24. cessation of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected, and enforceable in all respects with the priority described herein;<br><br>25. rejection of any unexpired lease identified as material by the DIP Lender;<br><br>26. the release provided to the DIP Lender in section 10.13 of the Bridge Loan Agreement is not approved by the Bankruptcy Court within two (2) business days of the Petition Date;<br><br>27. the Borrowers' failure to obtain approval of the Bid Protections by the 20th day following the Petition Date;<br><br>28. the Borrowers' failure to comply with any Milestone (as defined below); and<br><br>29. any person files a motion seeking standing to assert a claim or challenge to the Lender's liens and claims.<br><br>Solely with respect to 26 above, so long as the Borrowers use their best commercially reasonable efforts to obtain Bankruptcy Court approval of the release in section 10.13 of the Bridge Loan Agreement within two (2) business days of the Petition Date, the DIP Lender agrees that there shall not be an Event of Default if there is a delay in approval of the release so long as the release is ultimately approved in the Final DIP Order. For the avoidance of doubt, if the Bankruptcy Court at any time makes a ruling that the release is not approved or if the release is not approved, at the latest, upon entry of the Final DIP Order, an Event of Default shall immediately occur.<br><br>Solely with respect to 27 and 28 above, so long as the Borrowers use their best commercially reasonable efforts to obtain Bankruptcy Court approval, denial or modification of a specific Bid Protection or Milestone shall not constitute an Event of Default unless such denial or modification would result in material harm the DIP Lender. |
|---|---|
| **Milestones** | The Borrowers shall comply with the following milestones (collectively, the "Milestones"). |

| | |
|---|---|
| DIP Term Sheet, pp. 15-17 | 1.  On or before the date that is two (2) business days after the Petition Date, the Interim DIP Order authorizing and approving on an interim basis the DIP Facility and the transactions contemplated thereby, in form and substance satisfactory to the DIP Lender shall have been entered by the Bankruptcy Court; |
| | 2.  On or before the date that is twenty-five (25) days after the Petition Date, the Final DIP Order authorizing and approving the DIP Facility and the transactions contemplated thereby, in form and substance satisfactory to the DIP Lender shall have been entered by the Bankruptcy Court; |
| | 3.  On the Petition Date, the Borrowers shall have filed a motion seeking entry of an order (the "<u>Bid Procedures Order</u>") approving the Sale Process, including the "stalking horse" bid, Bid Protections (as defined in the Sale Term Sheet), and the terms of the Sale Term Sheet; |
| | 4.  On or before the date that is three (3) days prior to the hearing to approve the Bid Procedures Order, the Borrowers shall finalize a term sheet setting forth the terms of an asset purchase agreement for the Purchased Assets in form and substance acceptable to the DIP Lender; |
| | 5.  On or before the date that is twenty (20) days after the Petition Date, the Bid Procedures Order, including the Bid Protections, shall have been approved by order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender. Borrowers shall commence the Sale Process within (1) business day of entry of the Bid Procedures Order; |
| | 6.  On or before the date that is fifty (50) days after the Petition Date, an Auction (to the extent necessary) for the Purchased Assets shall have occurred in accordance with the requirements for the Sale Process, including, without limitation, the terms of the Sale Term Sheet; |
| | 7.  On or before the date that is fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Approval Order approving the results of the Auction and an agreement or agreements for the sale of the Purchased Assets (the "<u>Approved Sale(s)</u>"); and |
| | 8.  The Approved Sale(s) shall be consummated within fifteen (15) days of Bankruptcy Court entering the Sale Approval Order approving such Approved Sale(s). |
| | "<u>Sale Process</u>" shall mean the implementation of bidding and sale procedures in respect of all of the Borrowers' assets and property, including the Purchased Assets, approved by an order of the Bankruptcy Court, and which at a minimum includes compliance with each of the provisions set forth in the Sale Term Sheet and the Milestones. |
| **Release**<br><br>DIP Term Sheet, p. 17 | Subject to approval of the Bankruptcy Court, upon entry of the Interim DIP Order, the Borrowers for themselves, their affiliates, directors, employees, representatives and assigns, forever and irrevocably discharge and release the DIP Lender, and its principals, predecessors, successors, assigns, agents, |

| | |
|---|---|
| | employees, representatives, attorneys, subsidiaries, affiliates from any and all claims, complaints, and lawsuits of any nature whatsoever, known or unknown, suspected or unsuspected, that the Borrowers now may have against the DIP Lender, including, but not limited to, any causes of action asserted or any claims related to the factual allegations contained in the Complaint for Patent Infringement filed by Vector Launch Inc. in the United States District Court for the Central District of California (Case No. 19-00656), which was dismissed without prejudice. |
| **Costs and Expenses**<br><br>DIP Term Sheet, pp. 17-18 | Subject to the entry of the Interim DIP Order, the Borrowers shall pay (a) all reasonable fees and expenses related to the 363 Sale and (b) all actual, documented, and reasonable out of pocket costs and expenses of the DIP Lender (including, without limitation, fees and disbursements of counsel, including local counsel, and financial and accounting advisors) in connection with (i) the negotiation, preparation, execution and entry, as applicable, of the DIP Loan Documents, whether incurred before or after execution of the DIP Loan Documents, (ii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrowers or any other person) in any way relating to the DIP Loan Documents or Borrowers' affairs, and (iii) the enforcement of any rights and remedies under the DIP Loan Documents. Notwithstanding the foregoing, or any other provision in the DIP Loan Documents, unless there is an Event of Default, the Borrowers' liability for the Lender's expenses incurred in connection with the negotiation, preparation, execution and entry, as applicable, of the DIP Loan Documents, together with Lender's expenses in connection with the negotiation, preparation, execution and filing, to the extent applicable, of the 363 Sale Documents, as well as documentation in connection with any prepetition bridge loans, shall not exceed $650,000 (the "<u>Expense Cap</u>"). For the avoidance of doubt, the Expense Cap shall not apply to (i) any litigation, contest, dispute, suit, proceeding or action (whether instituted by the DIP Lender, Borrowers or any other person) in any way relating to the DIP Loan Documents or the Borrowers' affairs, or (ii) any attempt to enforce any rights of the DIP Lender against the Borrowers or any other person which may be obligated to the DIP Lender by virtue of the DIP Loan Documents.<br><br>All such expenses that become due and owing under the DIP Loan Documents prior to the Maturity Date of the Loans shall be automatically added to the principal amount of the Loans (and begin to bear interest) following the Borrowers' receipt of an invoice therefor from the DIP Lender. All such expense payments that become due and owing after maturity of the Loans (whether at stated maturity, by acceleration or otherwise) shall be due and payable in cash, on demand. |
| **Indemnification**<br><br>DIP Term Sheet, p. 18 | The Borrowers shall indemnify and hold harmless each Lender, each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and financial advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the |

|  | preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrowers, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |
| --- | --- |

## **REQUIREMENTS UNDER LOCAL RULE 4001-2**

17.    Local Rule 4001-2(a) provides in pertinent part that:

(i)   All Financing Motions must (a) recite whether the proposed form of order and/or underling cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by post-petition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be post-petition debt or that use prepetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

(H) Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).

Del Bankr. Local Rule 4001-2(a)(i).

## A.      **Cross-Collateralization**

18.      No provision of the DIP Term Sheet or Interim DIP Order grants cross-collateralization protection of the type contemplated by Local Rule 4001-2(a)(i)(A).

## B.      **Stipulations and Challenge Provisions**

19.      The DIP Facility does not implicate Local Rule 4001-2(a)(i)(B), as the Interim DIP Order provides parties in interest with seventy-five (75) days from the entry of the Interim DIP Order and the creditors' committee, if formed, sixty (60) days from the date of its formation to challenge the liens of the Prepetition Secured Parties in the Prepetition Collateral. Interim DIP Order, at ¶ 42.

## C.      **Creditors' Committee Professionals**

20.      Paragraph 25 of the Interim DIP Order includes a carve-out for payment of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are (i) incurred prior to the Maturity Date, and (ii) included in the Budget for the period prior to the Maturity Date; plus (b) all fees and expenses of professionals retained by the Debtors and any official committee appointed in the Chapter 11 Cases pursuant to a Bankruptcy Court order (excluding any "ordinary course professionals") ("Professionals") that are (i) incurred prior to the Maturity Date and which have not been paid prior to the Maturity Date, (ii) allowed either prior to or after the Maturity Date, and (iii) included in the amounts scheduled

as "Restructuring Professional Fees Incurred" in the Budget; plus (c) all fees and expenses of Professionals incurred and allowed after the occurrence of the Maturity Date, in an amount not to exceed $50,000; plus (d) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court after the Maturity Date.

**D.**     **Priming Liens**

21.     The DIP Facility will be secured by, among other things, a first-priority, senior, priming, perfected lien on and security interest in the DIP Collateral, including Prepetition Collateral. Interim DIP Order, at ¶¶ 18-19. As further explained below, the adequate protection to be provided to the Prepetition Lien Holders is fair and reasonable and is sufficient to satisfy the standards of Bankruptcy Code sections 363(c) and 364(d).

**E.**     **Additional Relief Sought at Final Hearing**

22.     At the Final Hearing, the Debtors will seek approval (i) of a Bankruptcy Code section 506(c) waiver; (ii) to grant liens on the proceeds of all avoidance actions; (iii) a "roll-up" of the Bridge Loan; and (iv) an equities of the case exception. These provisions implicate Local Rule 4001-2(a)(i)(C), (D), (E), and (H) and the justifications for each are set forth below.

**BASIS FOR RELIEF REQUESTED**

**A.**     **The Debtors' Need for Postpetition Financing**

23.     The Debtors believe that it is essential that they obtain postpetition financing. The relief requested herein will enable the Debtors to preserve the value of their estate and fund the administrative costs of running a sale process. Access to credit under the DIP Facility is necessary to provide working capital during the pendency of these cases to deal with the liquidity constraints described in the First Day Declaration and in this Motion and to provide the Debtors with sufficient resources to fund a sale process. Absent this new liquidity, not only would the Debtors' ability to maximize the value of their estates be jeopardized, but the Debtors almost certainly would be

forced to convert to a chapter 7 and liquidate their assets, resulting in substantially smaller recoveries for the Debtors' creditors.

24.     Bankruptcy Code section 364 "provides bankruptcy courts with the power to authorize postpetition financing for a Chapter 11 debtor-in-possession." *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991). "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'" *Id.* In particular, Bankruptcy Code section 364(c) establishes the conditions under which a debtor may obtain certain types of secured credit and provides, in pertinent part, as follows:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

25.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code section 364(c):

> (a)     the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);
>
> (b)     the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)     the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above factors and holding that

"[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

i.    *Credit Was Not Obtainable on Better Terms*

26.    To demonstrate that the credit required is not obtainable on an unsecured basis or on better terms, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code section 364(c). *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

27.    As discussed above, to obtain postpetition financing, the Debtors and their advisors approached several sophisticated, commercial entities, including potential strategic buyers and existing investors of the Debtors, about providing debtor-in-possession financing in conjunction with a sale or other restructuring transaction. None of those parties were willing to make a postpetition loan on an unsecured basis in an amount necessary for the Debtors' business operations and other financing needs. As such, when considering all of the factors, the Debtors

concluded that the DIP Facility (and the accompanying "stalking horse" bid) was their best financing alternative. The Debtors' efforts to seek necessary postpetition financing satisfy the statutory requirements of Bankruptcy Code section 364. *See*, *e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking financing under Bankruptcy Code section 364(c) made acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); *Ames*, 115 B.R. at 40.

ii.     *The DIP Facility is Necessary to Preserve Assets of the Estates*

28.     It is essential that the Debtors obtain the financing required to fund a sale process to maximize the value of their assets. The DIP Lender has agreed to also be the stalking horse bidder for certain of the Debtors' IP assets, which provides the Debtors the best option for maximizing value.

29.     The success of these cases depends almost entirely on the Debtors' ability to meet the administrative costs of their bankruptcy cases and sale process. If the proposed DIP Facility is denied, the DIP Lender will not serve as the stalking horse bidder, the Debtors will have almost no remaining cash, and the Debtors' ability to run an effective sale process will be irreparably damaged. Approval of the requested borrowing under the DIP Facility thus is crucial to maximizing the value of the Debtors' estates.

iii.     *The Terms of the DIP Facility Are Fair, Reasonable and Appropriate*

30.     As discussed above, the terms and conditions of the proposed DIP Facility are fair and reasonable under the circumstances and are superior to the terms of any alternative financing available to the Debtors. The interest rates and other covenants negotiated with the DIP Lender are reasonable, and the terms of the DIP Facility were highly negotiated in the context of the overall restructuring transactions contemplated by the DIP Term Sheet and Sale Term Sheet attached to the Bridge Loan Agreement. Moreover, the other terms and conditions of the proposed DIP

Facility are similar, or more favorable to the Debtors, than any other alternative financing available to the Debtors.

### iv.    *Application of the Business Judgment Standard*

31.    As described above, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facility provides the best alternative available in the circumstances of these Chapter 11 Cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

32.    The Debtors have exercised sound business judgment in determining that a postpetition credit facility is both necessary and appropriate and have satisfied the legal prerequisites to incur debt under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best interests of the Debtors' estates. The Debtors have reason to believe that the funds made available through the DIP Facility will be adequate to pay all administrative expenses due and payable during the proposed sale process to Lockheed Martin. Accordingly, the Court should grant the Debtors authority to enter into the DIP Facility and obtain funds from the DIP Lender on the secured and administrative "superpriority" basis described above, pursuant to Bankruptcy Code section 364(c).

B.     **Approval of Priming Liens**

33.     In addition to authorizing financing under Bankruptcy Code section 364(c), courts

also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in

priority to existing liens on the encumbered property, without the consent of the existing lien

holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders

are adequately protected. *See* 11 U.S.C. § 364(d)(1). Specifically, Bankruptcy Code section

364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a lien
> only if --
>
> (A)     the [debtor] is unable to obtain such credit otherwise; and
>
> (B)     there is adequate protection of the interest holder of the lien
>         on the property of the estate on which such senior or equal
>         lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

34.     As explained above, the Debtors have explored financial alternatives and are aware

of the lack of financing available to them. In light of that, and given the state of the credit markets,

the Debtors have concluded that financing comparable to that provided by the DIP Lender in the

DIP Facility is currently unobtainable, particularly a commitment accompanied by a stalking horse

bid. *See Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.),* 300 B.R. 861, 863,

865 (Bankr W D Pa 2003) (where debtor made efforts by "contacting numerous lenders" and was

unable to obtain credit without a priming lien, it had met its burden under section 364(d)); *In re*

*Dunes Casino Hotel,* 69 B.R. 784, 796 (Bankr D N J 1986) (holding that the debtor had made

required efforts under Bankruptcy Code section 364(d)(1) based on evidence that the debtor had

attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but

that at least three such lenders were willing to advance funds secured by a superpriority lien). Thus,

the Debtors are otherwise unable to obtain financing other than financing secured by first priority priming liens.

35.     Additionally, the interests of the Prepetition Lien Holders whose liens will be primed will be "adequately protected" under Bankruptcy Code section 364(d). What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at \*2 (Bankr D Del. Feb. 18, 1992); *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.,* 140 B.R. 360 (Bankr SDNY 1992); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of the adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *In re Continental Airlines Inc.,* 154 B.R. 176, 180-81 (Bankr. D. Del. 1993).

36.     In this case, access to the DIP Facility and the Cash Collateral are critical to the Debtors' ability to continue operations. The Debtors intend to provide adequate protection to the Prepetition Lien Holders in the form of Replacement Liens and superpriority claims (as described further below), as well as the existence of the stalking horse bid – dependent on the approval of the DIP Facility – that establishes an equity cushion more than adequate to protect the Prepetition Lien Holders.

37.     Accordingly, the adequate protection to be provided to the Prepetition Lien Holders is fair and reasonable and is sufficient to satisfy the standards of Bankruptcy Code sections 363(c) and 364(d).

C.      **Cash Collateral and Adequate Protection**

38.      The Prepetition Lien Holders are entitled, under Bankruptcy Code sections 363(e)

and 364(d)(1)(B), to adequate protection of their interest in their respective Prepetition Collateral,

including the Cash Collateral, for the aggregate diminution in the value of the Prepetition Lien

Holders' interest in the Prepetition Collateral, including the Cash Collateral, by reason of, among

other things, (i) the imposition of the automatic stay under Bankruptcy Code section 362, (ii) the

use of the Prepetition Lien Holders' Cash Collateral; and (iii) the use, sale or lease of Prepetition

Collateral pursuant to Bankruptcy Code section 363(a). Accordingly, the Debtors have agreed,

subject to the Court's approval, to grant to the Prepetition Lien Holders the following adequate

protection for any diminution in the value of their respective interests in the Prepetition Collateral

from the Petition Date:

(a)      The Prepetition Lien Holders shall have and are hereby granted the Replacement Liens subject to (i) unavoidable, duly perfected liens existing as of the Petition Date, which liens shall retain their respective priorities *vis a vis* the Replacement Liens granted hereby to the Prepetition Lien Holders; and (ii) the priorities set forth herein. Except as otherwise set forth herein, the Replacement Liens granted to the Prepetition Lien Holders pursuant to this Interim DIP Order shall be prior and senior to all liens and encumbrances (other than fees arising under 28 U.S.C. §1930) of (a) all other secured creditors in and to such property granted, or arising, subsequent to the date of this Interim DIP Order, (b) any intercompany claim of the Debtors or any subsidiary or affiliate of the Debtors, and (c) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to Bankruptcy Code section 551;

(b)      Prepetition Senior Lender shall have and is hereby granted a Lien on Intellectual Property (the "IP Adequate Protection Lien") of the Debtors subject to (i) unavoidable, duly perfected liens existing as of the Petition Date, which liens shall retain their respective priorities *vis a vis* the IP Adequate Protection Lien granted hereby to Prepetition Senior Lender; and (ii) the priorities set forth herein. Except as otherwise set forth herein, the IP Adequate Protection Lien granted to the Prepetition Senior Lender pursuant to this Interim DIP Order shall be prior and senior to all liens and encumbrances (other than fees arising under 28 U.S.C. §1930) of (a) all other secured creditors in and to such property granted, or arising, subsequent to the date of this Interim DIP Order, (b) any intercompany claim of the Debtors or any subsidiary or affiliate of the Debtors, and (c) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to Bankruptcy Code section 551; and

(c)     The Prepetition Lien Holders are hereby granted allowed super-priority claims in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the Prepetition Lien Holders' security interests and liens in the Prepetition Collateral, provided, however, that the super-priority claims granted to Prepetition Lien Holders shall be junior in all respects to the super-priority claims granted to the DIP Lender. No cost or expense of administration under Bankruptcy Code sections 105, 503(b), and 507(b) shall be senior to, or *pari passu* with, any super-priority claims.

Interim DIP Order, at ¶ 22.

## D.     **Additional Relief to Be Sought at Final Hearing**

39.     The Debtors also intend to seek the following relief in connection with the DIP Facility to be approved at the Final Hearing and pursuant to the Final DIP Order:

(A)     The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or any part thereof;

(B)     Nothing in the Interim DIP Order, the DIP Loan Documents, or any other documents related to the transactions contemplated hereby or thereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the pre-petition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their Chapter 11 Cases. The indemnification provided by the Debtors under the DIP Term Sheet is hereby approved;

(C)     Subject to entry of the Final DIP Order, the DIP Facility shall include a roll-up of all amounts loaned by the Bridge Lender to the Debtors prior to the Petition Date, plus all accrued but unpaid interest, fees and other expenses outstanding thereon pursuant to that certain Bridge Loan Agreement;

(D)     Subject to and effective only upon entry of the Final DIP Order granting such relief, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law.

(E)     Subject to entry of the Final DIP Order, the DIP Lender and Prepetition Secured Parties are entitled to all of the rights and benefits of Bankruptcy Code section 552(b)(1) and the 'equities of the case' exception therein shall not apply.

40.     <u>Roll-up</u>. As detailed above, in consideration for providing the DIP Loan commitments, the DIP Term Sheet provides for a roll-up of the Bridge Loan, plus all accrued but unpaid interest, fees, expenses and other obligations outstanding thereon, upon entry of the Final DIP Order that implicates Local Rule 4001-2(a)(i)(E). The Roll-Up Loan is necessary because the DIP Lender requires the Roll-Up Loan as part of the DIP Facility and would not have agreed to provide the new cash funding thereunder without it. In addition, the Roll-Up Loan is reasonable because the one-to-five (1:5) ratio of Roll-Up Loan to DIP Loans is far below other approved roll-up loans in this district. *See, e.g., In re American Apparel, Inc.,* No. 15-12055 (D.I. 80) (Bankr. D. Del. Oct. 6, 2015) (approving $90 million total financing, including a $60 million roll-up, at a ratio of 2:1); *In re Cal Dive Intl, Inc.,* No. 15-10458 (D.I. 282) (Bankr. D. Del. Apr. 20, 2015) (approving $120 million total financing, including a $99.8 million roll-up, at a ratio of 4.9:1); *In re RadioShack Corp.,* No. 15-10197 (D.I. 947) (Bankr. D. Del. Mar. 12, 2015) (approving $285 million total financing, including a $250 million roll-up, at a ratio of 7.1:1); *In re AWI Delaware, Inc.,* No. 14-12092 (D.I. 279) (Bankr. D. Del. Oct. 6, 2014) (approving $193 million total financing, including a $125 million roll-up, at a ratio of 1.8:1); *In re NEC Holdings Corp.,* No. 10-11890 (D.I. 223) (Bankr. D. Del. Jul. 16, 2010) (approving $139 million total financing, including a $110 million roll-up, at a ratio of 3.79:1); *In re Real Mex Rests., Inc.,* No. 11-13122 (D.I. 392) (Bankr. D. Del. Nov. 9, 2011) (approving $49 million total financing, including a $37.5 million roll-up, at a ratio of 3.26:1); *In re Pacific Energy Res., Ltd.*, No. 09-10785 (D.I. 415) (Bankr. D. Del. Jun. 4, 2009) (approving $183 million total financing, including a $143 million roll-up, at a ratio of 3.58:1).

41.     <u>Section 506(c) Waiver</u>. As is customary for financing transactions of this type, the DIP Lender required the section 506(c) waiver as a condition to providing the DIP Loans to the

Debtor. Thus, the 506(c) waiver represents an integral, negotiated term of the DIP Facility, without which the Debtors would have been unable to obtain postpetition financing and is reasonable under the circumstances.

42. "Equities of the Case" Exception. This provision is common in postpetition financing transactions and, in this case, forms an integral component of the bargain achieved between the DIP Lender and the Debtors with respect to the DIP Facility following several weeks of negotiations. Accordingly, the facts and circumstances of these cases justify the inclusion of the above terms that require disclosure under Local Rule 4001-2, and these terms of the DIP Facility should be approved.

**E.      Liens on Avoidance Actions**

43. The DIP Term Sheet provides that the DIP Collateral includes liens on the proceeds of all avoidance actions. The DIP Lender required as a condition to providing the DIP Loans to the Debtors that the DIP Collateral include liens on the proceeds of avoidance actions as additional security for taking the risk of making the DIP Facility available to the Debtors. The lien on proceeds of avoidance actions will not be granted in the Interim DIP Order but will be requested as part of final approval of the DIP Facility. Accordingly, these provisions are appropriate to induce the DIP Lender to provide the financing necessary to fund these Chapter 11 Cases.

44. The Debtors submit that the foregoing requested relief is customary for debtor in possession financings of this nature and should be granted on a final basis pursuant to the Final DIP Order.

**F.      Approval of the DIP Facility on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm**

45. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

33

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

46.     In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dep't Stores*, 115 B.R. at 36.

47.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail in the First Day Declaration, the Debtors have an immediate need to obtain access to liquidity to, among other things, insure property of the estates, market and sell the GalacticSky assets, fund their operations while in chapter 11, make payroll (for their remaining employee and independent contractors), and satisfy other working capital needs. Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

48.     The crucial importance of a debtor's ability to secure postpetition financing repeatedly has been recognized in this district. *See, e.g., In re U.S. Concrete, Inc.*, Case No. 10-11407 (D.I. 41) (Bankr. D. Del. Apr. 30, 2010); *In re Taylor-Wharton Int'l LLC*, Case No. 09-14089 (D.I. 46) (Bankr. D. Del. Nov. 20, 2009); *In re Lazy Days' R.V. Center Inc.*, Case No. 09-13911 (D.I. 40) (Bankr. D. Del. Nov. 6, 2009); *In re Source Interlink Cos.*, Case No. 09-11424

(D.I. 240) (Bankr. D. Del. May 28, 2009); *In re EZ Lube, LLC*, Case No. 08-13256 (D.I. 144) (Bankr. D. Del. Jan. 14, 2009).

49.     Accordingly, the Debtors request that, pending the Final Hearing, the Bankruptcy Court schedule an interim hearing as soon after the Petition Date as is practical to consider the Debtors' request for authorization to obtain interim financing.

**G.     Good Faith**

50.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the DIP Lender should be afforded the benefits of Bankruptcy Code section 364(e) to the extent any or all of the provisions of the DIP Facility, or any order of this Bankruptcy Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court. *See* Interim DIP Order, at ¶ 41(c).

**H.     Modification of the Automatic Stay Is Warranted**

51.     The Interim DIP Order provides that the automatic stay provisions under Bankruptcy Code section 362 are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any DIP Event of Default, all rights and remedies provided for in the DIP Term Sheet, and to take various actions without further order of or application to the Bankruptcy Court. Interim DIP Order, at ¶ 36. The Interim DIP Order also proposes that the DIP Lender must provide the Debtors, any committee, and the U.S. Trustee with three (3) Business Days' notice prior to exercising any enforcement rights or remedies after a DIP Event of Default.

52.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the

present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Facility Term Sheet and the proposed DIP Orders.

**I.**     **Request for Final Hearing**

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than, 25 days following the Petition Date, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

**J.**     **Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

54.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), the twenty-one-day stay provided for by Bankruptcy Rule 6003(b), and the fourteen-day stay provided for, by Bankruptcy Rule 6004(h).

## NOTICE

55.     Notice of this Motion, the relief requested herein, and the Interim Hearing has been served by the Debtors on (a) the Office of the United States Trustee for Region 3, Attn: Juliet Sarkessian, Esq.; (b) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the DIP Lender and its counsel; (d) all other known holders of prepetition liens, encumbrances or security interests against the Debtors' property; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; (g) the Securities and Exchange Commission; (h) the Delaware Secretary of State; (i) the Delaware Secretary of the Treasury; (j) the attorneys general for Delaware, California, and Arizona; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party required to be provided notice under Local Rule 9013-1(m). As the Debtors are seeking "first day" relief in the Motion, within two (2) Business Days after entry of this Interim DIP Order, the Debtors will serve copies of the Motion and this Interim DIP Order and any order

entered in respect to the Motion as required by Local Rule 9013-l(m). Under the circumstances, notice was sent under Bankruptcy Rules 4001(b), 4001(c) and 4001(d), Local Rule 4001-2 and Bankruptcy Code section 102(1) in light of the emergency nature of the interim relief requested in the Motion, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

[*remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court (a) enter the Interim DIP Order, substantially in the form annexed hereto as **Exhibit A**; and (b) grant to the Debtors such other and further relief as the Bankruptcy Court may deem proper.

Wilmington, Delaware
Date: December 13, 2019

Sᴜʟʟɪᴠᴀɴ Hᴀᴢᴇʟᴛɪɴᴇ Aʟʟɪɴsᴏɴ ʟʟᴄ

  */s/ E.E. Allinson III*
Elihu E. Allinson, III (No. 3476)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Telephone: (302) 428-8191
Fax: (302) 428-8195
Email: zallinson@sha-llc.com

and

PILLSBURY WINTHROP SHAW PITTMAN LLP
Hugh M. Ray, III (*pro hac vice* admission pending)
Jason S. Sharp (*pro hac vice* admission pending)
William Hotze (*pro hac vice* admission pending)
2 Houston Center
909 Fannin Street, Suite 2000
Houston, Texas 77010-1028
Telephone: (713) 276-7600
Fax: (713) 276-7673
Email: hugh.ray@pillsburylaw.com
        jason.sharp@pillsburylaw.com
        william.hotze@pillsburylaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

## EXHIBIT A

**Proposed Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19-12670 (JTD) |
| Debtors. | (Joint Administration Requested) |
| | Re: Docket No._____ |

**INTERIM ORDER (I) APPROVING DEBTOR-IN-POSSESSION**
**FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a),**
**362, AND 364 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**2002, 4001, AND 9014 AND LOCAL BANKRUPTCY RULE 4001-2;**
**(II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO**
**BANKRUPTCY CODE SECTIONS 105, 361, 362, AND 363; (III) GRANTING**
**ADEQUATE PROTECTION AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS;**
**(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the Motion[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, and 364, Bankruptcy Rules 2002, 4001 and 9014 of the and Local Rule 4001-2, seeking, among other things:

A.     Authorization and approval for the Debtors to obtain postpetition financing and incur the DIP Facility, which includes: (i) the aggregate principal amount of not more than $2,000,000 in new borrowings (the "DIP Loan"), of which the aggregate principal amount of not more than $500,000 will be available to the Debtors on an interim basis in one or more draws in accordance with the Budget and pursuant to this Interim DIP Order; (ii) $500,000 in aggregate

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is: PO Box 14928, Long Beach, CA 90853-4928.

[2] Capitalized terms that are not otherwise defined in this Interim DIP Order have the meanings given to such terms in the Motion or the DIP Term Sheet (defined below), as applicable.

principal amount loaned by Lockheed Martin Corporation ("<u>Lockheed Martin</u>") to the Debtors prior to the Petition Date (as defined below), plus all accrued but unpaid interest, fees and other expenses outstanding thereon (collectively, the "<u>Bridge Loan</u>"), which shall be rolled up (such loan, the "<u>Roll-Up Loan</u>," and together with the DIP Loan, the "<u>DIP Loans</u>") and become DIP Loans hereunder on a final basis upon entry of the Final DIP Order (as defined below); and (iii) $37,500 constituting the initial commitment fee (the "<u>Initial Commitment Fee</u>"), which shall be approved by this Interim DIP Order and deemed fully earned on the closing date of the Interim DIP Facility (as defined below) and ratably added to the outstanding principal balance of the DIP Loans on such date and constitute additional DIP Loan principal for all purposes (the DIP Loans and Initial Commitment Fee approved pursuant to this Interim DIP Order constituting the "<u>Interim DIP Facility</u>"), all of which shall be on the terms and conditions set forth in (a) the term sheet for the DIP Facility attached hereto as **<u>Exhibit I</u>** (as may be amended from time to time, the "<u>DIP Term Sheet</u>"), by and among the Debtors, as Borrowers, and Lockheed Martin, as DIP lender (in such capacity, the "<u>DIP Lender</u>"), which terms and conditions may be documented in a credit and security agreement, by and among the Debtors, as borrowers, and DIP Lender, as lender, and (b) all other financing statements, mortgages, deeds of trust, deeds to secure debt, pledge agreements, affidavits, security agreements, fixture filings, assignments, memoranda or other documents, instruments or evidences of perfection with respect to the DIP Collateral (as defined below) as may be acceptable to the DIP Lender (together with the DIP Term Sheet, the "<u>DIP Loan Documents</u>"), all of which, if requested by the DIP Lender in its sole discretion, shall be executed and delivered by the parties thereto on or prior to _____, 2019, in form and substance satisfactory to the DIP Lender in its sole discretion, and shall become effective only after approval by this Court at the Final Hearing (as defined below) (other than the DIP Term Sheet, which shall

be effective on an interim basis pursuant to this Interim DIP Order, and shall become effective on a final basis upon entry of the Final DIP Order, unless replaced by other documentation to be approved at the Final Hearing);[3]

B.    Authorization, pursuant to Bankruptcy Code section 364(c)(1), to grant to the DIP Lender, as security for the obligations under the DIP Loan Documents (the "DIP Obligations"), an allowed super-priority administrative expense claim in these Chapter 11 Cases, which claim is a super-priority, administrative expense claim that has priority over all other administrative expenses and other claims against the Debtors in their Chapter 11 Cases, including, without limitation, any other super-priority claims;

C.    Authorization, pursuant to Bankruptcy Code section 364(c)(2), to grant to the DIP Lender, fully-perfected and enforceable senior, first priority liens on and security interests in the DIP Collateral, other than avoidance actions, that is not subject to an existing lien;

D.    Effective upon entry of the Final DIP Order (as defined below), authorization, pursuant to Bankruptcy Code section 364(c)(2), to grant to the DIP Lender, fully-perfected and enforceable, senior, first-priority liens on and security interests in all proceeds of avoidance actions;

E.    Authorization, pursuant to Bankruptcy Code section 364(d), to grant to the DIP Lender, fully perfected, enforceable, first priority, priming DIP Liens on all DIP Collateral subject to a lien or security interest as of the Petition Date (each, a "Lien"), including, for the avoidance of doubt, the Liens securing the Prepetition Bridge Loan Obligations and Prepetition Senior Lender Obligations;

---

[3]  At present, the DIP Lender intends to lend pursuant to the DIP Term Sheet, this Interim DIP Order and the Final DIP Order (as defined below, once entered), but shall have the right to require additional DIP Loan Documents.

F.      Authorization, pursuant to Bankruptcy Code section 364(c)(1), to grant adequate protection, including, among other things, Replacement Liens (as defined in paragraph 21) and super-priority claims on account of the Debtors' prepetition obligations (the "Prepetition Senior Lender Obligations") under that certain Plain English Growth Capital Loan and Security Agreement, dated as of October 19, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Prepetition Senior Loan Agreement"), by and among Vector Launch Inc. and Garvey Spacecraft Corporation, as borrowers, and TriplePoint Capital, as lender (the "Prepetition Senior Lender" and together with the Bridge Lender, the "Prepetition Lien Holders"), which Replacement Liens shall be junior to the DIP Liens but senior to the Replacement Liens granted to the Bridge Lender (defined below), and super-priority claims which shall be junior to the DIP Liens and super-priority claims granted to the DIP Lender, and senior to the super-priority claims granted to the Bridge Lender (defined below);

G.      Authorization to grant adequate protection, including, among other things, Replacement Liens and super-priority claims to Bridge Lender (defined below) with respect to the Debtors' use of Cash Collateral and all diminution in value of the Prepetition Bridge Loan Collateral (as defined below), which Replacement Liens shall be junior to the DIP Liens and the Replacement Liens granted to the Prepetition Senior Lender, and super-priority claims which shall be junior to the DIP Liens and super-priority claims granted to the DIP Lender, and junior to the super-priority claims granted to the Prepetition Senior Lender;

H.      Pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court on or prior to December 16, 2019, to consider entry of this Interim DIP Order;

4

I.      Pursuant to this Interim DIP Order, that this Court schedule a final hearing (the "Final Hearing") on or prior to _____, to consider entry of the final DIP order (the "Final DIP Order") authorizing and approving, on a final basis, all of the relief requested in the Motion and DIP Loan Documents, including the full amount of the DIP Facility; and

J.      That the Court grant other related relief.

The Interim Hearing having been held by this Court on December 16, 2019, and upon the First Day Declaration, the record made by the Debtors at the Interim DIP Hearing and the evidence and arguments of counsel, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

1.      Petition Date. On December 13, 2019 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in the Chapter 11 Cases.

2.      Jurisdiction, Venue and Statutory Predicates. This Court has jurisdiction over the Debtors, the Chapter 11 Cases, and the persons, entities and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. § 1408. The predicates for the relief

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact include conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

requested herein are Bankruptcy Code sections 105(a), 361, 362, 363, and 364, and 507; Bankruptcy Rules 4001 and 9014; and Local Rule 4001-2(b).

3.    <u>Committee Formation</u>. No official committee of unsecured creditors (a "<u>Committee</u>") has been appointed in the Chapter 11 Cases to date.

4.    <u>Notice</u>. Notice of the Motion, the relief requested therein, and the Interim Hearing has been served by the Debtors on (a) the Office of the United States Trustee for Region 3, Attn: Juliet Sarkessian, Esq.; (b) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the DIP Lender and its counsel; (d) all other known holders of prepetition liens, encumbrances or security interests against the Debtors' property; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; (g) the Securities and Exchange Commission; (h) the Delaware Secretary of State; (i) the Delaware Secretary of the Treasury; (j) the attorneys general for Delaware, California, and Arizona; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party required to be provided notice under Local Rule 9013-1(m). As the Debtors have sought "first day" relief in the Motion, within two (2) Business Days after entry of this Interim DIP Order, the Debtors will serve copies of the Motion and this Interim DIP Order and any order entered in respect to the Motion as required by Local Rule 9013-l(m). Under the circumstances, notice was sent under Bankruptcy Rules 4001(b), 4001(c) and 4001(d), Local Rule 4001-2 and Bankruptcy Code section 102(1) in light of the emergency nature of the interim relief requested in the Motion, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

5.    <u>Necessity and Uses of Financing and Cash Collateral</u>. The DIP Facility and the Debtors' use of Cash Collateral will allow the Debtors to continue the operations of their

businesses and administer and preserve the value of their estates during the pendency of the Chapter 11 Cases. Pursuant to this Interim DIP Order, the Debtors shall be authorized to borrow funds under the Interim DIP Facility in an aggregate principal amount of not more than $500,000 in one or more draws in accordance with the Initial Budget (as defined below). Entry of this Interim DIP Order approving the Interim DIP Facility and the Debtors' interim use of Cash Collateral will benefit the Debtors and their estates and creditors and is necessary to avoid immediate and irreparable harm to the Debtors' creditors and estates. Therefore, it is in the best interest of the Debtors' creditors and estates to establish the Interim DIP Facility described in the Motion, as set forth in this Interim DIP Order, and as contemplated by the DIP Loan Documents, and to authorize the Debtors' use of Cash Collateral, subject to the terms and conditions in the DIP Loan Documents and as set forth in this Interim DIP Order.

6.      <u>No Credit Available on Other Terms</u>. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code sections 503(b)(1), 364(a), or 364(b). The Debtors are unable to obtain secured credit allowable solely under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) without granting the DIP Liens to the DIP Lender and the DIP Super-Priority Claim (as defined below) to the DIP Lender, pursuant to Bankruptcy Code sections 364(d) and 364(c)(1), under the terms and conditions set forth in the DIP Loan Documents and this Interim DIP Order. The Debtors are also unable to obtain financing from sources other than the DIP Lender or on more favorable terms than those set forth in the DIP Loan Documents.

7.      <u>Business Judgment and Good Faith</u>. The terms and conditions of the Interim DIP Facility, as set forth in the DIP Loan Documents, and the use of Cash Collateral, as described in the Motion, and as all were set forth at the Interim Hearing, are fair and reasonable, and the entry into the Interim DIP Facility on the terms and conditions set forth in the DIP Loan Documents

7

represent a sound, prudent exercise of the Debtors' business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The Interim DIP Facility and use of the DIP Collateral and Cash Collateral were negotiated in good faith (as that term is used in Bankruptcy Code section 364(e)) and at arm's length and for fair consideration among the Debtors and the DIP Lender. Accordingly, all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the extension of the Interim DIP Facility, the DIP Loan Documents, and all fees and other obligations or indebtedness owing to the DIP Lender, shall be deemed to have been extended by the DIP Lender in good faith (as that term is used in Bankruptcy Code section 364(e)), and in express reliance upon the protections offered by Bankruptcy Code section 364(e) and shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim DIP Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

8.    _Property of the Estates_. Each item of the DIP Collateral constitutes property of the estates of the Debtors.

9.    _Good Cause_. Good and sufficient cause exists for the entry of this Interim DIP Order. The borrowings under the Interim DIP Facility and the Debtors' use of Cash Collateral and the other relief requested in the Motion, are necessary, essential, appropriate, and in the best interest of the Debtors, their creditors, and their estates, as the borrowings under the Interim DIP Facility and access to Cash Collateral will, among other things, provide the Debtors with the liquidity necessary to fund the necessary expenses of their businesses, preserve and maximize the value of the Debtors' estates for the benefit of all creditors through a sale of all or substantially all of their assets, and avoid immediate and irreparable harm to the Debtors and their estates, their

creditors, their businesses, and their assets which would result if the Debtors did not have access to the Interim DIP Facility and Cash Collateral.

10.  <u>Debtors' Acknowledgments and Agreements</u>. Without prejudice to the rights of any other party but subject to entry of the Final DIP Order, the Debtors admit, stipulate, acknowledge and agree that:

(a)  <u>Bridge Loan</u>. Prior to the Petition Date, Lockheed Martin provided bridge financing (in such capacity, the "<u>Bridge Lender</u>") to the Debtors in the principal amount of $500,000. As of the Petition Date, the Debtors were liable to Bridge Lender in the amount of $500,000, plus accrued but unpaid interest, fees, and expenses incurred under and in connection with the Bridge Loan Agreement as provided therein (collectively, the "<u>Prepetition Bridge Loan Obligations</u>"). The Prepetition Bridge Loan Obligations are secured by senior, priority, fully-perfected security interests in and liens on all of the Debtors' rights, title and interests in, to and under their respective "Collateral" as defined in the Bridge Loan Agreement (the "<u>Prepetition Bridge Loan Collateral</u>") senior in all respects to all other interests in or claims against the Debtors or the Debtors' assets, except that such lien and security interest is junior in priority only to the Prepetition Senior Lender Obligations arising under the Prepetition Senior Loan Agreement.

(b)  <u>Validity and Enforceability</u>. (i) The Bridge Loan Agreement is valid and enforceable by Bridge Lender against the Debtors, (ii) the Prepetition Bridge Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are secured by valid, binding, enforceable, duly perfected liens and security interests granted by the Debtors to the Bridge Lender (the "<u>Bridge Loan Liens</u>") on the Prepetition Bridge Loan Collateral in the amount and to the extent set forth in the Bridge Loan Agreement, including the proceeds derived therefrom, and (iii) the Bridge Lender duly perfected the Bridge Loan Liens by, among other

things, filing financing statements and, where necessary, by possession of relevant instruments, certificates, cash or other property, and all such financing statements were validly executed by, or at the direction or with the consent of, authorized representatives of the Debtors.

(c)     Cash Collateral. All of the Debtors' cash constitutes Cash Collateral or proceeds of the Bridge Loan Collateral and, therefore, is Cash Collateral of the Bridge Lender. For purposes of this Interim DIP Order, the term "Cash Collateral" shall be deemed to include, without limitation: (i) all "cash collateral" as defined under Bankruptcy Code section 363; and (ii) all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtors in which the Bridge Lender asserts security interests, liens, or mortgages, regardless of (x) whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to this Interim DIP Order, and (y) whether the property converted to cash existed as of the Petition Date or arose thereafter.

Based on the foregoing, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

11.     Motion Granted. The Motion is granted in accordance with the terms and conditions of this Interim DIP Order. Any objections to the Motion with respect to entry of this Interim DIP Order that have not been withdrawn, waived or settled are hereby denied and overruled.

12.     Final Hearing. The Final Hearing to consider entry of the Final DIP Order will be held on _____, at __:__ p.m. Eastern Time. The Debtors shall, on or before December __, 2019, mail a notice of the entry of this Interim DIP Order, together with a copy of this Interim DIP Order, to the parties having been given notice of the Interim Hearing, to any party which has filed prior to the such date of service a request for notice with the Bankruptcy Court and to counsel for any Committee. Such notice shall constitute adequate notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of,

10

among other things, the proposed (a) full amount of the DIP Facility, less the aggregate amount of DIP Loans actually borrowed by the Debtors on a final basis pursuant to this Interim DIP Order; (b) Final Commitment Fee; (c) Roll-up of the Bridge Loan; (d) lien on the proceeds of all avoidance actions; (e) waiver of rights under Bankruptcy Code section 506(c); (f) restriction on "marshaling" (or the application of any similar doctrine) relating to the DIP Lender; (g) waiver under Bankruptcy Code section 552(b); and (h) the Carve-Out. The notice of entry of this Interim DIP Order shall state that any party in interest objecting to the DIP Facility, DIP Loan Documents or use of Cash Collateral on the terms and conditions set forth therein and herein shall file a written objection with the Clerk of the Bankruptcy Court no later than _____, at 4:00 p.m. Eastern Time, which shall be served so that the same are received on or before such date and time by: (a) counsel to the Debtors: (i) Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp, and (ii) Sullivan Hazeltine Allinson LLC, North Market Street, Suite 1300, Wilmington, DE 19801, Attn: Elihu Ezekiel Allinson, III; (b) counsel to the DIP Lender: (i) Hogan Lovells US LLP, 390 Madison Avenue, New York, NY 10017, Attn: Christopher R. Donoho, III and John Beck, and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899, Attn: Robert Dehney and Andrew Remming; (c) counsel to any Committee; and (d) the U.S. Trustee.

13.   Authorization of the Interim DIP Facility and DIP Loan Documents.

(a)   The Debtors are hereby authorized, pursuant to the terms of this Interim DIP Order and the DIP Loan Documents, including, without limitation the conditions to funding of the DIP Facility in the DIP Term Sheet, to incur the Interim DIP Facility in the aggregate amount of $500,000, including to (a) borrow funds under the Interim DIP Facility in an aggregate principal

amount of not more than $500,000 in one or more draws in accordance with Initial Budget (as defined below) during the period from the date of closing on the Interim DIP Facility following the entry of this Interim DIP Order until the date of entry of the Final DIP Order, (b) incur the $37,500 Initial Commitment Fee, which shall be deemed fully earned on the closing date of the Interim DIP Facility and ratably added to the outstanding principal balance of the DIP Loans on such date and constitute additional DIP Loan principal for all purposes, and (c) use Cash Collateral. The Debtors' use of borrowings under the DIP Facility and Cash Collateral, subject to the Permitted Deviation (as defined below) shall be in accordance with the purposes described herein and the Initial Budget (as defined below) and subsequent Budgets approved by the DIP Lender. The DIP Loans shall be evidenced by the books and records of the DIP Lender, or, if requested by the DIP Lender, a promissory note executed and delivered to the DIP Lender by the Debtors.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements) that may be reasonably required or necessary for the Debtors' performance of their obligations under or in connection with the Interim DIP Facility and DIP Loan Documents, including, without limitation, (i) the execution, delivery and performance of the DIP Loan Documents, any other documents or instruments that may be reasonably requested by the DIP Lender in connection with the DIP Facility, and any waivers, forbearances, consents, or amendments to the DIP Loan Documents as the Debtors and the DIP Lender may agree in writing, all in accordance with the terms of the DIP Loan Documents and this Interim DIP Order, and (ii) payment of all reasonable fees and expenses of the DIP Lender and

their respective counsel and other retained professionals as set forth in the DIP Loan Documents and Paragraph 45 hereof.

14.     Upon entry of this Interim DIP Order, the DIP Loan Documents shall constitute valid, binding, and enforceable obligations of the Debtors, enforceable against the Debtors in accordance with the terms thereof. Subject to entry of the Final DIP Order, no obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim DIP Order shall be voidable or recoverable under the Bankruptcy Code (including without limitation, under Bankruptcy Code section 502(d)) or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim and shall survive dismissal of, or conversion of the cases to cases under Chapter 7 of the Bankruptcy Code.

15.     DIP Liens. As security for and to the extent of the DIP Obligations incurred pursuant to this Interim DIP Order, effective and perfected immediately upon entry of this Interim DIP Order, and without the necessity of the execution, recordation, or filings of mortgages, deeds of trust, security agreements, control agreements, pledge agreements, financing statements, or other similar documents or instruments, the liens described in the DIP Loan Documents (the "DIP Liens"), are hereby granted and approved on all assets of the Debtors of whatever kind or nature, wherever located, and whether now owned or which may be hereafter acquired by the Debtors, *including, without limitation*, all of the Debtors' rights, title and interests in and to the following (collectively, the "DIP Collateral"):

(a)     all Accounts;

(b)     all Chattel Paper;

(c)     all Money, including Cash Collateral, and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

13

(d)      all Documents;

(e)      all General Intangibles (including patents, trademarks, service marks, copyrights, and other intellectual property), Payment Intangibles and Software;

(f)      all Goods, including Inventory, Equipment and Fixtures;

(g)      all Instruments;

(h)      all Investment Property;

(i)      all Letter-of-Credit Rights and other Supporting Obligations;

(j)      all Records;

(k)      all Commercial Tort Claims;

(l)      all Proceeds and Accessions with respect to any of the foregoing Collateral; and

(m)      subject to entry of the Final DIP Order, proceeds of all avoidance actions.

16.     Each category of DIP Collateral set forth above (other than in clause (m)) shall have the meaning set forth in the New York Uniform Commercial Code, it being the intention of the Debtors that the description of the DIP Collateral set forth above be construed to include the broadest possible range of assets.

17.     <u>First Lien on Unencumbered Property</u>. Pursuant to Bankruptcy Code section 364(c)(2), the DIP Liens constitute valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon the DIP Collateral that is not subject to any valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date or valid Liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by Bankruptcy Code section 546(b), if any.

18.     <u>Priming DIP Liens</u>. Pursuant to Bankruptcy Code section 364(d), the DIP Liens granted pursuant to this Interim DIP Order constitute valid, binding, continuing, enforceable, fully perfected, first priority, priming DIP Liens upon the DIP Collateral that is subject to a Lien as of the Petition Date, including, for the avoidance of doubt, any valid, non-avoidable and enforceable Lien that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b), such that the DIP Lender shall have liens senior in all respects to any such security interests in the DIP Collateral, including, without limitation, all Liens securing the Prepetition Bridge Loan Obligations and Prepetition Senior Lender Obligations and the Adequate Protection Liens.

19.     <u>Liens Senior to Certain Other Liens</u>. The DIP Liens granted pursuant to this Interim DIP Order to the DIP Lender, shall be senior to and shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or (b) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, other than as otherwise required by applicable law.

20.     <u>DIP Super-Priority Claim</u>. Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses and all other claims against the Debtors, including, now or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses or claims arising under Bankruptcy Code sections 105, 326, 328, 330,331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 (the "<u>DIP Super-Priority Claim</u>"), and, for the avoidance of doubt, the super-priority claim granted as adequate protection in respect of the Prepetition Bridge Loan Obligations and the Prepetition Senior Lender Obligations.

21.     <u>Adequate Protection for the Prepetition Lien Holders</u>. In this Interim DIP Order, the term "<u>Replacement Lien</u>" shall mean that, subject to the terms and conditions set forth in this Interim DIP Order, the Prepetition Lien Holders shall have and are hereby granted (effective upon the date of this Interim DIP Order and without the necessity of the Debtors or the Prepetition Lien Holders' execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or otherwise), valid and perfected, security interests in, and liens upon the Collateral, in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the respective Prepetition Lien Holders' security interests and liens in the Prepetition Collateral.

22.     The Prepetition Lien Holders are granted the following adequate protection for any diminution in the value of their respective interests in the Prepetition Collateral from the Petition Date resulting from (i) the imposition of the DIP Liens, (ii) the use, sale, lease, disposition, shrinkage, decline in market value, consumption, or physical deterioration of the Prepetition Collateral (including Cash Collateral) by the Debtors, and (iii) the imposition of the automatic stay pursuant to Bankruptcy Code section 362 (collectively, the "<u>Adequate Protection Obligations</u>"):

(a)     The Prepetition Lien Holders shall have and are hereby granted the Replacement Liens subject to (i) unavoidable, duly perfected liens existing as of the Petition Date, which liens shall retain their respective priorities *vis a vis* the Replacement Liens granted hereby to the Prepetition Lien Holders and (ii) the priorities set forth herein. Except as otherwise set forth herein, the Replacement Liens granted to the Prepetition Lien Holders pursuant to this Interim DIP Order shall be prior and senior to all liens and encumbrances (other than fees arising under 28 U.S.C. §1930) of (i) all other secured creditors in and to such property granted, or arising, subsequent to the date of this Interim DIP Order, (ii) any intercompany claim of the Debtors or

any subsidiary or affiliate of the Debtors, and (iii) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to Bankruptcy Code section 551;

(b)      Prepetition Senior Lender shall have and is hereby granted a Lien on Intellectual Property (the "IP Adequate Protection Lien") of the Debtors that are subject to (i) unavoidable, duly perfected liens existing as of the Petition Date, which liens shall retain their respective priorities *vis a vis* the IP Adequate Protection Lien granted hereby to Prepetition Senior Lender and (ii) the priorities set forth herein. Except as otherwise set forth herein, the IP Adequate Protection Lien granted to the Prepetition Senior Lender pursuant to this Interim DIP Order shall be prior and senior to all liens and encumbrances (other than fees arising under 28 U.S.C. §1930) of (i) all other secured creditors in and to such property granted, or arising, subsequent to the date of this Interim DIP Order, (ii) any intercompany claim of the Debtors or any subsidiary or affiliate of the Debtors, and (iii) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estates pursuant to Bankruptcy Code section 551; and

(c)      The Prepetition Lien Holders are hereby granted allowed super-priority claims in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the Prepetition Lien Holders' security interests and liens in the Prepetition Collateral, provided, however, that the super-priority claims granted to Prepetition Lien Holders shall be junior in all respects to the super-priority claims granted to the DIP Lender. No cost or expense of administration under Bankruptcy Code sections 105, 503(b), and 507(b) shall be senior to, or *pari passu* with, any super-priority claims.

23.      Termination. All (i) DIP Obligations of the Debtors to the DIP Lender shall be due and payable in accordance with the terms of the DIP Term Sheet (but until entry of the Final DIP

Order) and (ii) authorization to use Cash Collateral shall cease, on the date (the "DIP Expiration Date") that is the earliest to occur of: (a) the date that is twenty-five (25) calendar days after the Petition Date, unless this Court shall have entered the Final DIP Order on or prior to 11:59 p.m. Eastern Time on such date; (b) the date that is fifty-five (55) calendar days after the Petition Date, unless this Court shall have entered an order pursuant to Bankruptcy Code section 363 approving the sale of the Purchased Assets (as defined in the DIP Term Sheet) (the "Sale Order") on or prior to 11:59 p.m. Eastern Time on such date; (c) the date that is fifteen (15) calendar days after entry of the Sale Order, unless the Approved Sale (as defined in the DIP Term Sheet) shall have been consummated prior thereto; and (d) the occurrence of an Event of Default.

24.     Reservation of Rights of Prepetition Lien Holders. Except as expressly provided herein, nothing contained in this Interim DIP Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity, to the DIP Lender or Prepetition Lien Holders, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of the Debtors to contest such assertion).

25.     Carve-Out. All DIP Obligations (and the repayment thereof), DIP Liens other liens and security interests, and DIP Super-Priority Claim of the DIP Lender securing the DIP Facility and DIP Obligations shall be subject to and subordinate to a carve-out for payment of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are (i) incurred prior to the Maturity Date and (ii) included in the Budget for the period prior to the Maturity Date; plus (b) all fees and expenses of professionals retained by the Debtors and any Committee appointed in the Chapter 11 Cases (other than "ordinary course

professionals") ("Professionals") in the Chapter 11 Cases that are (i) incurred prior to the Maturity

Date and which have not been paid prior to the Maturity Date, (ii) allowed either prior to or after

the Maturity Date, and (iii) included in the amounts scheduled as "Restructuring Professional Fees

Incurred" in the Budget; plus (c) all fees and expenses of Professionals incurred and allowed after

the occurrence of the Maturity Date in an amount not to exceed $50,000; plus (d) all fees required

to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy

Court after the Maturity Date.

26.     Payment of Allowed Professional Fees Prior to the Maturity Date. Any payment or

reimbursement in respect of any allowed Professional fees incurred prior to the occurrence of the

Maturity Date shall not reduce the Carve-Out.

27.     Payment of Carve-Out on or After the Maturity Date. Any payment made on or

after the occurrence of the Maturity Date in respect of any allowed fees and expenses of

Professionals incurred after the Maturity Date shall permanently reduce the Carve-Out on a dollar-

for-dollar basis. Any funding of the Carve-Out shall be added to, and made a part of, the DIP

Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted

under this Interim DIP Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

28.     Access to Collateral. The DIP Lender and its advisors shall be given reasonable

access to the collateral securing their respective liens, security interests and claims granted

pursuant to this Interim DIP Order for purposes of monitoring the business of the Debtors and

valuing such collateral.

29.     Perfection of DIP Liens. The automatic stay imposed under Bankruptcy Code

section 362(a) is hereby vacated and modified to the extent necessary to permit the Debtors to

grant the DIP Liens to the DIP Lender contemplated by the DIP Loan Documents and this Interim DIP Order.

30.    The DIP Liens granted pursuant to the DIP Loan Documents and this Interim DIP Order shall constitute valid, enforceable and fully perfected security interests and liens, and the DIP Lender shall <u>not</u> be required to file, record, or serve financing statements, mortgages, notices of lien, or similar instruments which otherwise may be required under federal, state, or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens. The failure by the Debtors to execute, file, record or serve, or take any similar actions, with respect to any of the foregoing or similar documents or instruments relating to the DIP Liens shall in no way affect the validity, enforceability, perfection, or relative priority of such security interests and liens. The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien, or similar instruments in any jurisdiction, or take any other action to validate and perfect the liens and security interests granted to it hereunder. Whether or not the DIP Lender shall, in its sole discretion, choose to file any of the foregoing or otherwise confirm perfection of the liens and security interests granted to them under the DIP Loan Documents and this Interim DIP Order, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim DIP Order. The DIP Lender, without any further consent of any party, is authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens, and the Debtors shall cooperate with any reasonable requests of the DIP Lender to facilitate any of the foregoing.

31.    A certified copy of this Interim DIP Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim DIP Order for filing and recording.

32.    <u>Budget</u>. Attached hereto as **<u>Exhibit II</u>** is the initial Budget (the "<u>Initial Budget</u>"), which has been approved by the DIP Lender. All references to the Budget in this Interim DIP Order and the DIP Term Sheet shall mean as the same is subject to the Permitted Deviation (as defined below). Commencing on the Wednesday of the fourth (4th) week following the Petition Date, the Debtors shall deliver to the DIP Lender no less frequently than once every two (2) weeks an updated budget (each a "<u>Proposed Budget</u>") reflecting weekly cash flow forecasts of receipts and disbursements for such Budget period (in substantially the same format as the prior monthly cash flow forecast of receipts and disbursements), in the manner and with the accompanying information set forth in the DIP Term Sheet. Each Proposed Budget shall be subject to review and approval by the DIP Lender before being deemed an approved Budget. Three (3) Business Days after delivery of a Proposed Budget, unless the DIP Lender delivers a written, good faith, objection to the Debtors (a "<u>Proposed Budget Objection</u>") setting forth specific objections to the Proposed Budget, such Proposed Budget shall be deemed approved by the DIP Lender and shall become the new Budget. If the DIP Lender shall have timely delivered a Proposed Budget Objection to the Debtors, the prior approved Budget shall continue in place and the Parties shall negotiate in good faith to resolve the objections set forth in the Proposed Budget Objection. Upon resolution of the objections set forth in the Proposed Budget Objection, such Proposed Budget shall become the new Budget.

33.     Compliance with the Budget shall be tested beginning on the seventh (7th) day after the date of entry of this Interim DIP Order and each week thereafter (each, a "Budget Test Date") for the period from the entry of this Interim DIP Order through the applicable Budget Test Date (each, a "Budget Test Period"). During each Budget Test Period, the actual aggregate amount of disbursements shall not be more than 110% of the aggregate amount of projected disbursements set forth in the Budget for such Budget Test Period (the "Permitted Deviation"); provided that the DIP Lender may, in its sole but reasonable discretion and without further Court approval, authorize the Debtors in writing to exceed the Permitted Deviation.

34.     Budget Covenants.

(a)     Except as provided in the DIP Term Sheet or this Interim DIP Order, or as approved by the DIP Lender, the Debtors shall not, directly or indirectly, (i) use any proceeds of the DIP Loans in a manner or for a purpose other than those consistent with the DIP Term Sheet and this Interim DIP Order or (ii) permit a disbursement causing any deviation from the Budget other than Permitted Deviation.

(b)     Prior to the occurrence of a DIP Event of Default, the Debtors shall be permitted to pay fees and expenses of Professionals solely to the extent that such fees and expenses are in accordance with the Budget and authorized to be paid under Bankruptcy Code sections 330 and 331 (other than any Professionals whose fees are not subject to such provisions) pursuant to an order of the Bankruptcy Court, as the same may be due and payable. Upon the occurrence of a DIP Event of Default, the right of the Debtors to pay professional fees and expenses shall terminate, other than as provided with respect to the Carve-Out.

35.     Termination. Subject to the terms and conditions set forth in this Interim DIP Order, the Debtors are authorized to use the proceeds of the Interim DIP Facility and the Cash Collateral

22

in the amounts, and solely for the purposes, set forth in the Initial Budget, subject to Permitted Deviation, through the earlier to occur of (a) the date that is thirty (30) calendar days after the date of entry of this Interim DIP Order (unless such date is extended by the DIP Lender) and (b) entry of the Final DIP Order.

36.     <u>Remedies; Termination of DIP Facility and Use of Cash Collateral</u>. Following three (3) Business Days' notice of a DIP Event of Default to the Debtors, any Committee, and the U.S. Trustee, unless such DIP Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Lender shall have relief from the automatic stay to exercise remedies under the DIP Loan Documents, the Chapter 11 Orders, and applicable law. In addition, following three (3) Business Days' notice of a DIP Event of Default to the Debtors, any Committee, and the U.S. Trustee and continuing during the pendency of such DIP Event of Default, unless such DIP Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, without limitation of any of the remedies set forth in the DIP Term Sheet and the other DIP Loan Documents, the Debtors shall have no right to use or seek to use any Cash Collateral in which the DIP Lender has an interest, other than in connection with funding and/or reserving amounts to fund the Carve-Out, or to request further DIP Loans. Subject to the terms and conditions set forth in this Interim DIP Order, the Debtors are authorized to use the proceeds of the Interim DIP Facility and the Cash Collateral solely for the purposes set forth in the DIP Loan Documents, in accordance with the Initial Budget, and in accordance with any subsequent approved Budget, including, without limitation, to fund and/or reserve amounts to fund the Carve-Out.

37.     <u>Asset Dispositions</u>. The Debtors shall not sell, transfer, license or otherwise dispose of any assets outside the ordinary course of business unless such sale is (i) pursuant to the 363 Sale Order or (ii) approved by the DIP Lender in its sole discretion and by the Bankruptcy Court.

38.     <u>Marshaling</u>. Subject to entry of the Final DIP Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or any part thereof.

39.     <u>Section 552(b)</u>. Subject to entry of the Final DIP Order, the DIP Lender is entitled to all of the rights and benefits of Bankruptcy Code section 552(b)(1) and the "equities of the case" exception therein shall not apply.

40.     <u>Proofs of Claim</u>. The DIP Lender may, but shall not be required to, file proofs of claim in the Chapter 11 Cases or any successor cases and any order entered by the Bankruptcy Court in relation to the establishment of procedures to file proofs or a bar date in the Chapter 11 Cases or any successor cases shall, or shall be deemed to, so provide.

41.     <u>Preservation of Rights Granted Under this Interim DIP Order</u>.

(a)     Except as otherwise set forth herein, no claim or Lien having a priority senior to or *pari passu* with those granted by this Interim DIP Order to the DIP Lender shall be granted or allowed while any portion of the Interim DIP Facility (or any refinancing thereof), the DIP Loan commitments, the DIP Obligations which are the subject of this Interim DIP Order, and the DIP Liens and the Adequate Protection Liens shall not be (a) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551 or (b) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

24

(b)     To the extent permitted by applicable law, if an order dismissing the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise is at any time entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349), to the fullest extent permitted by law, that (a) the DIP Liens and DIP Super-Priority Claim pursuant to this Interim DIP Order shall continue in full force and effect and shall maintain their relative priorities as provided in this Interim DIP Order until all DIP Obligations shall have been paid and satisfied in full and that such DIP Liens, and DIP Super-Priority Claim, shall, notwithstanding such dismissal, remain binding on all parties in interest and (b) this Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to and provided for in this Interim DIP Order.

(c)     If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (a) the validity of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification or vacation or (b) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents, with respect to any DIP Obligations. Notwithstanding any such reversal, stay, modification, or vacation, any use of Cash Collateral, or DIP Obligations incurred, by the Debtors prior to the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e), this Interim DIP Order and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral and DIP Obligations.

(d)     Except as expressly provided in this Interim DIP Order or in the DIP Loan Documents, the DIP Liens, Adequate Protection Liens, DIP Super Priority Claim, and all other

25

rights and remedies of the DIP Lender granted by the provisions of this Interim DIP Order and the DIP Loan Documents, as applicable, shall survive, and shall not be modified, impaired or discharged by (a) the entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Cases or (b) the entry of an order confirming a plan of reorganization in the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors waive any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim DIP Order and the DIP Loan Documents shall continue in these Chapter 11 Cases or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, Adequate Protection Liens and DIP Super-Priority Claim and all other rights and remedies of the DIP Lender granted pursuant to this Interim DIP Order or DIP Loan Documents, as applicable, shall continue in full force and effect.

42.     <u>Effect of Stipulations on Third Parties</u>. The agreements, stipulations, and findings contained in this Interim DIP Order (other than the releases with respect to the Bridge Lender Releasees, as defined in the Bridge Loan Agreement, which releases are binding upon all parties upon entry of this Interim Order) shall be binding upon all parties in interest, including, but not limited to, the Debtors and their estates, any Committee, if appointed, and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or 11 trustee or examiner appointed or elected for any of the Debtors, except to the extent that (a) a party in interest with standing, has timely commenced an adversary proceeding asserting any claims or causes of action solely with respect to the validity, priority or extent of the Bridge Lender's claims or liens, objecting to the Bridge Lender's claims or liens, or challenging any of the admissions set forth in Paragraph 10 of this Interim DIP Order (a "<u>Challenge</u>") no later than the earlier of (the "<u>Challenge Period</u>") (i) 75 days from the date of entry of this Interim DIP Order with respect to

26

parties in interest other than the Committee or (ii) 60 days from the date of formation of the Committee with respect to the Committee and (b) the Bankruptcy Court has ruled in favor of the party who timely commenced such Challenge. If no such Challenge is timely commenced within the Challenge Period, (a) all of the admissions in Paragraph 10 of this Interim DIP Order shall be binding and preclusive on the Debtors and their estates and their respective creditors, the Committee (if any), equity holders, any chapter 7 or 11 trustee or examiner appointed or elected for any of the Debtors, and all other parties in interest in these Chapter 11 Cases, (b) the claims of the Bridge Lender shall constitute allowed claims for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case, (c) the Bridge Loan Liens shall be deemed legal, valid, binding, perfected, and otherwise unavoidable, (d) the Bridge Loan Liens and Prepetition Bridge Loan Obligations shall not be subject to subordination, counterclaims, set-off, defense, avoidance or any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any chapter 7 or 11 trustee or examiner appointed or elected for any of the Debtors or any other successor thereto, and (e) as a result of the foregoing, the repayment of any Prepetition Bridge Loan Obligations (including, but not limited to, by means of the Roll-Up Loans) in accordance with the terms of this Interim DIP Order and the Bridge Loan Agreement shall constitute an indefeasible payment and shall be final and binding for all purposes. If any such Challenge is timely commenced within the Challenge Period, the agreements, stipulations and findings contained in Paragraph 10 of this Interim DIP Order shall nonetheless remain binding and preclusive on the Debtors and their estates and their creditors, the Committee (if any), equity holders, any chapter 7 or 11 trustee or examiner appointed or elected for any of the Debtors, and all other parties in interest in these Chapter 11 Cases, except to the extent that such findings or admissions were expressly and successfully disputed in such Challenge. Nothing in

27

this Interim DIP Order confers on any person, including, but not limited to any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, claims and defenses with respect to the Prepetition Bridge Loan Obligations.

43.     <u>Limitations on Use of DIP Facility Proceeds and Cash Collateral</u>. Notwithstanding anything in this Interim DIP Order or in any other order by this Bankruptcy Court to the contrary that was entered prior to the entry of this Interim DIP Order, no portion of the DIP Collateral, including, without limitation, Cash Collateral, the DIP Facility, or the Carve-Out may be used: (a) for any purpose that is prohibited under the Bankruptcy Code, this Interim DIP Order or any other order entered in the Chapter 11 Cases; (b) to finance in any way: (i) any action, contested matter, suit, arbitration, adversary proceeding or other proceeding, application, motion, objection or other litigation of any type adverse to the interests of the DIP Lender or its rights and remedies under the DIP Loan Documents, this Interim DIP Order, or the Final DIP Order (upon its entry), or (ii) any other action which with the giving of notice or passing of time would result in an Event of Default under the DIP Loan Documents; (c) to make any distribution under a plan of reorganization in the Chapter 11 Cases; (d) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; or (e) for any purpose or in any manner not approved in the Budget or by the DIP Lender.

44.     <u>Rights to Credit Bid</u>. The DIP Lender (or its designees) shall have the right to (i) credit bid up to the full amount of the DIP Obligations, and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Bankruptcy

Code section 363 or any similar laws in any other jurisdictions to which the Debtors are subject or (ii) credit bid up to the full amount of the DIP Obligations, and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral at any other sale or foreclosure conducted by the DIP Lender (whether by judicial action or otherwise) in accordance with applicable Law, and shall have standing with respect to all aspects of any such sales or hearings related thereto.

45.    <u>Reimbursement of Fees and Expenses</u>. The Debtors shall reimburse the DIP Lender for all of its reasonable costs, fees, charges and expenses incurred in connection with the DIP Facility, DIP Loan Documents and the Chapter 11 Cases (including, without limitation, the reasonable fees and expenses of its attorneys and financial advisors), as set forth in the DIP Term Sheet. A copy of any invoice submitted by the DIP Lender to the Debtors shall be delivered simultaneously to the U.S. Trustee and counsel to any Committee (the "<u>Fee Notice</u>"). Such invoices may be redacted to preserve any applicable privilege or work product doctrine and shall not be required to contain specific time entries. None of such costs, fees, charges and expenses shall be subject to Court approval or required to be recorded or maintained in accordance with the United States Trustee guidelines relating to compensation and reimbursement of expenses and no recipient of any such payment shall be required to file any interim or final fee application with the Court. Subject to the Debtors, any Committee, or the U.S. Trustee filing a written objection with this Court to any such fees and expenses within fourteen (14) days after receipt of the Fee Notice, the Debtors shall pay promptly such invoice in accordance with this Interim DIP Order and DIP Term Sheet. To the extent a timely filed objection is filed by the Debtors, any Committee, or the U.S. Trustee, the Debtors (a) shall pay such portion of the fees and expenses to which no objection

is interposed and (b) shall pay any remaining fees and expenses as ordered by the Bankruptcy Court (or upon withdrawal or resolution of the objection).

46.     <u>Incorporation of DIP Term Sheet</u>. The provisions of the DIP Term Sheet are incorporated herein to the same force and effect as if expressly provided in this Interim DIP Order. In the event of any inconsistency between the provisions of this Interim DIP Order and the Motion, or the DIP Loan Documents, including the DIP Term Sheet, the provisions of this Interim DIP Order shall govern and control.

47.     <u>Enforceability</u>. This Interim DIP Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim DIP Order shall be immediately effective and enforceable upon its entity and there shall be no stay of execution or effectiveness of this Interim DIP Order.

48.     <u>Binding Effect; Successors and Assigns</u>. The DIP Loan Documents and the provisions of this Interim DIP Order, including, subject to entry of the Final DIP Order, all agreements, stipulations and findings herein shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the Debtors, the DIP Lender, the Committee, and their respective successors and assigns (including any estate representative or any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors) and shall inure to the benefit of the DIP Lender and the Debtors and their successors, assigns, and designees; <u>provided</u> that the DIP Lender shall have no obligation to permit the use of Cash Collateral or extend any financing under the DIP Facility or otherwise, as the case may be, to any trustee or similar responsible person appointed for the estates of the Debtors.

49.     <u>Limitation on Charging Expenses Against Collateral</u>. Subject to and effective only upon entry of the Final DIP Order granting such relief, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law.

50.     <u>Exculpation and Indemnity</u>. Nothing in this Interim DIP Order, the DIP Loan Documents, or any other documents related to the transactions contemplated hereby or thereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any of the other Debtors in the operation of their businesses, or in connection with their Chapter 11 Cases. The indemnification provided by the Debtors under the DIP Term Sheet is hereby approved.

51.     <u>Release</u>. Except as expressly provided in Paragraph 42 hereof, effective upon entry of this Interim DIP Order, the Debtors for themselves, their affiliates, directors, employees, representatives, and assigns, forever and irrevocably discharge and release the DIP Lender (in all capacities), and its principals, predecessors, successors, assigns, agents, employees, representatives, attorneys, subsidiaries, affiliates (collectively, the "<u>DIP Lender Releasees</u>") from any and all claims, complaints, and lawsuits of any nature whatsoever, known or unknown, suspected or unsuspected, whether in law or in equity, whether in contract or in tort or otherwise, that the Debtors now may have against the DIP Lender Releasees.

31

52.     <u>No Third-Party Beneficiary</u>. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third-party, any creditor or any direct, indirect or incidental beneficiary.

53.     <u>Waiver</u>. Effective upon entry of the Final DIP Order, no person or entity shall be entitled, directly or indirectly, to, except as expressly provided by Paragraph 25 of this Interim DIP Order with respect to the Carve-Out, charge or recover from the Collateral, whether by operation of Bankruptcy Code section 506(c) or Bankruptcy Code sections 105 or 552(b), or otherwise, or direct the exercise of remedies or seek (whether by order of this Bankruptcy Court or otherwise) to marshal or otherwise control the disposition of Collateral or property after a DIP Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

54.     <u>No Control</u>. In determining to make any loan under the DIP Term Sheet or in exercising any rights or remedies as and when permitted pursuant to this Final DIP Order or the DIP Loan Documents, the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. § 9601 *et seq.,* as amended, or any similar federal or state statute).

55.     <u>Retention of Jurisdiction</u>. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of the DIP Loan Documents and this Interim DIP Order and the rights of the parties set forth therein and herein, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for the Debtors notwithstanding the terms or provisions of

any such Chapter 11 plan or order confirming such Chapter 11 plan or any order dismissing or

closing the Chapter 11 Cases.

Dated: December __, 2019
Wilmington, Delaware

THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT I</u>**

DIP Term Sheet

### $2.5 MILLION SECURED BRIDGE LOAN/DEBTOR IN POSSESSION CREDIT FACILITY

#### SUMMARY OF TERMS AND CONDITIONS

This Summary of Terms and Conditions (the "DIP Term Sheet") outlines certain terms of the proposed bridge loan/DIP facility referred to below. The principal operative terms will apply to a DIP facility approved by the Bankruptcy Court (defined below) and it is anticipated that any prepetition bridge loans would be made under junior secured promissory notes that would be rolled up into the DIP facility upon filing. This DIP Term Sheet was prepared for discussion purposes only. Each party referred to herein is free to terminate discussions with respect to the transactions contemplated herein at any time.[1]

| | |
|---|---|
| **Borrowers:** | Vector Launch Inc., Garvey Spacecraft and each of their subsidiaries, (the "Borrowers"). |
| **Cases:** | The bankruptcy cases (the "Bankruptcy Cases") of the Borrowers to be filed under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). |
| **Lenders:** | Lockheed Martin Corporation, and/or its affiliates who elect to participate in the DIP Facility, or who are designated as Purchasers of the Purchased Assets, and any of their respective successors and assigns (the "Lenders"). |
| | The Lenders will also be a purchaser in connection with the Borrowers' sale of the Purchased Assets to the Purchaser pursuant to section 363 of the Bankruptcy Code (the "363 Sale"). The indicative terms of the 363 Sale are included in the Term Sheet annexed hereto as Exhibit A (the "Sale Term Sheet"). |
| **Bridge Loan/DIP Facility:** | A non-amortizing multi-draw secured term loan facility (the "DIP Facility," and all loans under such DIP Facility, collectively, the "Loans," and each, a "Loan") in the maximum principal amount of up to $2.5 million (the "Total Commitment Amount"), in each case subject to and in accordance with the Budget (as defined below), including the Budget Variance (as defined below). All Loans outstanding under the DIP Facility (together with all accrued and unpaid interest, fees, expenses and other amounts outstanding) shall become due and payable on the Maturity Date (as defined below). |

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings set forth in Sale Term Sheet (attached hereto) or the Interim DIP order, as applicable.

**Roll-up:**  Subject to entry of the Final DIP Order (as defined below), the DIP Facility shall include a roll-up of all amounts loaned by Lenders to Borrowers prior to the Petition Date (as defined below), plus all accrued but unpaid interest, fees, expenses and other obligations outstanding thereon pursuant to that certain Bridge Loan and Security Agreement by and between the Lenders and Borrowers (the "Bridge Loan" and such agreement, the "Bridge Loan Agreement"). The obligations owing under the Bridge Loan shall be deemed to be a Loan hereunder for all purposes.

**Borrowing Procedure:**  Subject to the Interim DIP Order, borrowing of the Loans shall be made every two weeks, if necessary, and in accordance with the Budget (as defined below), upon at least three (3) business days' prior notice to the Lenders by the Borrowers and shall be in an amount up to $500,000, or such lessor amount as may then be available for borrowing under the Total Commitment Amount.

**Availability:**  Prior to the Petition Date (as defined below), the Borrowers shall be permitted to borrow an initial aggregate principal amount of up to $500,000 under the Bridge Loan for the purposes set forth below and in accordance with the Budget (as defined below).

Subject to entry by the Bankruptcy Court of an interim order satisfactory to the Lenders in their sole discretion approving the DIP Facility on an interim basis (the "Interim DIP Order"), and until entry by the Bankruptcy Court of a final order satisfactory to the Lenders in their sole discretion approving the DIP Facility on a final basis (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), the Borrowers shall be permitted to borrow an additional amount up to $500,000 (the "Initial Borrowing") and use any cash on hand, including, without limitation, any cash remaining from the Bridge Loan proceeds, if any, for the purposes set forth below and in accordance with the Budget (as defined below) and Interim DIP Order.

Subject to entry of the Final DIP Order, the Borrowers shall be permitted to borrow up to an additional $1,500,000 (the "Subsequent Borrowing") for the purposes set forth below and in accordance with the Budget (as defined below) and Final DIP Order, and, for the avoidance of doubt, the Borrowers may not draw down more than $500,000 of the Subsequent Borrowing in any two week period.

2

| | |
|---|---|
| **Term of DIP Facility:** | Unless otherwise extended in writing by the Lenders in their sole discretion, the period from the Funding Date (as defined below) to the earliest of: (i) the Scheduled Maturity Date (as defined below); (ii) an Event of Default (as defined below) (iii) the consummation of a sale of  the Purchased Assets to Purchaser pursuant to section 363 of the Bankruptcy Code or otherwise; or (iv) three (3) days from a bidder other than the Purchaser being selected as the prevailing bidder at the Auction for the Purchased Assets (such date, the "Maturity Date").

"Scheduled Maturity Date" shall mean the date that is 120 days after the Funding Date (as defined below). |
| **Funding Date:** | The date on which the Initial Borrowing Conditions below shall have been met (the "Funding Date"). |
| **Use of Proceeds:** | Proceeds of the Loans shall be used by the Borrowers solely to: (i) fund expenditures during the Bankruptcy Cases, including the Sale Process, in accordance with the Budget (as defined below); and (ii) to pay reasonable fees and expenses of Shaun Martin of Winter Harbor LLC to serve as Borrowers' chief restructuring officer ("CRO") or other similar advisors engaged for managing, protecting, and conducting inventory of the Collateral (as defined below), including such amounts arising before and after the Petition Date (as defined below), in each case in accordance with the Budget (as defined below). |
| **Interest Rates:** | Any amounts advanced prepetition pursuant to the Bridge Loan will bear interest at a rate equal to 18% *per annum* based on a 360-day year on the outstanding principal amount of all outstanding obligations under the Bridge Loan until such time that the Bridge Loan is rolled up into the DIP Facility upon entry of the Final DIP Order. Any amounts under the Bridge Loan that are rolled up into the DIP Facility will constitute obligations thereunder in all respects.

Loans under the DIP Facility will bear interest at a rate equal to 15% *per annum* based on a 360-day year on the outstanding principal amount of all outstanding obligations under the DIP Facility, compounded monthly. All interest shall accrue and be paid on the Maturity Date; *provided,* that if the Lenders or one or more of their affiliates are the successful bidder for the Purchased Assets, some or all accrued but unpaid interest may be applied by the Lenders on the closing date of the 363 Sale toward the purchase price of the Purchased Assets. All interest |

3

accruing after the Maturity Date shall be payable in cash, upon demand by the Lenders.

During the continuance of an Event of Default (as defined below), any amounts outstanding under the DIP Facility will bear interest at an additional 2.0% *per annum.*

**Fees:**

As a material inducement to the Lenders to make the Loans to the Borrowers, the Borrowers shall pay the Lenders the following fees:

1.   A fee equal to 1.5% of the Total Commitment Amount, which shall be fully earned upon entry of the Interim DIP Order (the "Initial Commitment Fee", and (ii) a fee equal to 1.5% of the Total Commitment Amount, which shall be fully earned upon entry of the Final DIP Order (the "Final Commitment Fee", and together with the Initial Commitment Fee, the "Commitment Fees"); and

2.   A fee equal to 1.5% of the Total Commitment Amount, which shall be fully earned upon entry of the Final DIP Order and payable to the Lenders in the event the Borrowers do not repay all outstanding obligations under the DIP Facility on the Maturity Date (the "Facility Extension Fee", and together with the Commitment Fees, the "DIP Facility Fees").

Once earned, the DIP Facility Fees shall accrue interest at the non-default or default interest rate, as applicable. All Commitment Fees (together with accrued interest) shall be payable upon the Maturity Date and the Facility Extension Fee shall be payable upon demand; *provided, however,* that if the Lenders are the successful bidder for the Purchased Assets, some or all DIP Facility Fees may be applied by the Lenders on the closing date of the 363 Sale toward the purchase price of the Purchased Assets.

**Credit Bidding**

The Lenders shall have the right to credit bid any or all of the obligations owing by the Borrowers to the Lenders under the DIP Facility and any prepetition indebtedness owed to Lenders, including any outstanding accrued interest and fees thereunder. In the event the Lenders are not the successful bidder in any sale of the Purchased Assets, the proceeds of any sale of the Purchased Assets shall be applied first to the repayment in full of the DIP Facility.

| | |
|---|---|
| **Optional Prepayments and Commitment Reductions:** | No early repayment or prepayment of any obligation permitted under the DIP Facility. |
| **Mandatory Prepayments:** | Mandatory prepayments of the Loans shall be required in an amount equal to (i) 100% of the net cash proceeds from asset sales or series of related asset sales by the Borrowers, provided that, Borrowers shall not be permitted to sell, transfer, license or dispose of any collateral outside of the ordinary course of business without lenders' consent**;** (ii) 100% of insurance and condemnation proceeds, in each case received by the Borrowers; and (iii) 100% of all unrestricted cash and cash equivalents held by or on behalf of the Borrowers in excess of $250,000 for more than five (5) consecutive days. |
| **Priority:** | All amounts owing by the Borrowers under the DIP Facility at all times will constitute allowed superpriority administrative expense claims in the Bankruptcy Cases, having priority over all administrative expenses of the kind specified in sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code. |
| | All liens authorized and granted pursuant to the DIP Orders entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date (as defined below), and no further filing, notice or act will be required to effect such perfection. |
| | The Lenders shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under state law in order to reflect the security, perfection or priority of the Lenders' claims described herein, including prior to the Petition Date (as defined below) in connection with the Bridge Loan. |
| **Security:** | Any amounts advanced prepetition pursuant to the Bridge Loan will be rolled up into the DIP Facility upon filing of the Bankruptcy Cases and constitute obligations thereunder in all respects. |
| | All obligations of the Borrowers under the DIP Facility shall be secured by the following: (i) pursuant to section 364(d)(1) of the Bankruptcy Code, first priority, priming liens on and security interests in all assets of the Borrowers (including, without limitation all intellectual property) that are subject to validly-perfected, existing liens on the Petition Date (as defined below), including, for the avoidance of doubt, any valid, non-avoidable and enforceable Lien that is perfected subsequent to the Petition |

Date as permitted by Bankruptcy Code section 546(b), such that the DIP Lender shall have liens senior in all respects to any security interests in the DIP Collateral; and (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, first-priority liens on and security interests in all assets of the Borrowers (including, without limitation all intellectual property) that are not subject to existing liens on the Petition Date (as defined below), including, subject to entry of the Final DIP Order, all proceeds of Chapter 5 avoidance actions, wherever located, and whether existing now or after the date of entry of the Interim Order ((i) and (ii), collectively, the "DIP Liens" and such assets subject to the DIP Liens, the "Collateral").

The Borrowers shall use a cash management system that is the same as or substantially similar to its prepetition cash management system; *provided, however,* that the Borrowers shall only be allowed to withdraw or transfer from their accounts amounts necessary to fund expenses of the Borrowers in accordance with the Budget (as defined below), unless otherwise authorized in writing by the Lenders and an order of the Bankruptcy Court. Any changes from such prepetition cash management system must be approved in writing by the Lenders and approved by an order of the Bankruptcy Court. The DIP Orders shall provide the Lenders with a valid, perfected and enforceable first priority security interest in and lien on the cash held in the Borrowers' bank accounts.

**Carve-Out:**
The DIP Liens shall be subject to a carve-out only for payment of (i) accrued and unpaid U.S. Trustee and Bankruptcy Court fees incurred prior to the Event of Default (as defined below), plus (ii) Allowed (as defined in the Bankruptcy Code) fees and expenses of professionals retained in the Bankruptcy Cases (other than ordinary course professionals) that are incurred after the occurrence of an Event of Default (as defined below), in an amount not to exceed $50,000, in the aggregate for all professionals, plus (iii) allowed accrued but unpaid fees and expenses of professionals retained in the Bankruptcy Cases that were accrued before the occurrence of an Event of Default (as defined below) but solely to the extent consistent with the Budget (the "Carve-Out"), and each of the professionals retained shall have separate line item carve-outs for their fees and expenses as provided in the Budget (as defined below).

**Conditions Precedent to Effectiveness and Initial Borrowing:**
The following shall be conditions (the "Initial Borrowing Conditions") precedent to the effectiveness of the DIP Facility and the funding of the DIP Facility during the Interim Period:

1.  The filing of the Bankruptcy Cases with the Bankruptcy Court on or before December 12, 2019 (such date, the "Petition Date");

2.  The preparation, authorization and execution of the DIP Loan Documents with respect to the DIP Facility, in form and substance satisfactory to the Lenders;

3.  The Bankruptcy Cases shall have not been dismissed or converted to Chapter 7 cases;

4.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Bankruptcy Cases;

5.  Within two (2) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Lenders in their sole discretion authorizing and approving (a) the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of valid, enforceable, non-avoidable and fully perfected superpriority security interests and liens and superpriority claims in favor of the Lenders and (b) the current cash payment of expenses under any Bridge Loan, including such amounts arising before and after the Petition Date and without the necessity of filing motions, to the extent such expenses have actually been incurred. The DIP Orders, as applicable, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lenders;

6.  Within two (2) business days after the Petition Date, the Bankruptcy Court shall have approved the release of the Lenders provided for in section 10.13 of the Bridge Loan Agreement;

7.  All necessary governmental and third-party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated hereby shall have been obtained and shall remain in effect;

8.  The making of the initial Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;

9.  The delivery of a 13-week cash flow projection in form and substance mutually agreeable to the Borrowers and the Lenders (the "Initial Budget");

10. The Lenders shall be satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by the Borrowers, and the Lenders shall have received endorsements naming the Lenders as an additional insured and loss payee under all insurance policies to be maintained with respect to the properties of the Borrowers forming part of the Collateral. To the extent the Lenders are unsatisfied with the amount, types and terms and conditions of Borrowers' insurance and bonding, the Lenders shall include any amounts necessary to procure or modify Borrowers' insurance or bonding in the Budget (as defined below) and advance those amounts under the DIP Facility;

11. The Lenders shall have a valid and perfected lien on and security interest in the Collateral with the priority described in such section. All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid. Deposit account control agreement shall be entered into with respect to each deposit account and security account of the Borrowers, establishing "control" under the applicable state Uniform Commercial Code, in favor of the Lenders;

12. The Borrowers and Lenders have agreed to a form asset purchase agreement in connection with the Section 363 Sale, subject only to Bankruptcy Court approval; and

13. All of the "first day orders" entered around the time of the Petition Date shall be consistent with this DIP Term Sheet and the Sale Term Sheet and be reasonably satisfactory in form and substance to the Lenders in all respects.

**Conditions Precedent to Each Subsequent Borrowing:**

Unless otherwise indicated, the obligation to provide each Loan (including the Initial Borrowing) shall be subject to the satisfaction of the Initial Borrowing Conditions and each of the following:

1.  No default shall exist under the DIP Loan Documents;

2.  The representations and warranties of the Borrowers under the DIP Loan Documents shall be true and correct immediately prior to, and after giving effect to, such funding,

8

except to the extent such representations and warranties specifically relate to an earlier date;

3. The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;

4. The Borrowers shall be in compliance with all of the provisions of the 363 Sale Documents and Bid Procedures Order, and the Milestones (as defined below) required to be satisfied by such funding date;

5. If after giving effect to a request for, and the borrowing of, such Loan, the Total Commitment Amount would not be exceeded;

6. For any Subsequent Borrowing, the Bankruptcy Court has approved the roll-up of the Bridge Loan into the DIP Facility;

7. The Lenders will receive (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code. In no event shall any of the Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral;

8. For any Subsequent Borrowing, the Bankruptcy Court has approved the Bid Protections;

9. For any Subsequent Borrowing, each of the Final DIP Order and the Bid Procedures Order, in form and substance satisfactory to the Lenders, shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal;

10. No Event of Default (as defined below) and no condition which would constitute an Event of Default (as defined below) with the giving of notice or lapse of time or both shall exist;

11. Receipt of a borrowing notice from the Borrowers in form and substance reasonably satisfactory to the Lenders;

12. All other conditions to the funding of the Subsequent Borrowing in the DIP Loan Documents shall have been satisfied or waived by the Lenders; and

13. Such other customary conditions reasonably required by the Lenders and set forth in the DIP Loan Documents.

**Borrowers' Representations and Warranties:**

To induce the Lenders to enter into this DIP Term Sheet and to provide the DIP Facility, the Borrowers hereby represent and warrant to the Lenders, on the Closing Date and on each date the Borrowers submit a Notice of Borrowing that:

1. Subject to the entry of the DIP Orders, the execution, delivery and performance by the Borrowers of the DIP Loan Documents are within its powers, have been duly authorized by all necessary action pursuant to its organizational documents, require no further action by or in respect of, or filing with, any Governmental Authority and do not violate, conflict with or cause a breach or a default under (a) any Law applicable to the Borrowers or any of the organizational documents of the Borrowers, or (b) any agreement or instrument binding upon it, except for such violations, conflicts, breaches or defaults as could not, with respect to this clause (b), individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

2. Subject to the entry of the DIP Orders, each of the DIP Loan Documents and the DIP Obligations constitute the Borrowers' legal, valid and binding obligation, enforceable against it in accordance with its terms; and

3. The Borrowers (i) have the exclusive rights and title to the intellectual property to be sold pursuant to the Sale Term Sheet and (ii) have, or will have, good title to or a valid leasehold interest in, any and all of its assets and properties free and clear from all Liens of any kind, except for the Liens of the Prepetition Senior Lender.

**Lenders' Representations and Warranties:**

The Lenders hereby represent that no Lender is an insider or affiliate (as each term is defined under the Bankruptcy Code) of the Borrowers or has been an insider or affiliate of the Borrowers within the twelve months preceding the Funding Date.

**Financial Reporting Requirements:**

The Borrowers shall provide to the Lenders: (i) copies of the monthly operating reports filed with the Bankruptcy Court; (ii) rolling 13-week budget showing the Borrowers' projected cash

needs in form and substance acceptable to the Lenders (the "Budget"), which commencing on the first business day that is at least two weeks after the Petition Date and each bi-weekly period thereafter, the Borrowers shall (x) update the prior Budget showing the Borrowers' projected cash needs for the next thirteen (13) weeks therefrom and (y) provide the Lenders a detailed report of variances of actual to budgeted results on a line item basis for the preceding two (2) week period and on a life-to-date basis; (iii) monthly bank statements; and (iv) schedules of fixed assets and intellectual property, including all process patents for each Borrower and their subsidiaries.

All Budgets shall be subject to the approval of the Lenders, in their sole discretion.

**Budget Variances/ Financial Covenants:**

The aggregate amount of disbursements or receipts set forth in the Budget shall not vary by more than 10% (the "Budget Variance").

**Borrowers' Affirmative Covenants:**

Until payment and satisfaction in full of all DIP Obligations and termination of the DIP Facility, the Borrowers covenant and agree as to the following:

1. Preserve, renew and maintain in full force and effect their legal existence and good standing under the laws of their organizations and maintain, preserve and protect all of their properties and equipment necessary to the operation of their businesses in good working order and condition, ordinary wear and tear permitted;

2. Promptly (i) upon (but no later than three (3) business days after) request therefor by the Lender, deliver such information regarding the business or the financial or corporate affairs of Borrowers or the compliance by Borrowers with the terms of the DIP Loan Documents as the Lender may from time to time reasonably request; (ii) upon any officer of Borrowers becoming aware thereof, notify the Lender in writing of (a) the occurrence of any default, and (b) any matter that has resulted or could reasonably be expected to result in a material adverse effect; and (iii) upon (but no later than three (3) business days after) request therefor by the Lender, permit the Lender to visit and inspect any of Borrowers' properties and to have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the operation of Borrowers' businesses;

11

3.   Utilize the proceeds of the DIP Loan solely for (i) the payment of bankruptcy administrative expenses and working capital needs solely for the purposes of and up to the amounts set forth in the Budget (subject to the Budget Variance); and (ii) the payment of interest, fees and expenses relating to the DIP Loan;

4.   Use good faith and commercially reasonable efforts to implement a sale process consistent with the terms of the Sale Term Sheet; and

5.   As soon as reasonably practicable, upon any information becoming available to the Borrowers, provide the Lenders copies of any informational packages provided to potential bidders, and any draft order pertaining to the Auction, all draft agency or sale agreements, the deadlines established as to receipt of bids and, upon request of the Lenders, a status report and updated information relating to such motions and copies of any bids received from any proposed bidder for all or any portion of the Borrowers' assets and any updates, modifications or supplements to such information and materials.

**Borrowers' Negative Covenants:**   The Borrowers further covenant and agree that, so long as any Lender shall have any DIP Obligation outstanding, they shall not:

1. Create or permit to exist (i) any administrative expense, unsecured claim, or other claim or Lien on the DIP Collateral, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out or as may be included in the Budget, and (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than the adequate protection with respect to the Prepetition Credit Agreement;

2. Make any change, amendment or modification, or any application or motion for any change, amendment or modification, to the DIP Orders or Bid Procedures Order (defined below), other than as agreed in writing by the DIP Lender;

3. Make any payment of principal or interest or otherwise on account of any prepetition debt or payables, other than as included in the Budget and agreed to by the DIP Lender;

4. Declare or make any dividend, payment or other distribution directly or indirectly of cash or a non-cash asset on account of equity or ownership interests; and

5. File with the Bankruptcy Court a motion to approve, or otherwise seek approval of or pay, any incentive or retention plan, except as otherwise as agreed in writing by the Lenders.

**Events of Default:**

The following shall be events of default (each an "Event of Default") under the DIP Loan Documents:

1. the Borrowers' failure to make any payment when due;

2. the Borrowers' noncompliance with covenants, including the Budget Variance, or breaches of representations and warranties in the DIP Loan Documents or the 363 Sale Documents;

3. any representation or warranty made by Borrowers in the DIP Loan Documents or the 363 Sale Documents shall prove to have been incorrect in any material respect when made or at any other times specified therein;

4. any other material breach of the DIP Loan Documents or 363 Sale Documents;

5. the Borrowers' failure to satisfy or stay execution of judgments in excess of specified amounts;

13

6.  except as otherwise contemplated by the Budget, Borrowers shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables;

7.  the existence of certain materially adverse employee benefit or environmental liabilities;

8.  material impairment of the rights provided the Borrowers under the DIP Loan Documents;

9.  dismissal of any of the Bankruptcy Cases or conversion of any of the Bankruptcy Cases to a Chapter 7 case or one or more of the Borrowers files a motion seeking such relief;

10. termination or reduction of the exclusivity period for any of the Borrowers to file a Chapter 11 plan in the Bankruptcy Cases;

11. appointment of a Chapter 11 trustee in the Bankruptcy Cases;

12. appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrowers;

13. granting of relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any assets of the Borrowers in excess of an amount to be determined, in the aggregate;

14. entry of a Final DIP Order that does not approve the Roll-up of the Bridge Loan;

15. entry of an order granting any superpriority claim which is senior to or *pari passu* with the Lenders' claims under the DIP Facility;

16. entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require indefeasible repayment in full in cash of the DIP Facility as of the effective date of the plan;

17. entry of an order staying, reversing, vacating or otherwise modifying, without the prior consent of the Lenders, the DIP Facility or the DIP Orders;

18. the Borrowers' failure to comply with the DIP Orders in any material respect;

19. a change of control with respect to any of the borrowers shall occur (other than as a result of any sale of the Purchased Assets);

20. any material provision of the DIP Loan Documents, the 363 Sale Documents (as defined below), the Bid Procedures Order (defined below) or Sale Approval Order shall cease to be valid and binding on the Borrowers, or the Borrowers shall so assert in any pleading filed in any court;

21. an order is entered determining that (i) any of the Purchased Assets are not property of the Borrowers' bankruptcy estates (ii) the Purchased Assets are not capable of being sold pursuant to Section 363 of the Bankruptcy Code or (iii) there is a lien or other encumbrance on the Purchased Assets;

22. payment of or granting adequate protection with respect to prepetition debt (other than as approved by the Lenders and the Bankruptcy Court or as otherwise contemplated by the DIP Loan Documents);

23. entry of an order denying or terminating use of cash collateral by the Borrowers;

24. cessation of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

25. rejection of any unexpired lease identified as material by the Lenders;

26. the release provided to the Lenders in section 10.13 of the Bridge Loan Agreement is not approved by the Bankruptcy Court within two (2) business days of the Petition Date;

27. the Borrowers' failure to obtain approval of the Bid Protections by the 20th day following the Petition Date;

28. the Borrowers' failure to comply with any Milestone (as defined below); and

29. any person files a motion seeking standing to assert a claim or challenge to the Lender's liens and claims.

15

Solely with respect to 26 above, so long as the Borrowers use their best commercially reasonable efforts to obtain Bankruptcy Court approval of the release in section 10.13 of the Bridge Loan Agreement within two (2) business days of the Petition Date, Lenders agree that there shall not be an Event of Default if there is a delay in approval of the release so long as the release is ultimately approved in the Final DIP Order.  For the avoidance of doubt, if the Bankruptcy Court at any time makes a ruling that the release is not approved or if the release is not approved, at the latest, upon entry of the Final DIP Order, an Event of Default shall immediately occur.

Solely with respect to 27 and 28 above, so long as the Borrowers use their best commercially reasonable efforts to obtain Bankruptcy Court approval, denial or modification of a specific Bid Protection or Milestone shall not constitute an Event of Default unless such denial or modification would result in material harm the Lenders.

**Remedies:**               Subject to the Carve-Out, upon the occurrence and during the continuance of an Event of Default, the Lenders, in their sole and absolute discretion, may immediately (x) deliver a notice of an Event of Default; (y) terminate any pending Loans; and (z) terminate the DIP Facility.

**Milestones:**             The Borrowers shall comply with the following milestones (collectively, the "Milestones").

1. On or before the date that is two (2) business days after the Petition Date, the Interim DIP Order authorizing and approving on an interim basis the DIP Facility and the transactions contemplated thereby, in form and substance satisfactory to the Lenders shall have been entered by the Bankruptcy Court;

2. On or before the date that is twenty-five (25) days after the Petition Date, the Final DIP Order authorizing and approving the DIP Facility and the transactions contemplated thereby, in form and substance satisfactory to the Lenders shall have been entered by the Bankruptcy Court;

3. On the Petition Date, the Borrowers shall have filed a motion seeking entry of an order (the "Bid Procedures Order") approving the Sale Process, including the "stalking horse" bid, Bid Protections (as defined in the Sale Term Sheet), and the terms of the Sale Term Sheet;

16

4. On or before the date that is three (3) days prior to the hearing to approve the Bid Procedures Order, the Borrowers shall finalize a term sheet setting forth the terms of an asset purchase agreement for the Purchased Assets in form and substance acceptable to the Lenders;

5. On or before the date that is twenty (20) days after the Petition Date, the Bid Procedures Order, including the Bid Protections, shall have been approved by order of the Bankruptcy Court, in form and substance acceptable to the Lenders. Borrowers shall commence the Sale Process within (1) business day of entry of the Bid Procedures Order;

6. On or before the date that is fifty (50) days after the Petition Date, an Auction (to the extent necessary) for the Purchased Assets shall have occurred in accordance with the requirements for the Sale Process, including, without limitation, the terms of the Sale Term Sheet;

7. On or before the date that is fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Approval Order approving the results of the Auction and an agreement or agreements for the sale of the Purchased Assets (the "Approved Sale(s)"); and

8. The Approved Sale(s) shall be consummated within fifteen (15) days of Bankruptcy Court entering the Sale Approval Order approving such Approved Sale(s).

"Sale Process" shall mean the implementation of bidding and sale procedures in respect of all of the Borrowers' assets and property, including the Purchased Assets, approved by an order of the Bankruptcy Court, and which at a minimum includes compliance with each of the provisions set forth in the Sale Term Sheet and the Milestones.

**Release:**               Subject to approval of the Bankruptcy Court, upon entry of the Interim DIP Order, the Borrowers for themselves, their affiliates, directors, employees, representatives and assigns, forever and irrevocably discharge and release the Lenders, and their principals, predecessors, successors, assigns, agents, employees, representatives, attorneys, subsidiaries, affiliates from any and all claims, complaints, and lawsuits of any nature whatsoever, known or unknown, suspected or unsuspected, that the Borrowers now may have against the Lenders, including, but not limited to, any causes of action asserted or any claims related to the factual allegations contained in the Complaint for Patent

17

Infringement filed by Vector Launch Inc. in the United States District Court for the Central District of California (Case No. 19-00656), which was dismissed without prejudice.

**Costs and Expenses:** Subject to the entry of the Interim DIP Order, the Borrowers shall pay (a) all reasonable fees and expenses related to the 363 Sale and (b) all actual, documented, and reasonable out of pocket costs and expenses of the Lenders (including, without limitation, fees and disbursements of counsel, including local counsel, and financial and accounting advisors) in connection with (i) the negotiation, preparation, execution and entry, as applicable, of the DIP Loan Documents, whether incurred before or after execution of the DIP Loan Documents, (ii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrowers or any other person) in any way relating to the DIP Loan Documents or Borrowers' affairs, and (iii) the enforcement of any rights and remedies under the DIP Loan Documents. Notwithstanding the foregoing, or any other provision in the DIP Loan Documents, unless there is an Event of Default, the Borrowers' liability for the Lender's expenses incurred in connection with the negotiation, preparation, execution and entry, as applicable, of the DIP Loan Documents, together with Lender's expenses in connection with the negotiation, preparation, execution and filing, to the extent applicable, of the 363 Sale Documents, as well as documentation in connection with any prepetition bridge loans, shall not exceed $650,000 (the "Expense Cap"). For the avoidance of doubt, the Expense Cap shall not apply to (i) any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Lenders, Borrowers or any other person) in any way relating to the DIP Loan Documents or the Borrowers' affairs, or (ii) any attempt to enforce any rights of the Lenders against the Borrowers or any other person which may be obligated to the Lenders by virtue of the DIP Loan Documents.

All such expenses that become due and owing under the DIP Loan Documents prior to the Maturity Date of the Loans shall be automatically added to the principal amount of the Loans (and begin to bear interest) following the Borrowers' receipt of an invoice therefor from the Lenders. All such expense payments that become due and owing after maturity of the Loans (whether at stated maturity, by acceleration or otherwise) shall be due and payable in cash, on demand.

**Indemnification:** The Borrowers shall indemnify and hold harmless each Lender, each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and

representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and financial advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrowers, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Assignments and Participations:**

Borrowers shall not sell, assign or transfer any interest in the DIP Facility or the DIP Loan Documents, or any of the obligations thereunder, or any portion thereof, including Borrowers' rights, title, interests, remedies, powers, and duties hereunder or thereunder, without Lenders' prior written consent.

The Lenders shall be free to sell, assign or transfer any interest in the DIP Facility or the DIP Loan Documents, or any of the obligations thereunder, or any portion thereof, and to syndicate the Loans (or any portion thereof), to any person or persons selected by Lenders in their sole discretion. Subject to the foregoing, the DIP Loan Documents shall be binding upon and inure to the benefit of the successors and permitted assigns of Borrowers and the Lenders.

**Governing Law and Submission to Jurisdiction:**

New York law except as governed by the Bankruptcy Code. Non-exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of remedies by the Lenders and preservation of the Collateral's value.

19

**Exhibit A**

**Sale Term Sheet**

The following Summary of Principal Terms (this "<u>Sale Term Sheet</u>"), dated November 20, 2019, represents certain terms for an acquisition of the assets specified below pursuant to a sale (a "<u>Sale</u>") under section 363 of the Bankruptcy Code. Capitalized terms not otherwise defined in this Sale Term Sheet shall have the meanings set forth in DIP Term Sheet to which this Exhibit A is attached.

The transactions contemplated in this Sale Term Sheet are referred to herein as the "<u>Proposed Transaction</u>." This Sale Term Sheet and any definitive documentation executed in connection herewith is and will remain subject to the approval of the Bankruptcy Court presiding over the anticipated Bankruptcy Cases. Except for this paragraph and the paragraphs within the sections of this Sale Term Sheet captioned "Bidding Procedures," "Bid Protections," "Confidentiality," "Exclusivity," and "Governing Law" (collectively, the "<u>Binding Provisions</u>") which specific provisions Lockheed Martin and Vector Launch Inc. ("<u>Vector</u>") agree are binding on the parties hereto, it is understood and agreed that this Sale Term Sheet is one of intent only and does not and is not intended to constitute a binding agreement with respect to the Proposed Transaction.

| | |
|---|---|
| **Sellers:** | Vector, Garvey Spacecraft, and each of their subsidiaries with assets related to the business designated for purchase by Purchaser, all of such entities to become chapter 11 debtors and debtors in possession in the Bankruptcy Cases (the "<u>Debtors</u>" or "<u>Sellers</u>"). |
| **Purchaser:** | Lockheed Martin Corporation ("<u>Lockheed Martin</u>") or its designated affiliate (collectively, "<u>Purchaser</u>").<br><br>Purchaser shall serve as the stalking horse bidder in connection with the Proposed Transaction. |
| **Purchase Agreement:** | After the execution of this Sale Term Sheet, the parties expect to commence negotiating a definitive asset purchase agreement (the "<u>Purchase Agreement</u>", and all documents related thereto, the "<u>363 Sale Documents</u>"). The Purchase Agreement would contain terms consistent with this Sale Term Sheet, customary covenants, representations, warranties and closing conditions and such other terms and conditions as the parties may agree, including, without limitation, Sellers' warranty of good title to the Patent Portfolio (as defined below), Sellers' representation that the Sellers do not own or lease any hardware, computers, network, servers, drives or other equipment or physical personal property related to, integrated with or otherwise used in Sellers' software defined satellite products or services (*i.e.*, GalaticSky) or the Purchased Assets, except as specifically described in advance of the sale,  and a release of any |

| | |
|---|---|
| | claims against Lockheed Martin and its affiliates, including, without limitation, regarding use of the "Vector" name by Lockheed Martin.<br><br>Signing of the Purchase Agreement (and any related documents) would be subject to (i) negotiation of definitive documentation acceptable to Sellers and Purchaser and (ii) completion of final due diligence satisfactory to the Purchaser.<br><br>Except with respect to the Binding Provisions specified herein, this Sale Term Sheet is non-binding. Any binding offer for the Proposed Transaction and signing of the Purchase Agreement (and any related documents) would be subject to (i) satisfactory completion of due diligence; (ii) negotiation and execution of definitive transaction documents for the Proposed Transaction acceptable to Sellers and Purchaser; (iii) receipt of any requisite government approvals; and (iv) obtaining all required internal approvals.<br><br>To complete this process in the shortest possible time, Lockheed Martin and its representatives will require appropriate access to Sellers' key employees and information related to the Purchased Assets as may be reasonably requested. Lockheed Martin is prepared to dedicate substantial resources to the due diligence process to ensure that it is completed quickly, efficiently and with minimal disruption. The length of time required to complete due diligence is most frequently predicated on the availability of complete information and the target company's support during the process. The parties are prepared to devote substantial resources to the expeditious negotiation of definitive transaction documents. |
| **Purchased Assets/Assumed Liabilities:** | Pursuant to the Purchase Agreement, Purchaser would acquire all intellectual property rights related to Sellers' software-defined satellite product and services (*i.e.*, GalacticSky), including the patents and patent applications listed in Appendix A as well as any other U.S. or foreign patent applications owned by Sellers and their respective affiliates which are currently pending at the United States Patent and Trademark Office or a foreign patent office and not listed in Appendix A (the "Patent Portfolio"), and all designs, technical information, and computer software related thereto (collectively, the "Purchased Assets").<br><br>Other than liabilities that Purchaser agrees to assume pursuant to the Purchase Agreement (the "Assumed Liabilities"), Purchaser will not assume or be deemed to have assumed any liabilities of Sellers. The Sale Approval Order (defined below) will provide customary language that Purchaser shall not be considered a successor to the Sellers. |

| Consideration: | In consideration for the Proposed Transaction, upon closing and subject to Purchaser's right to credit bid outstanding obligations under the DIP Facility as provided below, Purchaser shall pay Sellers $4.25 million and assume the Assumed Liabilities, if any, under the Purchase Agreement. |
|---|---|
| Liens and Encumbrances: | All Purchased Assets would be transferred to Purchaser pursuant to Section 363(f) of the Bankruptcy Code, free and clear of all claims, liens, encumbrances, interests and other restrictions of any kind or nature whatsoever. Any such liens existing at the time of the closing under the Purchase Agreement will attach to the cash Consideration according to their relative priorities, which proceeds would be held by Sellers until the Bankruptcy Court orders. |
| Closing Conditions: | Unless otherwise specified in the winning bid, usual and customary closing conditions for transactions of this size and type, including but not limited to:<br><br>(a)  Sellers shall have performed, satisfied and complied in all material respects with all obligations and covenants required by the Purchase Agreement (unless waived or overbid) to be performed or complied with by Sellers on or prior to the closing;<br>(b)  Sellers shall have delivered to Purchaser all other documents reasonably required to be delivered under the Purchase Agreement and all such documents shall have been properly executed by Sellers;<br>(c)  Purchaser shall have received the third-party consents specified in the Purchase Agreement;<br>(d)  The Bankruptcy Court shall have entered the order approving the Proposed Transaction under section 363 of the Bankruptcy Code (the "Sale Approval Order" and together with the Bid Procedures Order, the "Approval Orders") and the Approval Orders shall have become final and non-appealable; and<br>(e)  The Approval Orders shall be in a customary form for section 363 sales and in form and substance acceptable to Purchaser. The Approval Orders shall provide that the Sale of the Purchased Assets is (i) pursuant to section 363(f) of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, interests, and rights of set-off, whether known or unknown, disputed, contingent, actual, or otherwise, arising prior to closing, (ii) to a good faith purchaser and (iii) to Purchaser with no successor liability. |
| Bidding Procedures: | Sellers shall conduct an auction (the "Auction") with bidding procedures ("Bidding Procedures") designating Purchaser as stalking |

horse bidder for the Purchased Assets. The Bidding Procedures shall be in form and substance acceptable to Purchaser.

Any third party that submits a "Qualified Bid" for the Purchased Assets shall be permitted to participate in the Auction, *provided*, *that*, to constitute a Qualified Bid, such bid must, among other things: (a) provide for a purchase price that includes cash consideration in an amount equal to (x) the DIP Facility including any outstanding accrued interest and fees thereunder, (y) the Bid Protections (as defined below) and (z) exceed the cash and total consideration under the Proposed Transaction by at least $500,000 (the "Initial Minimum Overbid"); (b) be for substantially all of the Purchased Assets on terms substantially similar to the Purchase Agreement; (c) describe other liabilities that such third party proposes to assume; (d) provide a $750,000 upfront cash deposit; and (e) be accompanied by written evidence demonstrating that such third party has committed financing or unconditional access to funds that will allow such third party to consummate such Sale in a timely manner. Notwithstanding the foregoing, Sellers shall be permitted to select one or more bids for some or all of the Debtors' assets that, in the aggregate, satisfies the conditions of subparagraphs (a), (c), and (d) of the immediately preceding sentence.

A successful bidder for the Purchased Assets other than the Purchaser shall be required to fund a portion of the Sale proceeds within three (3) days from the Auction sufficient to satisfy in full, in cash all outstanding obligations of the DIP Facility; *provided, however*, that in the event that the Purchaser's bid is selected as the back-up bid (the "Back-Up Bid") at the Auction, the Purchaser's Back-Up Bid shall remain irrevocable until the earlier of (i) the Sellers inform the Purchaser that the Sellers will proceed with the Purchaser's Back-Up Bid or (ii) fifteen (15) days after the Purchaser's bid is selected as the Back-Up Bid at the Auction.

Other requirements to participate in the Auction (including conditions that must be satisfied so that a bid constitutes a Qualified Bid in the Auction and under the Bidding Procedures) shall be agreed upon in the Bidding Procedures, except that the Bidding Procedures shall provide, among other things, that at the Auction each subsequent bid shall be a Qualified Bid (except with respect to the Initial Minimum Overbid requirement and any bid deadline established by the Bidding Procedures ) and must be made in higher increments of at least $250,000 (the "Minimum Bid Increment"). The Bidding Procedures will also provide that the Auction be open and that the identity and amount of the highest and best bid in each subsequent round shall be disclosed.

|  | Purchaser shall be deemed a "Qualified Bidder" in all respects. The Lenders shall have the right to credit bid, whether as the stalking horse bidder or otherwise, up to the full amount of the DIP Facility funded including any outstanding accrued interest and fees thereunder.<br><br>For the avoidance of doubt, neither the Bidding Procedures set forth in this section nor the Bid Protections set forth below shall apply to a sale or auction by the Sellers of any assets that are not Purchased Assets (collectively, the "Excluded Assets") and the Sellers shall be permitted to market and sell the Excluded Assets in accordance with any procedures approved by the Bankruptcy Court; provided, however, if the Sellers sell the Purchased Assets and the Excluded Assets together to a purchaser other than the Purchaser, then Purchaser shall still be entitled to the Bid Protections.<br><br>Nothing herein or any other document (other than an order by the Bankruptcy Court) shall preclude Sellers from modifying the Bidding Procedures to the extent reasonably necessary to exercise their fiduciary duties under applicable law. |
|---|---|
| **Bid Protections:** | In the event that Sellers accept or approve, or a court approves or orders, any alternative sale of the Purchased Assets pursuant to a Qualified Bid or restructuring involving some or all of Sellers' assets, Purchaser shall be entitled to (i) a break-up fee in an aggregate amount equal to 5% of the cash consideration of the highest or otherwise best bid at the Auction and (ii) reimbursement for all of Purchaser's reasonable, actual, documented out-of-pocket costs and expenses (including, without limitation, the fees and expenses of counsel, advisors and representatives) incurred in connection with the Proposed Transaction up to $350,000 (collectively, the "Bid Protections"). The Bid Protections shall be payable out of the proceeds of any alternative sale or restructuring involving the Purchased Assets. |
| **Confidentiality:** | Until the filing of the Sale Motion, Purchaser and Sellers agree to keep this Sale Term Sheet confidential; provided that with Purchaser's consent, Sellers may disclose this Sale Term Sheet to its senior secured lenders, provided such parties agree to keep this Sale Term Sheet confidential. |
| **Exclusivity:** | Sellers covenant and agree that until the earlier of (a) entry of the Bid Procedures Order or (b) forty-five (45) days after the execution of this Sale Term Sheet by the parties or their respective authorized representatives (the "Exclusivity Period"), none of Sellers, their affiliates or subsidiaries will, and they will cause their respective directors, officers, managers, employees, agents, advisors or |

|  | representatives not to, directly or indirectly, solicit, initiate, seek, facilitate, support or induce the making of offers for, encourage, negotiate, discuss, or enter into any agreement, understanding or commitment, or maintain or continue any communications or negotiations with any person regarding, a possible Sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring, refinancing or other disposition of all or any part of the Purchased Assets, including, without limitation, the acquisition of all or any portion of the Patent Portfolio or any interest therein or license thereof (a "Competing Sale") with any party other than Purchaser and its representatives or provide any information to any party other than Purchaser regarding Sellers in that connection. Upon expiration of the Exclusivity Period, Sellers are authorized to take any and all actions reasonably necessary to exercise their fiduciary duties to obtain the highest or best offer for the Purchased Assets and the Excluded Assets.<br><br>Sellers represent that neither they nor any of their affiliates nor any of their respective directors, officers, managers, employees, agents, advisors or representatives is a party to or bound by any agreement, arrangement, or understanding with respect to a Competing Sale other than the Binding Provisions of this Sale Term Sheet. If Sellers or any of their affiliates or any of their respective directors, officers, managers, employees, agents, advisors or representatives, receives an unsolicited offer or other inquiry regarding a Competing Sale prior to the expiration of the Exclusivity Period, Sellers shall immediately notify Purchaser of such inquiry, including the identity of the person or entity making the offer or inquiry and the material terms thereof. If Seller breaches its obligations under this paragraph, or if an Auction process is required for the Purchased Assets, but the Bidding Procedures or the Bid Protections are not approved to the satisfaction of Purchaser, Purchaser shall have the right to terminate this Sale Term Sheet without cost or liability to, or any recourse against, Purchaser. |
| **Governing Law:** | The Term Sheet and the Purchase Agreement will be governed and construed in accordance with the laws of the State of New York without regard to the conflict of laws rules thereof except as governed by the Bankruptcy Code. The parties will irrevocably: (a) agree that any suit, action or other legal proceeding arising out of the Term Sheet and Purchase Agreement will be brought in the United States District Court for the Southern District of New York until the commencement of the Bankruptcy Cases, and thereafter in the Bankruptcy Court for the District of Delaware, (b) consent to the jurisdiction of such courts in any suit, action or proceeding, (c) waive any objection which they, or any of them, may have to the laying of venue of any such suit, action or proceeding in such courts, |

|  | and (d) agree that service of process by overnight courier or registered or certified mail, at the addresses specified herein or therein will be good and sufficient service of process.<br><br>EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS TERM SHEET OR THE PURCHASE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. |

Appendix A to Sale Term Sheet

| Cntry | Status | App. No. | Filed | Pat. No. | Issued | Type | Title |
|---|---|---|---|---|---|---|---|
| US | Granted | 15/297,436 | 10/19/16 | 9,641,238 | 05/02/17 | PRI | Virtualization-Enabled Satellite Platforms |
| US | Granted | 15/459,472 | 03/15/17 | 9,876,563 | 01/23/18 | CON | Virtualization-Enabled Satellite Platforms |
| US | Granted | 15/859,978 | 01/02/18 | 10,084,534 | 09/25/18 | CON | State Transfer Among Virtualization-Enabled Satellite Platforms |
| US | Granted | 16/137,862 | 09/21/18 | 10,305,582 | 05/28/19 | CON | State Transfer Among Satellite Platforms |
| US | Pending | 16/245,420 | 01/11/19 | | | CIP | State Transfer Among Virtualized Nodes in Spaceborne or Airborne Systems |
| US | Pending | 16/422,516 | 05/24/19 | | | CON | State Transfer Among Satellite Platforms |
| WO | Natl Phase | PCT/US16/ 059622 | 10/31/16 | | | | Virtualization-Enabled Satellite Platforms |
| EP | Pending | 2016919155 | 05/20/19 | | | | Virtualization-Enabled Satellite Platforms |
| JP | Pending | 2019521812 | 04/18/19 | | | | Virtualization-Enabled Satellite Platforms |
| US | Granted | 15/297,461 | 10/19/16 | 9,722,692 | 08/01/17 | PRI | Statefulness Among Clustered Satellite Platforms |
| US | Granted | 15/626,929 | 06/19/17 | 9,991,951 | 06/05/18 | CON | Peer State Transfer Among Satellite Devices |
| US | Granted | 15/996,845 | 06/04/18 | 10,250,319 | 04/02/19 | CON | Task Transfer Among Satellite Devices |
| US | Pending | 16/371,333 | 04/01/19 | | | CON | Virtualized Software Payloads On Satellite Devices |
| WO | Natl Phase | PCT/US16/ 059623 | 10/31/16 | | | | Statefulness Among Clustered Satellite Platforms |
| EP | Pending | 2016919012 | 05/20/19 | | | | Statefulness Among Clustered Satellite Platforms |
| JP | Pending | 2019521790 | 04/18/19 | | | | Statefulness Among Clustered Satellite Platforms |
| US | Granted | 15/353,411 | 11/16/16 | 9,740,465 | 08/22/17 | PRI | Orchestration of Software Application Deployment in a Satellite Platform |

| Cntry | Status | App. No. | Filed | Pat. No. | Issued | Type | Title |
|-------|--------|----------|-------|----------|--------|------|-------|
| US | Granted | 15/638,837 | 6/30/17 | 9,875,091 | 01/23/18 | CON | User-Initiated Software Application Deployment to an Orbital Satellite Platform |
| WO | Natl Phase | PCT/US16/064584 | 12/02/16 | | | | Orchestration of Software Application Deployment in a Satellite Platform |
| EP | Pending | 2016921766 | 06/17/19 | | | | Orchestration of Software Application Deployment in a Satellite Platform |
| US | Granted | 15/653,881 | 07/19/17 | 9,819,742 | 11/14/17 | PRI | Bandwidth Aware State Transfer Among Satellite Devices |
| WO | Pending | PCT/US17/044900 | 08/01/17 | | | | Bandwidth Aware State Transfer Among Satellite Devices |
| US | Granted | 15/653,718 | 07/19/17 | 9,960,837 | 05/01/18 | PRI | Pseudo-Geosynchronous Configurations in Satellite Platforms |
| US | Granted | 15/922,325 | 3/15/18 | 10,270,521 | 04/23/19 | CON | Pseudo-geosynchronous Communications in Satellite Platforms |
| US | Pending | 16/390,489 | 04/22/19 | | | CON | Orbital Monitoring Windows In Satellite Platforms |
| WO | Pending | PCT/US17/043963 | 07/26/17 | | | | Pseudo-Geosynchronous Configurations in Satellite Platforms |
| US | Granted | 15/653,678 | 07/19/17 | 9,998,207 | 06/12/18 | PRI | Orbital Network Layering in Satellite Platforms |
| US | Granted | 16/003,308 | 06/08/18 | 10,225,001 | 03/05/19 | CON | Orbital Network Layering |
| US | Pending | 16/291,771 | 03/04/19 | | | CON | Communications In Layered Orbital Networks |
| WO | Pending | PCT/US17/043657 | 07/25/17 | | | | Orbital Network Layering in Satellite Platforms |
| US | Granted | 15/653,807 | 07/19/17 | 10,069,935 | 09/04/18 | PRI | Role-Specialization in Clustered Satellite Platforms |

9

| Cntry | Status | App. No. | Filed | Pat. No. | Issued | Type | Title |
|---|---|---|---|---|---|---|---|
| US | Granted | 16/117,834 | 08/30/18 | 10,306,019 | 05/28/19 | CON | Variable Role-Specialization Among Computing Devices of Computing Platforms |
| US | Pending | 16/245,488 | 01/11/19 | | | CIP | Role-Specialization In Spaceborne And Airborne Computing Platforms |
| US | Pending | 16/422,584 | 05/24/19 | | | CON | Role Differentiation For Task Servicing In Computing Platforms |
| WO | Pending | PCT/US17/ 044672 | 07/31/17 | | | | Role-Specialization in Clustered Satellite Platforms |

# **EXHIBIT II**

Initial Budget

(subject to change prior to entry of interim DIP order)

**Vector Launch Inc.**
Debtor in Possession
13 Week DIP Cash Flow

| $000's | Forecast Week Ending 12/21/19 | Forecast Week Ending 12/28/19 | Forecast Week Ending 1/4/20 | Forecast Week Ending 1/11/20 | Forecast Week Ending 1/18/20 | Forecast Week Ending 1/25/20 | Forecast Week Ending 2/1/20 | Forecast Week Ending 2/8/20 | Forecast Week Ending 2/15/20 | Forecast Week Ending 2/22/20 | Forecast Week Ending 2/29/20 | Forecast Week Ending 3/7/20 | Forecast Week Ending 3/14/20 | Forecast 13 Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | 44 | 261 | 256 | 704 | 370 | 772 | 362 | 762 | 629 | 545 | 518 | 288 | 157 | 44 |
| | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Lockheed DIP financing | 500 | - | 500 | - | 500 | - | 500 | - | - | - | - | - | - | 2,000 |
| **Total Receipts** | **500** | **-** | **500** | **-** | **500** | **-** | **500** | **-** | **-** | **-** | **-** | **-** | **-** | **2,000** |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| <u>Payroll & Related</u> | | | | | | | | | | | | | | |
| Ongoing salary and wages (J. Garvey) | 13 | - | 13 | - | 13 | - | 13 | - | 13 | - | 13 | - | 13 | 90 |
| Independent contractors | 31 | - | 30 | - | 28 | - | 28 | - | 28 | - | 20 | - | 20 | 184 |
| G&A / Business Services | 1 | 5 | 2 | 11 | - | - | 2 | 11 | 0 | - | - | 12 | 1 | 46 |
| Facilities | 35 | - | - | 57 | - | - | - | 57 | - | - | - | 57 | - | 206 |
| IT | 9 | - | - | 7 | 0 | - | 7 | - | 1 | - | 5 | 2 | 1 | 31 |
| Utilities (non-IT) | 7 | - | - | 3 | - | - | 3 | - | - | 3 | - | - | - | 15 |
| Equipment Rentals | 3 | - | - | - | 3 | - | - | - | 3 | - | - | - | - | 9 |
| Logistics | 15 | - | - | - | - | - | - | - | - | - | - | - | - | 15 |
| Professional Fees - Ordinary course | - | - | - | - | - | 15 | - | - | - | - | - | - | - | 15 |
| Insurance | 158 | - | - | - | 7 | - | - | - | 7 | - | - | - | - | 173 |
| Taxes/business licenses | 3 | - | - | - | - | - | - | - | - | - | - | - | - | 3 |
| Other | 8 | - | 7 | - | 7 | - | 7 | - | 7 | - | 7 | - | 7 | 50 |
| **Total Operating Disbursements** | **283** | **5** | **51** | **79** | **58** | **15** | **59** | **68** | **59** | **3** | **45** | **71** | **41** | **838** |
| | | | | | | | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Professional Fees | - | - | - | 256 | 40 | 395 | 40 | 65 | 25 | 25 | 185 | 60 | 15 | 1,106 |
| **Total Non-Operating Disbursements** | **-** | **-** | **-** | **256** | **40** | **395** | **40** | **65** | **25** | **25** | **185** | **60** | **15** | **1,106** |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | 217 | (5) | 449 | (335) | 402 | (410) | 401 | (133) | (84) | (28) | (230) | (131) | (56) | 56 |
| | | | | | | | | | | | | | | |
| **Ending Cash Balance** | 261 | 256 | 704 | 370 | 772 | 362 | 762 | 629 | 545 | 518 | 288 | 157 | 100 | 100 |