## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19-12670 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR (I) AN ORDER
PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 364, 365,
AND 541, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007
AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BIDDING
PROCEDURES AND BID PROTECTIONS FOR THE SALE OF CERTAIN
ASSETS OF THE DEBTORS; (B) APPROVING THE STALKING HORSE BIDDER
PURCHASE AGREEMENT; (C) APPROVING FORMS AND MANNER OF NOTICE
OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH;
(D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT
REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (E) SCHEDULING THE AUCTION AND SALE HEARING;
AND (F) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE
SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND
ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT,
ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") respectfully submit this motion (the "<u>Motion</u>") for entry of an order, in the form attached hereto as **Exhibit A** (the "<u>Bidding Procedures Order</u>"), (a) approving the bidding procedures (the "<u>Bidding Procedures</u>" attached as **Exhibit 1** to the Bidding Procedures Order)[2] and Bid Protections (as defined below) in connection with the sale of certain of the Debtors' assets consisting of the Debtors' software-defined satellite products and services (*i.e.*, GalacticSky), together with all related products and service offerings that have been marketed,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is: PO Box 14928, Long Beach, CA 90853-4928.

[2] Capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Bidding Procedures.

sold, distributed or otherwise provided, or that the Sellers intend to market, sell, distribute, or otherwise provide (collectively, the "GalacticSky Assets"); (b) authorizing the Debtors to accept the stalking horse bid (the "Stalking Horse Bid") of Lockheed Martin Corporation (the "Stalking Horse Bidder") and enter into an asset purchase agreement with the Stalking Horse Bidder dated December 13, 2019 (as amended or modified prior to the date hereof, the "Stalking Horse Bidder Purchase Agreement"); (c) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (d) approving procedures for the assumption and assignment and rejection of designated executory contracts and unexpired leases (the "Assignment and Rejection Procedures"); (e) scheduling the auction (the "Auction") and the date and time of the hearing to approve the sale (the "Sale Hearing") of the GalacticSky Assets and assumption of certain liabilities of the Debtors (the "Assumed Liabilities"); and (f) granting related relief, by which the Debtors will solicit and select the highest or otherwise best offer for the purchase of the GalacticSky Assets and assumption of the Assumed Liabilities. The Debtors further request that, at the Sale Hearing, the Court enter an order (the "Sale Order"), the proposed form of which will be filed before the Sale Hearing, (i) authorizing the Sale of the GalacticSky Assets (the "Sale") free and clear of all liens, claims, interests and other encumbrances (collectively, "Encumbrances"); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief. In support of this Motion, the Debtors rely on the *Declaration of Shaun Martin in Support of First Day Pleadings* (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

As discussed herein, the Debtors propose the following timeline for conducting the Sale process:

| Event | Deadline |
|---|---|
| Bidding Procedures Hearing | January 6, 2020 |
| Bid Deadline | January 29, 2020 |
| Auction | January 31, 2020 |
| Sale Objection Deadline | January 29, 2020 |
| Assignment Objection Deadline | January 27, 2020 |
| Sale Hearing (proposed) | February 4, 2020 |
| Deadline to Close Proposed Sale Transaction | February 19, 2020 |

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to Bankruptcy Rules 7008 and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue in the Court is proper pursuant to 28 U.S.C. § 1408.

3.     The predicates for the relief requested herein are sections 105, 363, 364, 365, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (these "Chapter 11 Cases"). The Debtors continue to operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5.      The Debtors were established with the goal of extending access to space and transforming the space economy by developing a family of small launch vehicles designed for the rapid and frequent launch of payloads ranging from 60 kg – 315 kg to low-Earth orbit. In addition, the Debtors were also developing a space-grade cloud-computing platform known as GalacticSky. Additional details regarding the Debtors' businesses and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration and are incorporated herein by reference.

6.      As part of their efforts to address their financial situation prior to commencing these Chapter 11 Cases, the Debtors engaged Winter Harbor LLC ("Winter Harbor"), a restructuring and turnaround consulting firm with expertise in distressed asset sales, as chief restructuring officer to advise the Debtors on a potential sale or other strategic transaction. The Debtors determined that entering into these Chapter 11 Cases was necessary to maximize the value of the Debtors' assets by being able to sell the Debtors' GalacticSky Assets (as well as, the Debtors' launch-vehicle related assets) to one or more buyers free and clear of all Encumbrances, other than Encumbrances expressly permitted or assumed by the buyer(s).

7.      Prior to the Petition Date, from mid-August 2019, when one of the Debtors' most significant equity sponsors informed the Debtors that it would no longer participate in any future equity funding, through October 2019, members of the Debtors' board of directors (collectively,

the "Directors") solicited interest from various parties, including former investors, current secured lenders, and potential competitors, for completing a transaction or providing funding, whether through equity sponsorships, distressed loans, or asset sales. A total of four serious offers were received, two for the GalacticSky Assets from entities related to former employees or investors of the Debtors, one for all of the Debtors assets from an investment entity, and an offer from Lockheed for the GalacticSky Assets. Lockheed's offer was substantially higher than the others. As such, Winter Harbor and the Debtors then negotiated with those entities in an effort to obtain the best possible offer to serve as stalking horse purchaser in an in-court auction sale process. The marketing process resulted in the Stalking Horse Bid as described and set forth in the Stalking Horse Bidder Purchase Agreement.

## RELIEF REQUESTED

### A.  Bidding Procedures and Bid Protections Order

8.      By this Motion, the Debtors seek entry of the Bidding Procedures Order: (i) approving the Bidding Procedures; (ii) approving the Stalking Horse Bidder Purchase Agreement and the bid protections contained therein; (iii) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (iv) establishing the Assumption and Rejection Procedures; and (v) scheduling the Auction and Sale Hearing.

9.      Additionally, by this Motion, the Debtors further request that, at the Sale Hearing, the Court enter the Sale Order.

i.            *The Bidding Procedures*

10.     To maximize the value of the GalacticSky Assets for the benefit of the Debtors' estates and stakeholders, the Debtors seek to implement a competitive bidding process. As described more fully in the Bidding Procedures and the Bidding Procedures Order, the Debtors seek approval to sell the GalacticSky Assets to a Qualified Bidder, determined in accordance

with the Bidding Procedures and Bidding Procedures Order, that makes the highest or otherwise best offer for the GalacticSky Assets. Although the Debtors are not actively marketing their non-GalacticSky Assets in the current sale, to ensure the Debtors receive the highest or otherwise best offer for the GalacticSky Assets, the Bidding Procedures authorize Potential Bidders to submit bids for non-GalacticSky Assets, including substantially all of the Debtors' assets.[3] The Debtors request that competing bids for the GalacticSky Assets be governed by the Bidding Procedures and Bidding Procedures Order, which, among other things, collectively establish:

- the requirements that a Potential Bidder (other than the Stalking Horse Bidder) must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder (*see* Bid Proc., at Article III);

- the requirements for Qualified Bidders to submit bids and the method and criteria by which such bids become Qualified Bids (*see* Bid Proc., at Articles III-V);

- the deadline by which bids must be submitted (*see* Bid Proc., at Article II);

- the procedures for conducting the Auction (*see* Bid Proc., at Articles V-VI);

- the assumption and assignment procedures for executory contracts and unexpired leases (*see* Bid Proc., at Article VIII); and

- various other matters relating to the sale process generally, the Sale Hearing, return of any Good Faith Deposits, and designation of a Back-Up Bidder (*see* Bid Proc., at Articles IX-XI).

11.    The Debtors will select the highest or otherwise best Qualified Bid for the GalacticSky Assets to be the starting bid at the Auction (the "Baseline Bid"). In no event shall any Qualified Bidder, other than the Stalking Horse Bidder be entitled to seek a break-up fee, expense reimbursement, or any similar bidding protections.

---

[3] The Bidding Procedures permit bids for exclusively non-GalacticSky Assets, provided that certain minimum thresholds are met. If any such bids are received, the Debtors, in consultation with the Committee (if any), the Debtors may auction such non-GalacticSky Assets at the Auction, which sales shall be subject to Court approval at the Sale Hearing.

12.    The Bidding Procedures contain the following provisions, some of which are required to be highlighted pursuant to Local Rule 6004-1(c), and which are more fully described in the Bidding Procedures and the Bidding Procedures Order:[4]

    a.    **Provisions Governing Qualification of Bidders.** To qualify as a Qualified Bidder and participate in the Auction, each Potential Bidder must (unless waived by the Debtors in their Permitted Discretion) deliver to the Notice Parties the most current audited (if available) and the latest unaudited financial statements or such other financial information evidencing the Potential Bidder's ability to (i) close the Sale within the time period prescribed in the Bidding Procedures Order and (ii) provide adequate assurance of future performance to counterparties to Transferred Contracts (as defined below) to be assumed and assigned to the Potential Bidder. In addition, unless waived by the Debtors in their Permitted Discretion, if the Potential Bidder is an entity formed in whole or part for the purpose of acquiring all or part of the GalacticSky Assets, the Potential Bidder must deliver to the Notice Parties current audited (if available) and the latest unaudited financial statements and/or such other relevant financial information as may be requested by the Debtors of each equity holder of such Potential Bidder, which equity holders must also guarantee the obligations of such Potential Bidder on terms reasonably acceptable to the Debtors, evidencing, the Potential Bidder's ability to (a) close the Sale within the time period prescribed in the Bidding Procedures Order and (b) provide adequate assurance of future performance to counterparties to Transferred Contracts to be assumed and assigned to the Potential Bidder. The Debtors, in the Debtors' Permitted Discretion, shall determine whether a Potential Bidder has complied with the foregoing requirements and has qualified to submit a Qualified Bid and participate in the Auction (each such Potential Bidder, a "<u>Qualified Bidder</u>"), and the Debtors shall provide prompt written notice of their determination to any such Potential Bidder and counsel to the Committee. The Debtors may (and at the request of the Committee shall) request additional information from a Potential Bidder or Qualified Bidder at any time prior to the Sale closing to evaluate such bidder's ability to bid at the Auction over and above its initial offer in its Qualified Bid, consummate the Sale and fulfill its obligations in connection therewith. Each Potential Bidder or Qualified Bidder shall be obligated to provide such additional information within two (2) Business Days of receiving such requests as a condition to participating further in the Auction and Sale processes; <u>provided</u>, <u>however</u>, that additional information requests made by the Debtors during the Auction in connection with a Qualified Bidder's ability to continue to bid at the Auction over and above its initial offer in its Qualified Bid shall, in the Debtors' Permitted Discretion, be satisfied prior to such Qualified Bidder submitting any further bids at the Auction. The failure to comply with such requests shall disqualify such Potential Bidder or Qualified Bidder. For

---

[4]  These provisions are excerpted from the Bidding Procedures. To the extent there are any inconsistencies between this summary and the Bidding Procedures, the Bidding Procedures shall govern.

purposes of these Bidding Procedures, the Stalking Horse Bid shall be deemed to constitute a Qualified Bid for the GalacticSky Assets and the Stalking Horse Bidder/Bidding DIP Lender shall be deemed to be a Qualified Bidder. Finally, notwithstanding anything to the contrary in these Bidding Procedures, the Potential Bidder must, as a condition of being a Qualified Bidder, warrant and demonstrate compliance with all applicable laws and regulations relating to technology transfers, arms transfers, and similar regulatory restrictions (collectively, the "Regulatory Restrictions").[5]

b. **Provisions Governing Qualified Bids**. To participate in the Auction, as set forth in Article IV of the Bidding Procedures, each Potential Bidder (other than the Stalking Horse Bidder) must submit a "Qualified Bid" to the Debtors by the Bid Deadline (as defined below). "A Qualified Bid shall mean a bid submitted by a Qualified Bidder that:

A. Is made in writing;

B. Is submitted prior to the Bid Deadline;

C. Designates which of the Debtors' assets, including the GalacticSky Assets, the Qualified Bidder proposes to purchase; provided, however, that in the event that the Debtors receive one or more Qualified Bids for less than all of the GalacticSky Assets, the Debtors, in their Permitted Discretion, may request that Qualified Bidders provide a purchase price allocation for those GalacticSky Assets they have designated;

D. Designates which of the Assumed Liabilities the Qualified Bidder proposes to assume, if any;

E. Designates which of the Transferred Contracts the Qualified Bidder proposes to have assumed and assigned to it and which executory contracts or unexpired leases it wishes to the Debtors to reject, if it is the Successful Bidder (as defined below), or the Debtors' rights and interests therein sold and transferred, as the case may be;

---

[5] The Regulatory Restrictions include, but are not limited to, the following: International Traffic in Arms Regulations (ITAR), Office of Foreign Asset Control (OFAC) regulations, Committee on Foreign Investment in the United States (CFIUS) rules and regulations, and all of the following statutes: Trading With the Enemy Act (TWEA), 50 USC App 1-44; International Emergency Economic Powers Act (IEEPA), 50 USC 1701 et seq.; Antiterrorism and Effective Death Penalty Act (AEDPA), 8 USC 1189, 18 USC 2339B; United Nations Participation Act (UNPA), 22 USC 287c; Cuban Democracy Act (CDA), 22 USC 6001–10; The Cuban Liberty and Democratic Solidarity Act (Libertad Act), 22 USC 6021–91; The Clean Diamonds Trade Act, Pub. L. No. 108-19; Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 USC 1901–1908, 8 USC 1182; Burmese Freedom and Democracy Act of 2003, Pub. L. No. 108–61, 117 Stat. 864 (2003); The Foreign Operations, Export Financing and Related Programs Appropriations Act, Sec 570 of Pub. L. No. 104-208, 110 Stat. 3009-116 (1997); The Iraqi Sanctions Act, Pub. L. No. 101-513, 104 Stat. 2047-55 (1990); The International Security and Development Cooperation Act, 22 USC 2349 aa8–9; The Trade Sanctions Reform and Export Enhancement Act of 2000, Title IX, Pub. L. No. 106-387 (October 28, 2000).

F. Includes a binding, definitive, and fully executed asset purchase agreement that: (a) shall be in form and substance substantially similar to the Stalking Horse Bidder Purchase Agreement and marked to reflect only those changes required as a condition of such Qualified Bidder's closing the Sale; (b) shall not contain any provisions entitling such Qualified Bidder to any break-up fee, expense reimbursement or other bid protections of any kind; and (c) waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of the Bid or participation in any Auction. An asset purchase agreement, together with its schedules and exhibits, submitted in accordance with these Bidding Procedures shall be referred to herein as a "Qualified Bidder Purchase Agreement";

G. To the extent any Qualified Bidder wishes to bid on both the GalacticSky Assets and the non-GalacticSky Assets, the Qualified Bidder must submit separate bids that identify the purchase price for each of the GalacticSky Assets and the non-GalacticSky Assets, , and such bids will be treated as separate bids for all purposes, provided that any Qualified Bidder that submits separate bids shall be required to pay a single Good Faith Deposit (defined below);[6]

H. To the extent a bid is for all or substantially all of the GalacticSky Assets subject to the Stalking Horse Bid, the purchase price included in such bid must include cash consideration in an amount not less than $5,060,000 (the "GSA Minimum Cash Purchase Price"), which amount shall consist of cash in the following amounts:

    1.  $4,250,000, the purchase price set forth in such Stalking Horse Bid; plus

    2.  $210,000, the "Break-Up Fee"; plus

    3.  $350,000, the "Expense Reimbursement";[7] plus

    4.  $250,000, as a cash premium over the Stalking Horse Bid;[8]

I. Pays a good faith cash deposit of $750,000 (the "Good Faith Deposit"). The Good Faith Deposit shall be paid by wire transfer to a segregated

---

[6] For the avoidance of doubt, a Qualified Bidder may submit bids for both the GalacticSky Assets and non-GalacticSky Assets but the Debtors' assets will be sold in separate lots at the Auction.

[7] To the extent the Debtors' actual costs for the Expense Reimbursement are less than $350,000, this amount shall be reduced by an equivalent dollar amount.

[8] For the avoidance of doubt, Qualified Bids may include additional consideration of any form so long as the cash consideration equals the GSA Minimum Cash Purchase Price or the Non-GSA Minimum Gash Purchase Price, as applicable.

account pursuant to instructions to be provided upon request by a Qualified Bidder. The Debtors reserves the right to increase, decrease or waive the Good Faith Deposit for one or more Qualified Bidders in their Permitted Discretion. Such Qualified Bidder's Qualified Bidder Purchase Agreement shall provide that the Good Faith Deposit shall be forfeited to the Debtors in the event of a breach thereof (after giving effect to any applicable notice and cure periods) by such Qualified Bidder;

J. If a bid is for the non-GalacticSky Assets, it must include cash consideration in excess of $3,000,000 (the "Non-GSA Minimum Cash Purchase Price"), and the Debtors, in consultation with the Committee (if any), may designate such bid a Qualified Bid at the Auction, provided, that the bid includes (i) a Qualified Bidder Purchase Agreement and (ii) a Good Faith Deposit (such bid, a "Non-GSA Qualified Bid");

K. Provides that the GSA Minimum Cash Purchase Price or the Non-GSA Minimum Cash Purchase Price, as applicable, shall be paid in full in cash at the closing of the Sale;

L. Provides that such bid shall be open and irrevocable until the earlier of:

1. such bid being determined by the Debtors not to be a Qualified Bid;

2. if such bid is not chosen by the Debtors at the Auction to be the Successful Bid or Back-Up Bid (as each such term is defined below), the date of entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder;

3. if such bid is chosen by the Debtors to be the Successful Bid, the date which is the earlier to occur of: (i) the closing of the Sale to such Successful Bidder, and (ii) five (5) Business Days following the date the order approving the Sale to the Successful Bidder shall have become a final, non-appealable, order ("Final Order");

4. if such bid is chosen by the Debtors to be the Back-Up Bid, the date which is the earlier to occur of: (i) the date of closing on the Sale to the Successful Bidder, and (ii) twenty-five (25) Business Days following the date the order approving the Sale to the Successful Bidder shall have become a Final Order; provided, that if the Successful Bidder shall fail to close on its purchase of the GalacticSky Assets during the period set forth above, (x) the Back-Up Bid shall continue to remain open and irrevocable, (y) the Back-Up Bidder shall be deemed to be the Successful Bidder, and (z) it shall close on the Sale within ten (10) Business Days of becoming the Successful Bidder; provided, however, in the event that the Stalking Horse Bidder's bid is selected as the Back-Up Bid, the Stalking Horse Bidder's Back-Up Bid shall remain irrevocable until

the earlier of (i) the Debtors inform the Stalking Horse Bidder that the Debtors will proceed with the Stalking Horse Bidder's Back-Up Bid, or (ii) fifteen (15) days after the Stalking Horse Bidder's bid is selected as the Back-Up Bid;

M. (i) Includes an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct all due diligence regarding the Debtors' assets before submitting its bid and that it has relied solely upon its own independent review, investigation, or inspection of any documents or assets in making its bid, and (ii) confirms the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the Sale and does not include any due diligence contingencies;

N. Provides evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) evidencing the authority of the Qualified Bidder to make a binding and irrevocable Qualified Bid and to consummate the Sale if such Qualified Bidder is the Successful Bidder or Back-Up Bidder, as such bid may be improved prior to or at the Auction;

O. Confirms that the Sale will be completed in accordance with the timing set forth in the Bidding Procedures Order;

P. If the Qualified Bidder was formed in whole or part for the purpose of acquiring all or part of the GalacticSky Assets, provides evidence which is reasonably satisfactory to the Debtors, in the Debtors' Permitted Discretion, from each of the equity holders of such Qualified Bidder demonstrating that such Qualified Bidder has, or will have access to, the financial resources needed to consummate the Sale if it becomes the Successful Bidder, and that the use of such resources to consummate the Sale has been authorized and approved by such entity's board of directors (or comparable governing body), provided, that the Debtors reserve the right to limit or waive this requirement for one or more Qualified Bidders in the Debtors' Permitted Discretion;

Q. Certifies that the Qualified Bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale;

R. Certifies and warrants that the Qualified Bidder is, at all times, in full compliance with the Regulatory Restrictions;

S. Is not conditioned on the receipt of any third party approvals or consents (excluding required Bankruptcy Court approval and required governmental, licensing or regulatory approval or consent, if any) other than third-party approvals or consents that are deemed reasonable, as determined by the Debtors, in the Debtors' Permitted Discretion;

T.  Is on terms substantially similar to the Stalking Horse Bidder Purchase Agreement and does not contain any financing contingencies or any other contingencies not set forth in the Stalking Horse Bidder Purchase Agreement; and

U.  Sets forth the representatives that are authorized to appear and act on behalf of such Qualified Bidder in connection with the proposed transaction and the Auction.

c.  **Modification of Bid and Auction Procedures.** The Debtors, in the Debtors' Permitted Discretion, are authorized to amend and modify these Bidding Procedures to impose additional terms and conditions on the proposed Auction and Sale of the GalacticSky Assets (or non-GalacticSky Assets) and assumption of the Assumed Liabilities (including the assumption and assignment of the Transferred Contracts), or to modify or eliminate any of the terms and conditions contained herein if, (i) in the Debtors' Permitted Discretion, such modifications would be in the best interest of the Debtors' estates and promote an open and fair sale Auction and Sale process and (ii) such modifications and/or additional terms and conditions are not materially inconsistent with the provisions of the Bidding Procedures Order or are otherwise acceptable to counsel to the Committee. Notwithstanding anything herein to the contrary, the Debtors in the Debtors' Permitted Discretion may consider and accept bids from a single Qualified Bidder or from multiple Qualified Bidders for less than all or substantially all, or any combination, of the GalacticSky Assets or non-GalacticSky Assets.

d.  **Closing with Alternative Backup Bidders.** Following entry by the Bankruptcy Court of an order authorizing the Sale to a Successful Bidder, if a Successful Bidder fails to consummate the Sale, and such failure is the result of a breach by the Successful Bidder of its obligations under its Qualified Bidder Purchase Agreement, the Successful Bidder's (other than the Stalking Horse Bidder) Good Faith Deposit shall be forfeited to the Debtors as liquidated damages in accordance with the terms of such agreement, and if the Successful Bidder is the Stalking Horse Bidder, the Debtors shall have the right to pursue all of their rights and remedies against the Stalking Horse Bidder and its equity holders in accordance with the terms of the Stalking Horse Bidder Purchase Agreement, the equity holder commitment letters and applicable law. If the Back-Up Bidder is later designated by the Debtors to be the Successful Bidder, the foregoing shall be read to apply to the Back-Up Bidder (and its guarantors, if any) in its capacity as the Successful Bidder. For the avoidance of doubt, notwithstanding anything to the contrary in a Successful Bidder(s)' Qualified Bidder Purchase Agreement, the Debtors, in their sole discretion, may determine that a failure by a Successful Bidder(s) to close the Sale as a result of the Successful Bidder(s)' failure or inability to receive any necessary governmental approvals, whether related to the Regulatory Restrictions or otherwise, is a breach by the Successful Bidder and the Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors as liquidated damages.

e. **Good Faith Deposits; Back-Up Bidder.** The Debtors shall return the Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder, within five (5) Business Days following entry by the Bankruptcy Court of an order authorizing the Sale to the Successful Bidder. Subject to Article IX, the Good Faith Deposit of the Successful Bidder shall be applied to, and deducted from, the Successful Bidder's obligations under the Successful Bid at the closing of the Sale. The Good Faith Deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) Business Days following the date its bid is no longer required to be open and irrevocable as set forth in Article IV(J). If the Back-Up Bidder is subsequently designated by the Debtors as the Successful Bidder as a result of the failure of the Successful Bidder to close on the Sale within the time period set forth in Article IV(J), the Back-Up Bidder shall be deemed to be the Successful Bidder and the Debtors and the Back-Up Bidder shall close the Sale within ten (10) Business Days of the Back-Up Bidder becoming the Successful Bidder. Subject to Article IX, the Good Faith Deposit of the Back-Up Bidder shall be held in escrow until such closing and applied to its obligations at the closing of the Sale. The Debtors reserve all of their rights regarding the return of all Good Faith Deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

f. **Provisions Governing the Auction**. If the Debtors receive at least one (1) bid that is a Qualified Bid (in addition to the Stalking Horse Bid), then the Debtors will conduct an auction (the "Auction"). If the Debtors receive one or more Non-GSA Qualified Bids, after consultation with the Committee (if any), the Debtors may auction any non-GalacticSky Assets subject to such Non-GSA Qualified Bids at the Auction, provided that any such proposed sales will be subject to Bankruptcy Court approval at the Sale Hearing. Notwithstanding anything to the contrary herein, the Debtors are not required to auction or sell any non-GalacticSky Assets pursuant to this sale process. If applicable, at the Auction the non-GalacticSky Assets shall be auctioned off in separate lots from the GalacticSky Assets, but may be conducted simultaneously with the auction of the GalacticSky Assets and in accordance with the procedures outlined in Article VI of the Bidding Procedures. If the Debtors do not receive at least one (1) bid that is a Qualified Bid (other than the Stalking Horse Bid), then the Debtors shall (i) file a notice with the Bankruptcy Court (and serve all Potential Bidders with the same) indicating that (a) the Auction is canceled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority at the Sale Hearing to consummate the Sale transactions with the Stalking Horse Bidder contemplated by the Stalking Horse Bidder Purchase Agreement.

ii. *The Bid Protections*

13. The Debtors seek approval of the bid protections in the Stalking Horse Bidder Purchase Agreement, which consist of the Expense Reimbursement and the Break-Up Fee

(collectively, the "Bid Protections"). The Expense Reimbursement provides that the Debtors will reimburse the Stalking Horse Bidder actual and documented out-of-pocket fees and expenses actually incurred in connection with the transactions contemplated in the Stalking Horse Bidder Purchase Agreement in an amount not to exceed $350,000. The Break-Up Fee provides that the Stalking Horse Bidder would be entitled to a cash payment in an amount equal to five percent (5%) of the Purchase Price set forth in the Stalking Horse Bidder Purchase Agreement ($210,000) for the Stalking Horse Bidder's preparation, negotiation, and execution of the Stalking Horse Bidder Purchase Agreement. Importantly, the Expense Reimbursement and the Break-Up Fee will be payable to the Stalking Horse Bidder only in the event that the Debtors seek and receive approval of a Sale of the Assets with a party other than the Stalking Horse Bidder, and then from the sale proceeds or the proceeds of the forfeited good faith deposits of the successful competing bidder and/or Back-Up Bidder in the event they shall fail to close on their purchase of the GalacticSky Assets with the Debtors, subject to certain conditions set forth in the Stalking Horse Bidder Purchase Agreement. If the Stalking Horse Bidder is the Back-Up Bidder, and closes on the purchase of the GalacticSky Assets, it will not be entitled to receive the Expense Reimbursement and the Break-Up Fee.

14.     These provisions provide the Stalking Horse Bidder with some assurance that it will be compensated for the considerable time and expense it has incurred negotiating and preparing the Stalking Horse Bidder Purchase Agreement and other related definitive documentation and the risk that arises from participating in the bidding and subsequent auction process. Other potential bidders will also benefit from the time and expense that the Stalking Horse Bidder spent negotiating and finalizing such documents. As such, the Debtors believe that providing the Stalking Horse Bidder with the Bid Protections is appropriate.

15.     In addition to compensating the Stalking Horse Bidder, providing the Stalking Horse Bidder with the Bid Protections (which the Stalking Horse Bidder required as a condition to entering into the Stalking Horse Bidder Purchase Agreement) will benefit the Debtors' estates because the purchase price in the Stalking Horse Bidder Purchase Agreement establishes a floor and promotes more competitive bidding. Specifically, the purchase price in the Stalking Horse Bidder Purchase Agreement sends a message to the marketplace that the Assets are worth at least such price. Without that floor, there is a real risk that the ultimate purchase price for the Assets may be undervalued.

### iii.     *Assumption and Assignment Procedures*

16.     The Debtors are seeking approval of the Assumption and Assignment Procedures for notifying counterparties to executory contracts and unexpired leases of proposed Cure Amounts (as defined below) with respect to those executory contracts and unexpired leases that the Debtors propose to assume and assign to the Successful Bidder (the "Transferred Contracts").

17.     As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will file a notice of potential assumption, assignment and/or transfer of the executory contracts and unexpired leases listed therein (such list, the "Transferred Contract and Cure Schedule"), substantially in the form attached as Exhibit A to the Notice of Proposed (I) Assumption and Assignment of Designated Executory Contracts and Unexpired Leases (II) Rejection of Contracts (the "Assignment and Rejection Notice"), attached as **Exhibit 3** to the Bidding Procedures Order, and serve such notice on all non-debtor parties to the Transferred Contracts (the "Contract Counterparties"). The Assignment and Rejection Notice served on each Contract Counterparty shall (i) identify each Transferred Contract; (ii) list the proposed cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Transferred Contract (the "Cure Amounts") as of such date; (iii) include a statement that

assumption and assignment of such Transferred Contract is not required or guaranteed; and (iv) inform such Contract Counterparty of the requirement to file any Assignment Objection (defined below) by the Assignment Objection Deadline (as defined below). Service of the Transferred Contract and Cure Schedule upon a Contract Counterparty does not constitute an admission that a particular Transferred Contract is an executory contract or unexpired lease of property or confirm that the Debtors are required to assume and/or assign such Contract.

18.     According to the Assignment and Rejection Notice, a Contract Counterparty must file any objection to the Cure Amount or the assumption and assignment of such Transferred Contract by January 27, 2020 (the "Assignment Objection Deadline"). In addition, if the Successful Bidder or Back-Up Bidder, in accordance with the Bidding Procedures, identifies additional executory contracts or unexpired leases that it wishes to add to the Transferred Contracts and Cure Schedule (each an "Additional Contract") (or wishes to remove a Transferred Contract from the Transferred Contracts and Cure Schedule), the Debtors shall, within two (2) calendar days of making such a determination, send a supplemental Assignment and Rejection Notice to the applicable Contract Counterparties to such executory contracts or unexpired leases added or removed from the Transferred Contracts and Cure Schedule. To the extent an executory contract or unexpired lease is not assumed and assigned to the Successful Bidder, the Debtors will reject such an unassigned, executory contract or unexpired lease. In no event will the Successful Bidder be responsible for any unassigned executory contracts or unexpired leases.

19.     The Debtors request that the Court require that any objections to the assumption and assignment, or sale and transfer, of the Debtors' rights and interests of and in any of the Transferred Contracts (each, an "Assignment Objection") must: (i) be made in writing and filed on the docket no later than the Assignment Objection Deadline, (ii) state the basis of such

objection with specificity, including, without limitation, the Cure Amount alleged by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number and email address), (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and (iv) be served on the parties set forth in the Bidding Procedures, so as to be actually received on or before 5:00 p.m. (E.T.) on the Assignment Objection Deadline.

20.     In addition, the Debtors request that objections from any Contract Counterparty to an Additional Contract (an "Additional Assignment Objection") must: (i) be made in writing and filed on the docket no later than ten (10) calendar days after the Debtors have sent notice to such Contract Counterparty of their intention to assume and assign, assign, or reject such Additional Contract (as applicable, the "Additional Assignment Objection Deadline"), (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such Contract Counterparty, and include contact information for such Contract Counterparty, (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and (iv) be served upon counsel to: (a) the Debtors and the United States Trustee (addresses for the foregoing are set forth in the Bidding Procedures), and (b) the Successful Bidder, and the Back-Up Bidder (addresses for the foregoing may be obtained from the Debtors' counsel), so as to be actually received on or before 5:00 p.m. (E.T.) on the Additional Assignment Objection Deadline.

21.     The Assignment and Rejection Notice shall also provide that Assignment Objections, if any, will be heard at the Sale Hearing or on such other date, as the Court may designate after the Sale Hearing. Any supplemental Assignment and Rejection Notice relating to an Additional Contract shall provide that Additional Assignment Objections will be resolved at a

hearing to be held by the Court on a date designated by the Court on at least seven (7) days' notice provided by the Debtors.

22.     At the Sale Hearing, the Debtors or the Successful Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder and (ii) request entry of an order approving the assumption and assignment of any or all Transferred Contracts to be assumed and assigned to the Successful Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

iv.          *Scheduling and Notice*

23.     Pursuant to the term sheet for the DIP facility (the "DIP Term Sheet"), the Debtors are required to obtain entry of the Bidding Procedures Order on or before January 6, 2020, which order shall (i) establish the deadline for submission of bids to be January 29, 2020 (the "Bid Deadline"), (ii) fix the date of the Auction to be no later than January 31, 2020, and (iii) fix the date of the Sale Hearing to be no later than February 5, 2020 (although the Debtors are requesting that the Bidding Procedures Hearing fix the Sale Hearing for February 4, 2020). In addition, the DIP Term Sheet requires that the closing on the Sale is to occur no later than February 19, 2020.

24.     Given the Debtors' pre-petition marketing effort and the 23-day marketing and diligence period (*i.e.*, the period from the date of entry of the Bidding Procedures Order through the Bid Deadline) to be established by the Bidding Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Debtors' assets. The proposed timeline provides interested bidders with sufficient time to perform due diligence given that the process is well understood at this juncture. Thus, the

schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Debtors' assets.

25. **Notice of Sale Hearing**. On the date the notice of this Motion is filed, the Debtors will cause this Motion and all exhibits hereto, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, to be served upon (a) the United States Trustee for Region 3; (b) counsel to the DIP Lender (as such term is defined in the DIP Term Sheet); (c) the creditors listed on the Debtors' consolidated list of twenty (20) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions;[9] (d) all parties asserting a security interest in the GalacticSky Assets to the extent any such interest is reasonably known to the Debtors; (e) various federal, state, county and city tax and regulatory authorities; (f) all entities known to have expressed an interest in a transaction with respect to the GalacticSky Assets or that have been identified by the Debtors or their advisors as a potential purchaser of the GalacticSky Assets; (g) local and state environmental authorities and the Environmental Protection Agency; (h) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the assets; (i) the contract counterparties whose contracts are identified as being assigned; (j) all of the Debtors' creditors, and (k) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

26. **Notice of Sale**. Within three (3) days of the entry of the Bidding Procedures Order, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction and the Sale Hearing,

---

[9] To be replaced by any official committee of unsecured creditors appointed in these Chapter 11 Cases.

substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, upon the Sale Notice Parties.

27.    **Post-Auction Supplement**. Following the Auction, the Debtors will promptly file with the Court a supplement (the "<u>Supplement</u>") that will inform the Court of the results of the Auction. The Supplement will identify, among other things, (i) the Successful Bidder(s) as the proposed purchaser of the GalacticSky Assets and, if applicable, any non-GalacticSky Assets, (ii) the amount and form of consideration to be paid by the Successful Bidder(s) for the GalacticSky Assets and, if applicable, any non-GalacticSky Assets, (iii) the Assumed Liabilities to be assumed by the Successful Bidder(s), (iv) the Transferred Contracts to be assumed by the Debtors and assigned to the Successful Bidder, or the Debtors' rights and interests therein sold and transferred to the Successful Bidder, as the case may be, in connection with the Sale, and (v) the executory contracts or unexpired leases designated to be rejected by the Debtors in connection with the Sale. The Supplement will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s). In addition, the Debtors will attach to the Supplement (i) any revised proposed Sale Order approving the Sale to the Successful Bidder, (ii) a copy of the purchase agreement entered into by the Debtors and the Successful Bidder following the Auction, and (iii) any additional information or documentation relevant to the Successful Bid. The Debtors will file the Supplement on the docket for the Chapter 11 Cases as promptly as is reasonably practicable prior to the Sale Hearing but will not be required to serve the same on any parties-in-interest in the Chapter 11 Cases.

**B.    Sale Order**

28.    To ensure the Debtors are in compliance with the DIP Term Sheet, the Debtors requests that this Court set the Sale Hearing for a date that is not later than February 4, 2020. At the Sale Hearing, the Debtors intend to seek entry of the Sale Order (A) approving the Sale free

and clear of all Encumbrances, and (B) authorizing the assumption and assignment of the

Transferred Contracts, among other things. Pursuant to the Sale Order, the Debtors will sell their

assets free and clear of all Encumbrances to the fullest extent possible pursuant to Bankruptcy

Code section 363(f), including without limitation, successor liability or similar theories (except

for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder) and

the Successful Bidder will be protected from liability for and cannot be pursued for any claims

owed by the Debtors. In addition, the Sale Order will have findings that the Sale is not a

fraudulent conveyance. The Bidding Procedures provide proper and adequate notice for these

and the other terms and conditions of the bidding, Auction and Sale processes.

## **BASIS FOR RELIEF REQUESTED**

### A.   **Approval of the Sale Is Warranted Under Bankruptcy Code Section 363(b) and the Bidding Procedures Are Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors.**

29.     Bankruptcy Code section 363(b)(1) provides that, "[t]he trustee, after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate. . . . ." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) further provides, in relevant

part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title." 11 U.S.C. §105.

30.     A debtor should be authorized to sell assets out of the ordinary course of business

pursuant to Bankruptcy Code section 363 if it demonstrates a sound business purpose for doing

so. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that a court

should approve a debtor's use of assets outside ordinary course of business if debtor can

demonstrate a sound business justification for proposed transaction); *see also In re Montgomery

Ward Holding Corp.*, 242 B.R.147, 154 (Bankr. D. Del. 1999) (finding that the debtor's sound

business purpose justified its sale of the assets outside of the ordinary course of business).

31.     Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate. *See Integrated*, 147 B.R. at 659 (providing that such procedures "encourage bidding and to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

32.     With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures. *See In re Trans World Airlines Inc.*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

33.     In exercising their fiduciary duties and in the sound exercise of the Debtors' business judgment, the Debtors have determined that the Bidding Procedures are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for their assets is the highest and best the market can generate.

34.     The Bidding Procedures provide a framework to facilitate and entertain bids for the purchase of the Debtors' GalacticSky Assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a sale of the Debtors' assets. In particular, the Bidding Procedures contemplate an open and fair auction process with minimum barriers to entry and provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

35.     The Bidding Procedures also provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for certain of the Debtors' assets. The Debtors therefore believe that submitting the purchase of their assets to a market-based test will ensure maximum recovery for all stakeholders. Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable and at or above market. *In re Summit Global Logistics*, 2008 WL 819934, at *14.

36.     If the Debtors do not receive at least one (1) bid that is a Qualified Bid (other than the Stalking Horse Bid), then the Debtors shall (i) file a notice with the Bankruptcy Court (and serve all Potential Bidders with the same) indicating that (a) the Auction is canceled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority at the Sale Hearing to consummate the Sale transactions with the Stalking Horse Bidder contemplated by the Stalking Horse Bidder Purchase Agreement.

37.     Similar bidding, auction and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g., In re Tuscany Int'l Holdings (U.S.A.) LTD.*, Case No. 14-10193 (KG) (Bankr. D. Del. Mar. 21, 2014); *In re Oncure Holdings, Inc.*, Case No. 13-11540 (KG) (Bankr. D. Del. Jul. 24, 2013); *In re Protostar Ltd.*, Case No. 09-12659 (MFW) (Bankr. D. Del. Aug. 24, 2009); *In re Midway Games Inc.*, Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); *In re Intermet Corp.*, Case No. 08-11859 (KG) (Bankr. D. Del. May 12, 2009); *In re VI Acquisition Corp.*, Case No. 08-10623 (KG) (Bankr. D. Del. Oct. 17, 2008); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May, 13, 2008); *In re Global Home Prods. LLC*, Case No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006); *In re Russell-Stanley Holdings, Inc.*, Case No. 05-12339 (MFW) (Bankr. D. Del. Sept. 9, 2005); *In re Ultimate Elecs., Inc.*, Case No. 05-10104 (PJW) (Bankr. D. Del. Mar. 24, 2005).

38.     In sum, the Debtors believe that the proposed Bidding Procedures create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for their assets. Accordingly, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

**B.     The Bid Protections Are Reasonable and Necessary.**

39.     The Bidding Procedures Order provides that the Debtors are authorized to agree to provide the Break-Up Fee and/or Expense Reimbursement to the Stalking Horse Bidder in the event the Stalking Horse Bidder is not the Successful Bidder at the Auction. This Court has acknowledged that a break-up fee is appropriate where it "is an essential inducement and condition of Buyer's entry into, and continuing obligations, under the APA." *In re WorldSpace, Inc.*, Case No. 08-12412 (PJW), 2010 WL 4739929, at *4 (Bankr. D. Del. June 2, 2010). The Stalking Horse Bid provides value to the Debtors' estates by setting a baseline bid for the GalacticSky Assets and increasing the odds of a value-maximizing Auction. *See In re Katy*

*Indus., Inc.*, No. 17-11101 (KJC) (Bankr. D. Del. June 19, 2017) (finding that a stalking horse purchaser provides a material benefit to the debtor by increasing the likelihood of an increase in sale price for the purchased assets).

40.    In addition, the Bid Protections sought here constitute actual, necessary costs and expenses of preserving the Debtors' estates. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (holding that break-up fees, like that of other administrative expenses, are allowed when such fees are actual, necessary costs of preserving the value of the debtor's estate) (citing *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999)). They are also appropriate for cases of this size because bid protections reasonably reflect "the risk, effort, and expenses of the prospective purchaser." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 662 (S.D.N.Y. 1992). Based on the pre-petition marketing process and the Debtors' negotiations with the Stalking Horse Bidder, a smaller amount for the Break-Up Fee or Expense Reimbursement would not have been sufficient to obtain the Stalking Horse Bidder based on the risk, effort, and expenses involved in this Sale. Additionally, the Bid Protections are within the range of other break-up fees approved in this district, particularly given the relatively small amount of the proposed purchase price. *See, e.g.*, Hr'g Tr. 31:8–9, *In re First Place Fin. Corp.*, No. 12-12961 (BLS) (Bankr. D. Del. Nov. 15, 2012) ("courts in this jurisdiction have gone . . . up to five percent [of the purchase price]" for a break-up fee alone); *In re Nirvanix, Inc.*, Case No. 13-12595 (BLS) (Bankr. D. Del. Oct. 23, 2013) (approving total bid protections of 11%—comprising a $150,000 break-up fee and $150,000 expense reimbursement for a $2,800,000 stalking horse bid); *In re First Place Fin. Corp.*, Case No. 12-12961 (BLS) (Bankr. D. Del. Nov. 26, 2012) (approving total bid protections of 6.6%—comprising a $3 million break-up fee and a $1 million expense reimbursement on a

transaction with $60 million in aggregate consideration); *In re Hub Holding Corp., et al.*, Case No. 09-11770 (PJW) (Bankr. D. Del. June 30, 2009) (approving total bid protections of 6.43%—comprising a $2,880,000 break-up fee and $1,750,000 expense reimbursement for a $72,000,000 stalking horse bid); *In re Fluid Routing Solutions Intermediate Holding Corp., et al.*, Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving total bid protections of 6.82%—comprising a $750,000 break-up for an $11,000,000 stalking horse bid); *see also* Hr'g Tr. 47:10–14, *In re Candi Controls, Inc.,* No. 18-10679 (CSS) (Bankr. D. Del. Apr. 11, 2018) (with regard to use of percentages for bid protections in smaller sales, "significant resources would have to be devoted, not only to the proposed transaction, and there's a cost associated with any business transaction of a size. And so the percentages, I think, are of less value."). Therefore, the Court should authorize the Debtors to agree to grant the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement. The Debtors further respectfully submit that the Bid Procedures should be allowed as administrative expense claims in the Chapter 11 Cases under Bankruptcy Code section 364(c)(i) with priority over all expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) and should be payable to the Stalking Horse Bidder from the proceeds of a sale to a Successful Bidder (other than from the Stalking Horse Bidder) within two (2) days of the Debtors' receipt of such proceeds.

**C.      The GalacticSky Assets Should Be Sold Free and Clear of Claims, Liens and Encumbrances Under 11 U.S.C. § 363(f).**

41.      In the interest of attracting the best offers, the Debtors request authorization to sell the GalacticSky Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with Bankruptcy Code section 363(f), with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale of the Assets and distributed as provided for in a further order of the Court.

42.     Under Bankruptcy Code section 363(f), a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied:

> i. applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> ii. such entity consents;
>
> iii. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> iv. such interest is in bona fide dispute; or
>
> v. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because Bankruptcy Code section 363(f) is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests. *See, e.g., In re Dura Automotive Sys., Inc.,* 2007 WL 7728109, at *6 n.32 (Bankr. D. Del. Aug. 15, 2007).

43.     Furthermore, Bankruptcy Code section 105(a) grants the court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). This equitable power may be utilized to effectuate the provisions of section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325, at *6-*7 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

44.     The Debtors will demonstrate at the Sale Hearing that the Sale satisfies the requirements of section 363(f). Accordingly, the Debtors request authorization to sell the GalacticSky Assets free and clear of all liens, claims, encumbrances, and other interests.

**D.    A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

45.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark BellFurniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); *In re Temtechco, Inc.*, 1998 WL 887256, at *4 (D. Del. 1998).

46.    As noted above, any asset purchase agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bidding Procedures and Bidding Procedures Order, with each of the parties represented by its own advisors and counsel. Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder for the GalacticSky Assets is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m). The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the GalacticSky Assets.

**E.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Should Be Authorized.**

47.    To enhance the value of the Debtors' estates (by curtailing further administrative liability and eliminating substantial rejection claims), the Debtors request authority under Bankruptcy Code section 365 to assume and assign the executory contracts and/or unexpired leases associated with the GalacticSky Assets to the Successful Bidder. The Debtors further requests that the Sale Order provide that the assigned executory contracts and/or unexpired leases will be transferred to, and remain in full force and effect for the benefit of, the Successful

Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in Bankruptcy Code sections 365(b)(2), (f)(1), and (f)(3), that prohibit such assignments. In addition, the Debtors may reject executory contracts and unexpired leases in the Sale Order or pursuant to another order of the Court.

48. The Debtors may, subject to court approval, assume and assign or reject executory contracts and unexpired leases under Bankruptcy Code section 365. 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See, e.g., In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007); *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc.* (*In re Rickel Home Ctrs., Inc.*), 209 F.3d 291, 298 (3d Cir. 2000); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992); *Sharon Steel National Fuel Gas Distrib. Corp.* (*In re Sharon Steel Corp.*), 872 F.2d 36, 39-40 (3d Cir. 1989); *In re NII Holdings, Inc.*, Case No. 14-12611 (SCC) (Bankr. S.D.N.Y. Apr. 20, 2015); *In re Delia's, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003). The assumption and assignment of the executory contracts and/or unexpired leases related to the GalacticSky Assets is an integral component of the Sale, without which the Sale would not be a viable option.

49. Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for

any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under the lease is provided. 11 U.S.C. § 365(b)(1)(A)-(C).

50.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp. (In re Sanshoe Worldwide)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007); *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).

51.     As set forth above, pursuant to the terms of the proposed Bidding Procedures Order, the Debtors will send the Assignment and Rejection Notice to all counterparties to the executory contracts and unexpired leases notifying such counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder of such contracts and/or leases. The Assignment and Rejection Notice will also set forth the Cure Amount, if any, owing for each such contracts and/or leases according to the Debtors' books and records.

52.     Counterparties to such contracts and/or leases will be given sufficient time (as set forth herein and in the proposed Bidding Procedures Order) to object to the proposed Cure Amounts, if any, set forth in the Assignment and Rejection Notice. If no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s) and the applicable non-debtor counterparty. The payment of the Cure Amounts specified in the Assignment and Rejection Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant non-debtor counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under the applicable executory contract(s) and/or lease(s) pursuant to Bankruptcy Code section 365(b)(1), unless the Debtors

determine, before the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder.

53.    Bankruptcy Code section 365(f)(2)(B) states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance." 11 U.S.C. § 365(f)(2)(B). If necessary, the Successful Bidder must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bidding Procedures Order. The affected non-debtor counterparties will also be able to challenge the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.

54.    Any assumption and assignment of an assigned contract and/or lease will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code. The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the assigned contracts and/or leases. The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to Bankruptcy Code section 365 with respect to the potential assumption and assignment of the applicable assigned contracts and/or leases. Consequently, assumption and assignment of the assigned executory contracts and/or leases in connection with the Sale of the Assets is appropriate under the circumstances.

**F.    The Proposed Notice Is Appropriate Under Bankruptcy Rule 2002.**

55.    The notices contemplated by the Bidding Procedures give notice of the proposed sale including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections. The Debtors submit that the notice procedures

comply with Bankruptcy Rule 2002 and include information regarding the Bidding Procedures necessary to enable interested bidders to participate in the Auction and constitutes good and adequate notice of the Bidding Procedures and the other components of the Auction. Therefore, the Debtors respectfully request this Court approve the proposed notice procedures.

**G.    Relief from Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

56.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the court orders otherwise.

57.    To preserve the value of the Debtors' estates and limit the costs of administering and preserving the GalacticSky Assets and comply with the DIP Facility's milestones, it is critical that the Debtors close the sale of their assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby requests that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

58.    The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for Region 3, Attn: Juliet Sarkessian; (b) each of the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the DIP Lender; (d) counsel to the Debtors' pre-petition secured lenders; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the United States

Department of Justice; (h) all entities known to have expressed a bona fide interest in a transaction with respect to the Assets at any time; (i) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; and (j) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request this Court to enter the Bidding Procedures Order, the Sale Order and further relief as the Court may deem just and appropriate.

Wilmington, Delaware
Date: December 13, 2019

**SULLIVAN HAZELTINE ALLINSON LLC**

*/s/ E.E. Allinson III*
Elihu E. Allinson, III (No. 3476)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Telephone: (302) 428-8191
Fax: (302) 428-8195
Email: zallinson@sha-llc.com

and

PILLSBURY WINTHROP SHAW PITTMAN LLP
Hugh M. Ray, III (*pro hac vice* admission pending)
Jason S. Sharp (*pro hac vice* admission pending)
William Hotze (*pro hac vice* admission pending)
2 Houston Center
909 Fannin Street, Suite 2000
Houston, Texas 77010-1028
Telephone: (713) 276-7600
Fax: (713) 276-7673
Email: hugh.ray@pillsburylaw.com
       jason.sharp@pillsburylaw.com
       william.hotze@pillsburylaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

## EXHIBIT A

**Proposed Bidding Procedures Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19-12670 (JTD) |
| Debtors. | (Joint Administration Requested) |
| | Re: Docket No._____ |

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 364, 365 AND 541, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS FOR THE SALE OF CERTAIN ASSETS OF THE DEBTORS; (B) APPROVING THE STALKING HORSE BIDDER PURCHASE AGREEMENT; (C) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) SCHEDULING THE <u>AUCTION AND SALE HEARING; AND (F) GRANTING RELATED RELIEF</u>**

Upon consideration of the Motion[2] of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter an order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and the Court having considered the statements of counsel, the First Day Declaration, any objections raised, and the evidence presented at the Bidding

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is: PO Box 14928, Long Beach, CA 90853-4928.

[2] Capitalized terms that are not otherwise defined in this Order have the meanings given to such terms in the Motion or Bidding Procedures (defined below), as applicable.

Procedures Hearing; and it appearing that the relief requested in the Motion is reasonable and in the best interests of the Debtors' bankruptcy estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    The Debtors have articulated good and sufficient reasons for, and the best interests of their estates, creditors, and other parties in interest will be served by the Court granting the relief requested in the Motion to be approved pursuant to this Bidding Procedures Order.

B.    Under the circumstances, and particularly in light of the marketing done by the Debtors and their advisors of the GalacticSky Assets prior to the date hereof, the Bidding Procedures are fair, reasonable and appropriate and constitute a reasonable, sufficient, adequate, and proper means to provide potential competing bidders with an opportunity to submit and are reasonably calculated to enable the Debtors to pursue, higher or otherwise better offers for the GalacticSky Assets.

C.    A reasonable opportunity to be heard regarding the relief provided herein has been afforded to all interested parties.

D.    The Debtors have demonstrated that, under the circumstances of these Chapter 11 Cases, the Bidding Procedures attached as **Exhibit 1** hereto (the "Bidding Procedures"), including the Debtors' acceptance of the Stalking Horse Bid and grant to the Stalking Horse Bidder of the Break-Up Fee and Expense Reimbursement (as such terms are defined herein), are: (a) fair, reasonable, and provide an appropriate process and timetable for the Debtors to utilize for the solicitation and consideration of competing offers to purchase substantially all of the GalacticSky Assets and (b) reasonably calculated to enable the Debtors to maximize the value of

their assets by setting the floor for bids and contributing to a robust auction process for the benefit of the Debtors' estates, creditors, and other parties in interest.

   E.  The Debtors' estates will suffer harm if the relief requested in the Motion to be approved by this Bidding Procedures Order is not granted.

   F.  The Debtors have articulated good and sufficient reasons for, and the best interests of their estates and stakeholders will be served by, the Court scheduling or fixing dates pursuant to this Bidding Procedures Order for (i) the Bid Deadline (as defined below), (ii) the Sale Objection Deadline (as defined below) to the Sale, (iii) the Auction, (iv) the Assignment Objection Deadline, and (v) the Sale Hearing.

   G.  The Sale Notice and Assignment and Rejection Notice are reasonably calculated to provide the Sale Notice Parties, the other Contract Counterparties, and other interested parties with proper notice of (i) the Bidding Procedures (ii) the Stalking Horse Bidder and Stalking Horse Bid (as each such term is defined below) (iii) the Bid Protections (as defined below), (iv) the Auction, (v) the Assignment and Rejection Procedures (including with respect to Cure Costs and the Assignment Objection Deadline), (vi) the Sale Hearing, and (vii) the Sale; constitute adequate and sufficient notice under the circumstances of these Chapter 11 Cases, and no other or further notice is required and afforded a reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the Bidding Procedures, the Stalking Horse Bid and the Bid Protections).

   H.  The Debtors have demonstrated a compelling and sound justification for the Court to enter into this Bidding Procedures Order and thereby (i) approve the Bidding Procedures; (ii) authorize the Debtors to accept the stalking horse bid (the "Stalking Horse Bid") with Lockheed Martin Corporation (the "Stalking Horse Bidder") and enter into the asset purchase

agreement (the "Stalking Horse Bidder Purchase Agreement") with the Stalking Horse Bidder dated December 13, 2019 (a copy of which is attached hereto as **Exhibit 4**) and (ii) grant the Stalking Horse Bidder the Bid Protections as an actual and necessary cost of preserving the Debtors' estates, within the meaning of Bankruptcy Code sections 503(b) and 507(a).

I.      The Motion and this Bidding Procedures Order comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

J.      Due, sufficient and adequate notice of the relief granted herein has been given to all parties in interest.

K.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact in this Bidding Procedures Order constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted as set forth in this Bidding Procedures Order.

2.      All objections filed to the Motion with respect to the relief granted herein that have not been withdrawn, waived, settled, or specifically addressed in this Bidding Procedures Order or Bidding Procedures, and all reservations of rights included in such objections, are overruled in all respects on the merits.

A.      **Approval of the Bidding Procedures**

3.      The Bidding Procedures, which are attached hereto as **Exhibit 1** and incorporated herein by reference, are hereby approved in all respects and shall govern all bidders and bids including those that may be submitted by Qualified Bidders at the Auction and other activities relating to the sale of the GalacticSky Assets. The failure to specifically include or reference any

particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

4.      The Debtors are authorized to (a) designate Lockheed Martin Corporation as the Stalking Horse Bidder and accept the Stalking Horse Bid, and (b) enter into the Stalking Horse Bidder Purchase Agreement.

5.      The Stalking Horse Bidder is granted a break-up fee in the amount of $210,000 (the "Break-Up Fee") and reimbursement of its reasonable and documented out-of-pocket expenses and disbursements not to exceed $350,000 ("Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"), incurred in connection with its due diligence or Stalking Horse Bid if the Stalking Horse Bidder does not become the Successful Bidder at the Auction or the Debtors otherwise breach the Stalking Horse Bidder Purchase Agreement, as set forth in the Stalking Horse Bidder Purchase Agreement. The Bid Protections shall be allowed as administrative expense claims in the Chapter 11 Cases under Bankruptcy Code section 364(c)(1) and shall be paid to the Stalking Horse Bidder in cash from the proceeds of a Successful Bid (other than from the Stalking Horse Bidder) within two (2) days of the date when the Debtors receive such proceeds, or from cash on hand as liquidated damages in the event of a breach by the Debtors of the terms of the Stalking Horse Bidder Purchase Agreement.

6.      As further described in the Bidding Procedures, the deadline for all competing bidders to submit a Qualified Bid is January 29, 2020, at 5:00 p.m., E.T. (the "Bid Deadline"), as further governed by the Bidding Procedures. Qualified Bidders seeking to submit bids for the GalacticSky Assets must do so in accordance with the terms of the Bidding Procedures and this Bidding Procedures Order.

7.      The Assignment Objection Deadline is January 27, 2020, at 5:00 p.m. (E.T.). If a timely objection is filed and cannot be resolved consensually, such objection will be resolved at the Sale Hearing or on such other date, as the Court may designate after the Sale Hearing.

8.      As further governed by the Bidding Procedures, if the Debtors receive one or more Qualified Bids, in addition to the Stalking Horse Bid, by the Bid Deadline, the Debtors may hold the Auction on January 31, 2020, at 10:00 a.m. (E.T.) in accordance with the Bidding Procedures at the offices of Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019. Only a Qualified Bidder who has submitted a Qualified Bid, the Bidding DIP Lender/Stalking Horse Bidder, members of the Committee, valid creditors of the Debtors, and the respective representatives and advisors of each of the foregoing shall be eligible to attend the Auction.

9.      Each Qualified Bidder participating in the Auction must confirm that it (i) has not engaged in any collusion with respect to its bid or the Sale and (ii) is in full compliance with the Regulatory Restrictions.

10.      Upon request of the Debtors, any Qualified Bidder participating in the Auction shall provide evidence demonstrating its compliance with any Regulatory Restriction.

11.      Prior to the Auction, the Debtors will select the highest Qualified Bid it has received to serve as the opening bid at the Auction (the "Baseline Bid"). The Baseline Bid must include cash consideration in an amount not less than the Minimum Cash Purchase Price specified in the Bidding Procedures. The first overbid at the Auction shall be the amount of the Baseline Bid plus $250,000 of additional consideration, (ii) thereafter, a Qualified Bidder may increase its Qualified Bid in any amount as long as each subsequent bid exceeds the previous highest bid by at least $250,000 of additional consideration, and (iii) any Qualified Bids by the

Stalking Horse Bidder made during the Auction will be entitled to a credit up to the full amount of all of the Debtors' DIP Obligations (as defined in the Stalking Horse Bidder Purchase Agreement).

12.     If the Debtors receive one or more Non-GSA Qualified Bids, after consultation with the Committee (if any), the Debtors may auction any non-GalacticSky Assets subject to such Non-GSA Qualified Bids at the Auction, provided that any such proposed sales will be subject to Court approval at the Sale Hearing. Notwithstanding anything to the contrary herein or in the Bidding Procedures, the Debtors are not required to auction or sell any non-GalacticSky Assets pursuant to the sale process approved in this Bidding Procedures Order. If applicable, at the Auction the non-GalacticSky Assets shall be auctioned off in separate lots from the GalacticSky Assets but may be conducted simultaneously with the auction of the GalacticSky Assets and in accordance with the procedures outlined in Article VI of the Bidding Procedures.

13.     The Auction will conclude when the Debtors, in the Debtors' Permitted Discretion, determine that they have received the highest or otherwise best offer(s) from a Qualified Bidder(s) for the GalacicSky Assets (or any non-GalacticSky Assets, if applicable) (each, a "Successful Bid"). The next highest or otherwise best Qualified Bid(s) submitted at the Auction, as determined by the Debtors, in the Debtors' Permitted Discretion, shall be the "Back-Up Bid". The Qualified Bidder(s) submitting the Successful Bid shall be the "Successful Bidder" and the Qualified Bidder(s) submitting the Back-Up Bid shall be the "Back-Up Bidder". The Committee, if appointed, shall retain all of its rights with respect to the Debtors' determinations concerning the Successful Bidder and Back-Up Bidder.

14.     Following the Auction, the Debtors shall promptly file with the Court the Supplement described in, and in accordance with, the provisions in the Bidding Procedures.

15.     If the Successful Bidder is not the Bidding DIP Lender/Stalking Horse Bidder, then within one (1) calendar day of the conclusion of the Auction, the Bidding DIP Lender shall provide to the Debtors and the Successful Bidder a statement of the total outstanding obligations under the DIP Facility (the "Outstanding DIP Loan Amount") and wiring instructions for payment of the Outstanding DIP Loan Amount. Within three (3) calendar days of the conclusion of the Auction, the Successful Bidder or the Debtors shall transfer cash, which, may include the Successful Bidder's Good Faith Deposit, to the Bidding DIP Lender equal to the Outstanding DIP Loan Amount, provided that the Debtors' shall retain the right to dispute any portion of the Outstanding DIP Loan Amount with the Bankruptcy Court. If the Bidding DIP Lender fails to provide the statement of the Outstanding DIP Amount within one (1) calendar day of the Conclusion, then for each calendar day thereafter, the "Maturity Date" under the DIP Facility shall be extended for an equal number of calendar days.

16.     If the Debtors do not receive at least one (1) bid that is a Qualified Bid (other than the Stalking Horse Bid), then the Debtors shall (i) file a notice with the Bankruptcy Court (and serve all Potential Bidders with the same) indicating that (a) the Auction is canceled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority at the Sale Hearing to consummate the Sale transactions with the Stalking Horse Bidder contemplated by the Stalking Horse Bidder Purchase Agreement.

17.     The Court shall conduct the Sale Hearing on February 4, 2020, at __:__ a.m./p.m. (E.T.), at which time the Court will consider approval of the Sale to the Successful Bidder. Following the conclusion of the Auction, with the consent of the Successful Bidder, or as otherwise directed by the Bankruptcy Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a

notice on the docket for these Chapter 11 Cases. At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

18.     The Debtors are hereby authorized to conduct the Sale without the necessity of complying with any state or local transfer laws or requirements.

19.     The Debtors' granting and payment of the Bid Protections pursuant to this Bidding Procedures Order and the Stalking Horse Bidder Purchase Agreement are: (a) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of Bankruptcy Code sections 503(b) and 507(a); (b) are of substantial benefit to the Debtors' estates and creditors and all parties in interest herein; (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed transactions, including the sale of substantially all of the assets of the Debtors, and the substantial efforts that have been and will be expended by the Stalking Horse Bidder; (d) have been negotiated by the parties and their respective advisors at arm's length and in good faith; and (e) are a material inducement for the Stalking Horse Bidder and a necessary condition to ensure that the Stalking Horse Bidder pursues the purchase of the GalacticSky Assets.

20.     The Bid Protections are necessary to maximize the value of the Debtors' estates. Without the Bid Protections, the Stalking Horse Bidder would not pursue the purchase of substantially all of the assets of the Debtors, likely resulting in the Debtors realizing a lower price for such assets.

21.     Except for the Stalking Horse Bidder, no other party submitting an offer or a competing Qualified Bid to purchase substantially all of the GalacticSky Assets shall be entitled to any expense reimbursement, break-up, termination, or similar fee or payment.

**B.**     **Approval of the Sale and Assignment and Procedures Notices**

22.     The Sale Notice and Assignment and Rejection Notice substantially in the forms attached hereto as **Exhibit 2** and **Exhibit 3**, respectively, to this Bidding Procedures Order, are approved in all respects. No other or further notice of the Bidding Procedures, Assignment and Rejection Procedures, the Sale Hearing, relevant objection or other deadlines, or the Sale is required.

23.     The Sale Notice and Assignment and Rejection Notice are reasonably calculated to provide the Sale Notice Parties, the other Contract Counterparties, and other interested parties with proper notice of (i) the Bidding Procedures, (ii) the Stalking Horse Bid, (iii) the Bid Protections, (iv) the Auction, (v) the Assignment and Rejection Procedures (including with respect to Cure Costs and the Assignment Objection Deadline), (vi) the Sale Hearing, and (vii) the Sale, constitute adequate and sufficient notice under the circumstances of these Chapter 11 Cases, and no other or further notice is required and afforded a reasonable opportunity to object or be heard regarding the relief requested in the Motion approved by this Bidding Procedures Order.

24.     To be considered, any objection to the Sale must (a) comply with the Bankruptcy Rules and the Local Rules, (b) be made in writing and filed with the Court, and (c) be filed on or before 05:00 p.m. (E.T.) on January 29, 2020, except objections to the identity of the Successful Bidder or Back-Up Bidder and the final terms of their respective bids may be filed on or before February 3, 2020 at 5:00 p.m. (E.T.).

25.     The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion at the Sale Hearing or thereafter of any objection to the relief requested by the Debtors to be approved at the Sale Hearing by entry of the Sale Order, or the consummation and performance of the Sale of the GalacticSky Assets to the Successful Bidder, including the

transfer of the GalacticSky Assets free and clear of all liens, claims, interests, and other encumbrances (with the same to attach to the cash proceeds of the Sale to the same extent and with the same order of priority, validity, force, and effect which they previously had against the GalacticSky Assets, subject to the rights and defenses of the Debtors and the Debtors' estates with respect thereto), and the Debtors' assumption and assignment of the Transferred Contracts to the Successful Bidder.

26.     The Assignment and Rejection Procedures, as described in the Motion, are hereby approved in all respects. The failure to specifically include or reference any particular provision of the Assignment and Rejection Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Assignment and Rejection Procedures be authorized and approved in their entirety.

27.     As further governed by the Assignment and Rejection Procedures, the Assignment Objection Deadline is January 27, 2020, at 5:00 p.m. (E.T.). Any Contract Counterparty that fails to file an Assignment Objection by the Assignment Objection Deadline in accordance with the Assignment and Rejection Procedures (i) shall be deemed to have forever waived and released any right to assert an Assignment Objection, (ii) to have consented to the assumption and assignment, or assignment, as the case may be, of their Transferred Contract without the necessity of obtaining any further order of the Bankruptcy Court, and (iii) shall be forever barred and estopped from (a) objecting to the Cure Amount set forth on the Cure Schedule with respect to the Transferred Contract, (b) seeking additional amounts arising under the Transferred Contract prior to the closing from the Debtors or Successful Bidder, and (c) objecting to the assumption and assignment, or assignment, as the case may be, of its Transferred Contract to the Successful Bidder.

28.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h) or 6006(d), the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

29.     The Debtors are authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effectuate the terms and requirements established and relief granted in this Bidding Procedures Order.

30.     To the extent of any inconsistences between the Bidding Procedures and this Bidding Procedures Order, this Bidding Procedures Order shall govern.

31.     All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32.     This Bidding Procedures Order shall be binding on all successors and assigns, including any trustee appointed in these Chapter 11 Cases.

33.     The rights of the Committee, if appointed, and all other parties in interest with standing in the Chapter 11 Cases, to seek an order of this Court extending the dates set forth herein and in the Bidding Procedures for the Bid Deadline, Auction, and Sale Hearing and the rights of the Debtors, Stalking Horse Bidder, and DIP Lender to contest any such requests, are preserved.

34.     The rights of the Committee, if appointed, and all other parties in interest with standing in the Chapter 11 Cases, to object to any and all aspects of the Sale, including, without limitation, the identity of the Successful Bidder or Back-Up Bidder, the form of each such bidder's asset purchase agreement, including, for avoidance of doubt, the form of asset purchase agreement submitted by the Stalking Horse Bidder, the terms of their respective bids, and the allocation of the purchase price pursuant to each such asset purchase agreement, and the rights of

the Debtors, and all other parties in interest with standing in the Chapter 11 Cases, to contest any such objections, are preserved.

35.    For the avoidance of doubt, Paragraphs 33 and 34 shall not be deemed to constitute consent of the Stalking Horse Bidder or any other Qualified Bidder to extend any of the deadlines contained in Section 5.6 or any other provision of the Stalking Horse Bidder Purchase Agreement or similar provisions of any Qualified Bidder Purchase Agreement or the waiver of any right or remedy of the Stalking Horse Bidder or any Qualified Bidder arising under such purchase agreement on account of a failure of the Debtors to meet any such deadline.

36.    The Court shall retain jurisdiction over any matter or dispute arising from or relating to the Bidding Procedures or this Bidding Procedures Order.

Dated: January __, 2020
Wilmington, Delaware

_____
THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

## BIDDING PROCEDURES

The following procedures (collectively, the "Bidding Procedures") shall govern the sale (the "Sale") of certain assets of Vector Launch Inc. and Garvey Spacecraft Corporation (the "Debtors") in Case No. 19-12670 (JTD) (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court")[1] consisting of the Debtors' software-defined satellite products and services (i.e., GalacticSky), together with all related products and service offerings that have been marketed, sold, distributed, or otherwise provided or that the Sellers intend to market, sell, distribute, or otherwise provide (collectively, the "GalacticSky Assets"), as described and set forth in the asset purchase agreement between the Debtors and Lockheed Martin Corporation (the "Stalking Horse Bidder" or the "Bidding DIP Lender", as lender of the loans under the DIP facility (the "DIP Facility") in these Chapter 11 Cases) dated December 13, 2019 (the "Stalking Horse Bidder Purchase Agreement"). The Stalking Horse Bidder's bid for the GalacticSky Assets, as set forth in the Stalking Horse Bidder Purchase Agreement, is referred to herein as the "Stalking Horse Bid". As used herein, "Permitted Discretion" shall mean the Debtors' exercise of their reasonable discretion after timely consultation with an official committee of unsecured creditors in these Chapter 11 Cases (the "Committee"), if any.

These Bidding Procedures have been approved and authorized by an order of the Bankruptcy Court, dated January __, 2020 (Dkt. No. __) (the "Bidding Procedures Order"), upon the motion of the Debtors dated December 13, 2019 (Dkt. No. __) (the "Bidding Procedures Motion"). The Bidding Procedures Order, among other things, (i) approved these Bidding Procedures; (ii) approved various forms and the manner of notice of respective dates, times, and places in connection therewith; (iii) scheduled the Auction (as defined below); (iv) scheduled the Sale Hearing (as defined below) and the objection deadline to the Sale; (v) approved procedures for the assumption and assignment or rejection of designated executory contracts, including related objection deadlines and the bar date for submitting a rejection damages claim; (vi) approved procedures for the rejection of designated executory contracts, including the bar date for submitting a rejection damages claim; and (vii) authorized the Debtors to designate Lockheed Martin Corporation as the Stalking Horse Bidder for the GalacticSky Assets and grant the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement (as such terms are defined in the Stalking Horse Bidder Purchase Agreement).

Copies of the Bidding Procedures Motion and its exhibits are available without charge at: https://dm.epiq11.com/vectorlaunch or for a fee on the Bankruptcy Court's electronic docket. To receive a confidentiality agreement to become a Potential Bidder (as defined below) or after a confidentiality agreement has been executed and delivered to the Notice Parties (as defined below), a copy of the Stalking Horse Bidder Purchase Agreement, kindly submit a request in writing, preferably via email, to (a) the Debtors' counsel: Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp (email: hugh.ray@pillsburylaw.com and jason.sharp@pillsburylaw.com or Sullivan Hazeltine Allinson LLC, 901 North Market Street, Suite 1300, Wilmington, DE 19801,

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order and any exhibits thereto, and, if not defined therein, in the Bidding Procedures Motion and any exhibits thereto.

1

Attn: Elihu Ezekiel Allinson III (email: zallinson@sha-llc.com) or (b) the Debtors' chief restructuring officer: Winter Harbor LLC, 265 Franklin Street, 10th Floor, Boston, MA 02110, Attn: Shaun Martin (email: smartin@winterharborco.com).

## Key Dates

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing bids for the GalacticSky Assets. The Debtors shall assist interested parties in conducting their respective due diligence investigations and shall accept Bids until **January 29, 2020 at 5:00 p.m. (E.T.)**.

The key dates for the sale process are as follows:[2]

| | |
|---|---|
| January 29, 2020 at 5:00 p.m. (E.T.) | Bid Deadline - Due Date for Bids and Good Faith Deposits. |
| January 27, 2020 at 5:00 p.m. (E.T.) | Assignment Objection Deadline. |
| January 30, 2019, 2020 at 5:00 p.m. (E.T.) | Debtors to determine which Bids are Qualified Bids and notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. |
| On or before January 30, 2020 at 5:00 p.m. (E.T.) | Debtors to send to each Qualified Bidder a schedule setting forth the highest or otherwise best fully binding offer for all or substantially all of the GalacticSky Assets and, if applicable, the non-GalacticSky Assets. |
| January 31, 2020 at 10:00 a.m. (E.T.) | Auction (if necessary), which will be held at the offices of Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019. |
| February 1, 2020 at 5:00 p.m. (E.T.) | Deadline for Debtors to file supplement informing the Bankruptcy Court of the results of the Auction. |
| February 3, 2020, at 9:00 a.m. (E.T.) | Deadline to file form of Sale Order. |
| January 29, 2020 at 05:00 p.m. (E.T.) | Sale Objection Deadline (for all objections other than the outcome of the Auction). |
| February 3, 2020 at 5:00 p.m. (E.T.) | Auction Objection Deadline (for all objections with respect to the outcome of the Auction). |
| February 4, 2020 at __:__ _.m. (E.T.) | Proposed Sale Hearing Date. |
| February 19, 2020 | Deadline to Close Proposed Sale Transaction. |

---

[2] These dates are subject to extension or adjournment as provided for herein.

## I.      Due Diligence

Subject to any limitations provided by applicable law,[3] the Debtors will afford interested parties that have or put in place an executed, unexpired confidentiality agreement in form and substance reasonably acceptable to the Debtors and, at the Debtors' request, financial information that demonstrates such party's ability to submit a bid that complies with the requirements herein and the Bidding Procedures Order (each, a "<u>Potential Bidder</u>"), the opportunity to conduct reasonable due diligence, subject to parameters and restrictions that the Debtors may establish in their Permitted Discretion. The due diligence period shall extend through and include the Bid Deadline (as defined below).

Neither the Debtors nor their advisors shall be obligated to furnish any information of any kind whatsoever relating to the GalacticSky Assets or the Debtors to any person or entity (excluding, for the avoidance of doubt, the Committee or the U.S. Trustee) (i) that is not a Potential Bidder or Qualified Bidder (as defined below), (ii) that is not in compliance with the requirements set forth herein and in the Bidding Procedures Order, as determined in the Debtors' Permitted Discretion, or (iii) after the Bid Deadline.

To the extent these Bidding Procedures require the Debtors to consult with the Committee in connection with making a determination or taking an action, or in connection with any other matter related to the Bidding Procedures or the Auction, the Debtors shall do so in a regular and timely manner prior to making such determination or taking such action.

## II.     Bid Deadline

**All Potential Bidders must deliver bids for any assets, including, but not limited to, the GalacticSky Assets so as to be received on or before 5:00 p.m. (E.T.), on January 29, 2020 (the "<u>Bid Deadline</u>")**, to the Debtors' chief restructuring officer: Winter Harbor LLC, 265 Franklin Street, 10th Floor, Boston, MA 02110, Attn: Shaun Martin (email: smartin@winterharborco.com); with copies provided contemporaneously to (i) counsel to the Debtors: Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp (email: hugh.ray@pillsburylaw.com and jason.sharp@pillsburylaw.com) and Sullivan Hazeltine Allinson LLC, 901 North Market Street, Suite 1300, Wilmington, DE 19801, Attn: Elihu Ezekiel Allinson III (email: zallinson@sha-llc.com) and (ii) counsel to the Committee (collectively, the "<u>Notice Parties</u>").

## III.    Qualified Bidder Requirement

To qualify as a Qualified Bidder and participate in the Auction, each Potential Bidder must (unless waived by the Debtors in their Permitted Discretion) deliver to the Notice Parties the most current audited (if available) and the latest unaudited financial statements or such other financial information evidencing the Potential Bidder's ability to (i) close the Sale within the

---

[3] As a condition to conducting diligence or submitting a Qualified Bid, all Potential Bidders must demonstrate and warrant their eligibility to review diligence materials under applicable laws and regulations, including, but not limited to, those governing trade in arms, foreign investment, technology transfers, etc.

time period prescribed in the Bidding Procedures Order and (ii) provide adequate assurance of future performance to counterparties to Transferred Contracts (as defined below) to be assumed and assigned to the Potential Bidder. In addition, unless waived by the Debtors in their Permitted Discretion, if the Potential Bidder is an entity formed in whole or part for the purpose of acquiring all or part of the GalacticSky Assets, the Potential Bidder must deliver to the Notice Parties current audited (if available) and the latest unaudited financial statements and/or such other relevant financial information as may be requested by the Debtors of each equity holder of such Potential Bidder, which equity holders must also guarantee the obligations of such Potential Bidder on terms reasonably acceptable to the Debtors, evidencing, the Potential Bidder's ability to (a) close the Sale within the time period prescribed in the Bidding Procedures Order and (b) provide adequate assurance of future performance to counterparties to Transferred Contracts to be assumed and assigned to the Potential Bidder. Finally, notwithstanding anything to the contrary in these Bidding Procedures, the Potential Bidder must, as a condition of being a Qualified Bidder, warrant and demonstrate compliance with all applicable laws and regulations relating to technology transfers, arms transfers, and similar regulatory restrictions (collectively, the "Regulatory Restrictions").[4]

The Debtors, in the Debtors' Permitted Discretion, shall determine whether a Potential Bidder has complied with the foregoing requirements and has qualified to submit a Qualified Bid and participate in the Auction (each such Potential Bidder, a "Qualified Bidder"), and the Debtors shall provide prompt written notice of their determination to any such Potential Bidder and counsel to the Committee.

The Debtors may (and at the request of the Committee shall) request additional information from a Potential Bidder or Qualified Bidder at any time prior to the Sale closing to evaluate such bidder's ability to bid at the Auction over and above its initial offer in its Qualified Bid, consummate the Sale and fulfill its obligations in connection therewith. Each Potential Bidder or Qualified Bidder shall be obligated to provide such additional information within two (2) Business Days of receiving such requests as a condition to participating further in the Auction and Sale processes; provided, however, that additional information requests made by the Debtors during the Auction in connection with a Qualified Bidder's ability to continue to bid at the Auction over and above its initial offer in its Qualified Bid shall, in the Debtors' Permitted Discretion, be satisfied prior to such Qualified Bidder submitting any further bids at the Auction.

---

[4] The Regulatory Restrictions include, but are not limited to, the following: International Traffic in Arms Regulations (ITAR), Office of Foreign Asset Control (OFAC) regulations, Committee on Foreign Investment in the United States (CFIUS) rules and regulations, and all of the following statutes: Trading With the Enemy Act (TWEA), 50 USC App 1-44; International Emergency Economic Powers Act (IEEPA), 50 USC 1701 *et seq.*; Antiterrorism and Effective Death Penalty Act (AEDPA), 8 USC 1189, 18 USC 2339B; United Nations Participation Act (UNPA), 22 USC 287c; Cuban Democracy Act (CDA), 22 USC 6001–10; The Cuban Liberty and Democratic Solidarity Act (Libertad Act), 22 USC 6021–91; The Clean Diamonds Trade Act, Pub. L. No. 108-19; Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 USC 1901–1908, 8 USC 1182; Burmese Freedom and Democracy Act of 2003, Pub. L. No. 108–61, 117 Stat. 864 (2003); The Foreign Operations, Export Financing and Related Programs Appropriations Act, Sec 570 of Pub. L. No. 104-208, 110 Stat. 3009-116 (1997); The Iraqi Sanctions Act, Pub. L. No. 101-513, 104 Stat. 2047-55 (1990); The International Security and Development Cooperation Act, 22 USC 2349 aa8–9; The Trade Sanctions Reform and Export Enhancement Act of 2000, Title IX, Pub. L. No. 106-387 (October 28, 2000).

The failure to comply with such requests shall disqualify such Potential Bidder or Qualified Bidder. **FOR THESE REASONS, POTENTIAL OR QUALIFIED BIDDERS SHOULD ANTICIPATE, AND BE PREPARED FOR, SUCH REQUESTS IN ADVANCE OF THE AUCTION.**

For purposes of these Bidding Procedures, the Stalking Horse Bid shall be deemed to constitute a Qualified Bid for the GalacticSky Assets and the Stalking Horse Bidder/Bidding DIP Lender shall be deemed to be a Qualified Bidder.

## IV.    Requirements of a Qualified Bid

A "Qualified Bid" shall mean a bid submitted by a Qualified Bidder that:

A.  Is made in writing;

B.  Is submitted prior to the Bid Deadline;

C.  Designates which of the Debtors' assets, including the GalacticSky Assets, the Qualified Bidder proposes to purchase; provided, however, that in the event that the Debtors receive one or more Qualified Bids for less than all of the GalacticSky Assets, the Debtors, in their Permitted Discretion, may request that Qualified Bidders provide a purchase price allocation for those GalacticSky Assets they have designated;

D.  Designates which of the Assumed Liabilities the Qualified Bidder proposes to assume, if any;

E.  Designates which of the Transferred Contracts the Qualified Bidder proposes to have assumed and assigned to it and which executory contracts or unexpired leases it wishes to the Debtors to reject, if it is the Successful Bidder (as defined below), or the Debtors' rights and interests therein sold and transferred, as the case may be;

F.  Includes a binding, definitive, and fully executed asset purchase agreement that: (a) shall be in form and substance substantially similar to the Stalking Horse Bidder Purchase Agreement and marked to reflect only those changes required as a condition of such Qualified Bidder's closing the Sale; (b) shall not contain any provisions entitling such Qualified Bidder to any break-up fee, expense reimbursement or other bid protections of any kind; and (c) waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of the Bid or participation in any Auction. An asset purchase agreement, together with its schedules and exhibits, submitted in accordance with these Bidding Procedures shall be referred to herein as a "Qualified Bidder Purchase Agreement";

G.  To the extent any Qualified Bidder wishes to bid on both the GalacticSky Assets and the non-GalacticSky Assets, the Qualified Bidder must submit separate bids that identify the purchase price for each of the GalacticSky Assets and the non-GalacticSky Assets, and such bids will be treated as separate bids for all purposes,

provided that any Qualified Bidder that submits separate bids shall be required to pay a single Good Faith Deposit (defined below);[5]

H.  To the extent a bid is for all or substantially all of the GalacticSky Assets subject to the Stalking Horse Bid, the purchase price included in such bid must include cash consideration in an amount not less than $5,060,000 (the "GSA Minimum Cash Purchase Price"), which amount shall consist of cash in the following amounts:

   1.  $4,250,000, the purchase price set forth in such Stalking Horse Bid; plus

   2.  $210,000, the "Break-Up Fee"; plus

   3.  $350,000, the "Expense Reimbursement";[6] plus

   4.  $250,000, as a cash premium over the Stalking Horse Bid;[7]

I.  Pays a good faith cash deposit of $750,000 (the "Good Faith Deposit"). The Good Faith Deposit shall be paid by wire transfer to a segregated account pursuant to instructions to be provided upon request by a Qualified Bidder. The Debtors reserves the right to increase, decrease or waive the Good Faith Deposit for one or more Qualified Bidders in their Permitted Discretion. Such Qualified Bidder's Qualified Bidder Purchase Agreement shall provide that the Good Faith Deposit shall be forfeited to the Debtors in the event of a breach thereof (after giving effect to any applicable notice and cure periods) by such Qualified Bidder;

J.  If a bid is for the non-GalacticSky Assets, it must include cash consideration in excess of $3,000,000 (the "Non-GSA Minimum Cash Purchase Price"), and the Debtors, in consultation with the Committee (if any), may designate such bid a Qualified Bid at the Auction, provided, that the bid includes (i) a Qualified Bidder Purchase Agreement and (ii) a Good Faith Deposit (such bid, a "Non-GSA Qualified Bid");

K.  Provides that the GSA Minimum Cash Purchase Price or the Non-GSA Minimum Cash Purchase Price, as applicable, shall be paid in full in cash at the closing of the Sale;

L.  Provides that such bid shall be open and irrevocable until the earlier of:

   1.  such bid being determined by the Debtors not to be a Qualified Bid;

---

[5] For the avoidance of doubt, a Qualified Bidder may submit bids for both the GalacticSky Assets and non-GalacticSky Assets but the Debtors' assets will be sold in separate lots at the Auction.

[6] To the extent the Debtors' actual costs for the Expense Reimbursement are less than $350,000, this amount shall be reduced by an equivalent dollar amount.

[7] For the avoidance of doubt, Qualified Bids may include additional consideration of any form so long as the cash consideration equals the GSA Minimum Cash Purchase Price or the Non-GSA Minimum Gash Purchase Price, as applicable.

6

2. if such bid is not chosen by the Debtors at the Auction to be the Successful Bid or Back-Up Bid (as each such term is defined below), the date of entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder;

3. if such bid is chosen by the Debtors to be the Successful Bid, the date which is the earlier to occur of: (i) the closing of the Sale to such Successful Bidder, and (ii) five (5) Business Days following the date the order approving the Sale to the Successful Bidder shall have become a final, non-appealable, order ("Final Order");

4. if such bid is chosen by the Debtors to be the Back-Up Bid, the date which is the earlier to occur of: (i) the date of closing on the Sale to the Successful Bidder, and (ii) twenty-five (25) Business Days following the date the order approving the Sale to the Successful Bidder shall have become a Final Order; provided, that if the Successful Bidder shall fail to close on its purchase of the GalacticSky Assets during the period set forth above, (x) the Back-Up Bid shall continue to remain open and irrevocable, (y) the Back-Up Bidder shall be deemed to be the Successful Bidder, and (z) it shall close on the Sale within ten (10) Business Days of becoming the Successful Bidder; provided, however, in the event that the Stalking Horse Bidder's bid is selected as the Back-Up Bid, the Stalking Horse Bidder's Back-Up Bid shall remain irrevocable until the earlier of (i) the Debtors inform the Stalking Horse Bidder that the Debtors will proceed with the Stalking Horse Bidder's Back-Up Bid, or (ii) fifteen (15) days after the Stalking Horse Bidder's bid is selected as the Back-Up Bid;

M. (i) Includes an acknowledgement and representation that the Qualified Bidder has had an opportunity to conduct all due diligence regarding the Debtors' assets before submitting its bid and that it has relied solely upon its own independent review, investigation, or inspection of any documents or assets in making its bid, and (ii) confirms the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the Sale and does not include any due diligence contingencies;

N. Provides evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) evidencing the authority of the Qualified Bidder to make a binding and irrevocable Qualified Bid and to consummate the Sale if such Qualified Bidder is the Successful Bidder or Back-Up Bidder, as such bid may be improved prior to or at the Auction;

O. Confirms that the Sale will be completed in accordance with the timing set forth in the Bidding Procedures Order;

P. If the Qualified Bidder was formed in whole or part for the purpose of acquiring all or part of the GalacticSky Assets, provides evidence which is reasonably satisfactory to the Debtors, in the Debtors' Permitted Discretion, from each of the

7

equity holders of such Qualified Bidder demonstrating that such Qualified Bidder has, or will have access to, the financial resources needed to consummate the Sale if it becomes the Successful Bidder, and that the use of such resources to consummate the Sale has been authorized and approved by such entity's board of directors (or comparable governing body), provided, that the Debtors reserve the right to limit or waive this requirement for one or more Qualified Bidders in the Debtors' Permitted Discretion;

Q. Certifies that the Qualified Bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale;

R. Certifies and warrants that the Qualified Bidder is, at all times, in full compliance with the Regulatory Restrictions;

S. Is not conditioned on the receipt of any third party approvals or consents (excluding required Bankruptcy Court approval and required governmental, licensing or regulatory approval or consent, if any) other than third-party approvals or consents that are deemed reasonable, as determined by the Debtors, in the Debtors' Permitted Discretion;

T. Is on terms substantially similar to the Stalking Horse Bidder Purchase Agreement and does not contain any financing contingencies or any other contingencies not set forth in the Stalking Horse Bidder Purchase Agreement; and

U. Sets forth the representatives that are authorized to appear and act on behalf of such Qualified Bidder in connection with the proposed transaction and the Auction.

All Qualified Bids will be considered by the Debtors; bids other than Qualified Bids will not be considered. The Debtors, in the Debtors' Permitted Discretion and in accordance with their fiduciary duties to the estates, may evaluate bids on numerous grounds, including, but not limited to, any delay, additional risks (including closing risks) and added costs to the Debtors. For the avoidance of doubt, the presence of any governmental, licensing, regulatory, or other approvals or consents in a bid or other contingencies, and the anticipated timing or likelihood of obtaining such approvals or consents or resolving such contingencies, may be grounds for the Debtors, in their Permitted Discretion, to determine that such bid (i) is not a Qualified Bid or (ii) is not higher or otherwise better than any other Qualified Bid.

For the avoidance of doubt, the Bidding DIP Lender (as the Stalking Horse Bidder) shall be allowed, to the maximum extent permitted by Bankruptcy Code section 363(k), to "credit bid" up to the full amount of all of the Debtors' DIP Obligations (as defined in the Stalking Horse Bidder Purchase Agreement).

## V.     Receipt of Qualified Bids

If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may, in the Debtors' Permitted Discretion, provide a Qualified Bidder with the

opportunity to remedy any deficiencies following the Bid Deadline but not later than one (1) day prior to the Auction. If any bid is determined by the Debtors, in their Permitted Discretion, not to be a Qualified Bid, and the applicable Qualified Bidder fails to remedy such bid in accordance with these Bidding Procedures, the Debtors shall, return such Qualified Bidder's Good Faith Deposit.

If the Debtors receive at least one (1) bid that is a Qualified Bid (in addition to the Stalking Horse Bid), then the Debtors will conduct an auction (the "Auction").

If the Debtors receive one or more Non-GSA Qualified Bids, after consultation with the Committee (if any), the Debtors may auction any non-GalacticSky Assets subject to such Non-GSA Qualified Bids at the Auction, provided that any such proposed sales will be subject to Bankruptcy Court approval at the Sale Hearing. Notwithstanding anything to the contrary herein, the Debtors are not required to auction or sell any non-GalacticSky Assets pursuant to this sale process. If applicable, at the Auction, the non-GalacticSky Assets shall be auctioned off in separate lots from the GalacticSky Assets but may be conducted simultaneously with the auction of the GalacticSky Assets and in accordance with the procedures outlined in Article VI.

If the Debtors do not receive at least one (1) bid that is a Qualified Bid (other than the Stalking Horse Bid), then the Debtors shall (i) file a notice with the Bankruptcy Court (and serve all Potential Bidders with the same) indicating that (a) the Auction is canceled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority at the Sale Hearing to consummate the Sale transactions with the Stalking Horse Bidder contemplated by the Stalking Horse Bidder Purchase Agreement.

## VI. Auction Process

**The Auction, if any, will take place at the offices of Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019, on January 31, 2020, commencing at 10:00 a.m. (E.T.).**

If the Debtors proceed with the Auction, the following rules and procedures shall apply (subject to Article XI hereof):

A.    Prior to the Auction, the Debtors will select the highest or otherwise best Qualified Bid it has received to serve as the opening bid at the Auction (the "Baseline Bid"), which, for the avoidance of doubt, shall include cash consideration not less than the Minimum Cash Purchase Price;

B.    As soon as practicable and no later than 5:00 p.m. (E.T.) one (1) Business Day prior to the commencement of the Auction, the Debtors will provide all Qualified Bidders and counsel to the Committee with a written notice via email identifying (i) all of the Qualified Bidders and (ii) which Qualified Bid has been chosen as the Baseline Bid and the relevant terms of the Baseline Bid;

C.    Only a Qualified Bidder, who has submitted a Qualified Bid, the Bidding DIP Lender/Stalking Horse Bidder, members of the Committee, valid creditors of the Debtors, and the respective representatives and advisors of each of the foregoing,

9

shall be eligible to attend the Auction.[8] Only a Qualified Bidder, who has submitted a Qualified Bid, and its representatives and advisors, shall be eligible to make any subsequent bids at the Auction. Each Qualified Bidder must appear in person or through a duly authorized representative who has the legal authority to bind the Qualified Bidder at the Auction (and who must provide the Debtors with written evidence of such authority prior to the Auction which is reasonably satisfactory to the Debtors) or they shall not be entitled to attend or participate at the Auction;

D.      All Qualified Bids shall be placed on the record at the Auction, which shall be transcribed, videotaped, or audiotaped in the reasonable discretion of the Debtors;

E.      Each Qualified Bidder will have the right to make additional modifications or improvements to its Qualified Bidder Purchase Agreement, that make its bid higher or otherwise better, at any time, prior to, or during, the Auction which are consistent with these Bidding Procedures and the Bidding Procedures Order;

F.      Upon request of the Debtors, any Qualified Bidder participating in the Auction shall provide evidence demonstrating its compliance with any Regulatory Restriction;

G.      Bidding shall commence at the Baseline Bid. The initial overbid at the Auction shall be in an amount not less than (i) the amount of the Baseline Bid plus (ii) $250,000 of additional consideration. Thereafter, a Qualified Bidder may increase its Qualified Bid in any amount as long as each subsequent bid (each, a "Subsequent Overbid") exceeds the previous highest bid by at least $250,000 of additional consideration;

H.      Each bid made by a Qualified Bidder at the Auction must continue to meet, satisfy or comply with the requirements of a Qualified Bid, other than those applicable to the submission of an initial Qualified Bid;

I.      The Auction will continue with each Qualified Bidder submitting additional Subsequent Overbids in each round of bidding, after being advised of the terms of the then highest bid and the identity of the Qualified Bidder who made such bid, in each round of bidding. Each Qualified Bidder must bid in each round or it shall be disqualified from further bidding at the Auction;

J.      The Auction will conclude when the Debtors, in the Debtors' Permitted Discretion, determine that they have received the highest or otherwise best offer(s) from a Qualified Bidder(s) for the GalacticSky Assets (or any non-GalacticSky Assets, if applicable) (each, a "Successful Bid"). The next highest or otherwise best Qualified Bid(s) submitted at the Auction, as determined by the

---

[8] Creditors who wish to attend the Auction must advise the Notice Parties via email of their intent to attend the Auction and identify any accompanying representatives or advisors **no later than the Bid Deadline**. Failure to provide advance notice as required in this footnote will result in denial of entry to the building where the Auction will be held.

Debtors, in the Debtors' Permitted Discretion, shall be the "<u>Back-Up Bid</u>". The Qualified Bidder(s) submitting the Successful Bid shall be the "<u>Successful Bidder</u>" and the Qualified Bidder(s) submitting the Back-Up Bid shall be the "<u>Back-Up Bidder</u>". In making these decisions, the Debtors, in the Debtors' Permitted Discretion, will consider, without limitation, (i) the amount of the purchase price offered, (ii) the Qualified Bidder's ability to close the Sale at the amount of its last bid made at the Auction and the timing thereof, (iii) indicia of good faith on the part of the Qualified Bidder, (iv) the terms and conditions of the Qualified Bidder Purchase Agreement, (v) the requirements as to the assumption and assignment of executory contracts, (vi) the ability to provide adequate assurance of future performance to the counterparties to executory contracts being assumed and assigned, (vii) the amount of any obligations the Debtors may have to a Stalking Horse Bidder for a Break-Up Fee or Expense Reimbursement, and (viii) the net benefit to the Debtors' estates;

K.     Prior to the conclusion of the Auction, the Debtors and the Successful Bidder shall enter into a definitive agreement based upon the Successful Bidder's Qualified Bidder Purchase Agreement previously submitted by the Successful Bidder and will make all related revisions to the proposed order approving the Sale to the Successful Bidder, in each case to reflect the results of the Auction;

L.     If the Successful Bidder is not the Bidding DIP Lender/Stalking Horse Bidder, then within one (1) calendar day of the conclusion of the Auction, the Bidding DIP Lender shall provide to the Debtors and the Successful Bidder a statement of the total outstanding obligations under the DIP Facility (the "<u>Outstanding DIP Loan Amount</u>") and wiring instructions for payment of the Outstanding DIP Loan Amount. Within three (3) calendar days of the conclusion of the Auction, the Successful Bidder or the Debtors shall transfer cash, which, may include the Successful Bidder's Good Faith Deposit, to the Bidding DIP Lender equal to the Outstanding DIP Loan Amount, <u>provided</u> that the Debtors' shall retain the right to dispute any portion of the Outstanding DIP Loan Amount in the Bankruptcy Court. If the Bidding DIP Lender fails to provide the statement of the Outstanding DIP Amount within one (1) calendar day of the Conclusion, then for each calendar day thereafter, the "Maturity Date" under the DIP Facility shall be extended for an equal number of calendar days.

M.     All Qualified Bids shall remain open and irrevocable for the time periods set forth in <u>Article IV(L)</u> above;

N.     Promptly following the conclusion of the Auction (and no later than one (1) day thereafter), the Debtors will file with the Bankruptcy Court a supplement (the "<u>Supplement</u>") that will inform the Bankruptcy Court of the results of the Auction. The Supplement will identify, among other things, (i) the Successful Bidder(s) as the proposed purchaser(s) of the GalacticSky Assets and, if applicable, any non-GalacticSky Assets, (ii) the amount to be paid by the Successful Bidder(s) for the GalacticSky Assets and, if applicable, any non-GalacticSky Assets, (iii) the Assumed Liabilities to be assumed by the Successful

Bidder(s), if any, (iv) the Transferred Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder, as the case may be, in connection with the Sale, and (v) the executory contracts designated by the Successful Bidder(s) to be rejected by the Debtors in connection with the Sale. The Supplement will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s). In addition, the Debtors will attach to the Supplement (i) any revised proposed order approving the Sale to the Successful Bidder(s), (ii) a copy of the Successful Bidder(s)' Purchase Agreement entered into by the Debtors and the Successful Bidder following the Auction, and (iii) any additional information or documentation relevant to the Successful Bid(s). The Debtors will file the Supplement on the docket for the Chapter 11 Cases as promptly as is reasonably practicable prior to the Sale Hearing and provide a copy thereof to counsel to the Committee, but will not be required to serve the same on any parties in interest in the Chapter 11 Cases;

O.    If, after an order is entered by the Bankruptcy Court at the Sale Hearing approving the Successful Bid, the Successful Bidder(s) shall fail to close the Sale because of a breach on the part of the Successful Bidder (after giving effect to any applicable cure periods or waivers), (i) the Back-Up Bidder shall automatically, and without the need for any action by the Debtors or the Bankruptcy Court, be deemed to be the Successful Bidder, (ii) the Back-Up Bid shall be deemed to be the Successful Bid, and (iii) the Debtors and Back-Up Bidder shall close the Sale within ten (10) Business Days following the date the Back-Up Bidder becomes the Successful Bidder, without the necessity of obtaining any further order of the Bankruptcy Court; and

P.    The Debtors, in the Debtors' Permitted Discretion, reserve the right, in their business judgment, to make one or more adjournments to, or cancel, the Auction or these Bidding Procedures to, among other things: (i) facilitate discussions between the Debtors, on the one hand, and one or more Qualified Bidders, on the other hand, (ii) allow the Debtors and/or Qualified Bidders to consider how they wish to proceed, (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional documentation or information as the Debtors in their business judgment may require to determine such Qualified Bidder's ability to close the Sale, or (iv) facilitate higher or better bids. For the avoidance of doubt, the Debtors may not waive compliance with the Regulatory Restrictions, as applicable.

## VII.    Sale Hearing and Closing

The hearing to approve the Sale (the "Sale Hearing") shall take place in the courtroom of the Honorable Judge _____ in the United States Bankruptcy Court for the District of Delaware on February 4, 2020, at __:__ [a.m./p.m.] (E.T.). Following the conclusion of the Auction, with the consent of the Successful Bidder, or as otherwise directed by the Bankruptcy Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket for the Chapter 11 Cases.

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval. The closing on the Sale with the Successful Bidder shall occur not later than February 19, 2020.

To be considered, any objection to the Sale for all issues other than the outcome of the Auction must (a) comply with the Bankruptcy Rules and the Local Rules, (b) be made in writing and filed with the Court, and (c) be filed on or before January 29, 2020, at 05:00 p.m. (E.T.) (the "Sale Objection Deadline"). Objections to the outcome of the Auction may be made at the Sale Hearing.

## VIII.   Assumption and Assignment Procedures for Executory Contracts

A.      Attached as **Exhibit 3** to the Bidding Procedures Order is the form of *Notice of (I) Debtors' Intent to Assume and Assign Designated Executory Contracts, (II) Cure Amounts Related to Designated Executory Contracts, and (III) Debtors' Intent to Reject Designated Executory Contracts* (the "Assignment and Rejection Notice").

B.      Attached as **Exhibit A** to the Assignment and Rejection Notice is a schedule of all executory contracts and unexpired leases the Debtors propose to assume and assign to the Successful Bidder listing the counterparties to such Transferred Contracts and the amount, if any, proposed to be paid to cure any defaults under such Transferred Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts"). In conjunction with its Qualified Bid, each Qualified Bidder shall designate which of such contracts or leases it wishes to have the Debtors assume and assign and which it does not desire the Debtors to assume and assign (the contracts and leases which the Successful Bidder designated for assumption and assignment shall be referred to as the "Transferred Contracts"). To the extent any Transferred Contract is determined not to be an executory contract under and for purposes of section 365 of the Bankruptcy Code, the Debtors shall instead assign to the Successful Bidder all of the Debtors' rights, title and interests in, to and under such contracts pursuant to section 363 of the Bankruptcy Code. Prior to the effectiveness of any assignment of a Transferred Contract, the Successful Bidder shall, at its own cost, in addition to the purchase price, cure monetary defaults under such Transferred Contract, if any, which are capable of being cured unless any counterparty agrees to a different treatment of such cure amounts. The Successful Bidder shall have no liability for any damages arising from rejection, breach or termination of any contracts or leases which it has not designated as Transferred Contracts.

C.      Objections to the assumption and assignment or sale and transfer of the Debtors' rights and interests of and in any of the Transferred Contracts (an "Assignment Objection") must: (i) be made in writing and filed on the docket for the Chapter 11 Cases no later than January 27, 2020 (the "Assignment Objection Deadline"), (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such counterparty, and include complete contact information for such counterparty (including address, telephone number and email

13

address), (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and (iv) be served on the following, so as to be actually received by them on or before 5:00 p.m. (E.T.) on the Assignment Objection Deadline:

- Counsel to the Debtors: Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp (email: hugh.ray@pillsburylaw.com and jason.sharp@pillsburylaw.com) and Sullivan Hazeltine Allinson LLC, 901 North Market Street, Suite 1300, Wilmington, DE 19801, Attn: Elihu Ezekiel Allinson, III (email: zallinson@sha-llc.com);

- The Office of the United States Trustee for Region 3, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Juliet Sarkessian, Esq.;

- Counsel to the Committee;

- Counsel to the Bidding DIP Lender/Stalking Horse Bidder: Hogan Lovells US LLP, 390 Madison Avenue, New York, NY 10017, Attn: Christopher R. Donoho, III and John Beck;

- Counsel to each Qualified Bidder (contact information should be obtained from the Debtors' counsel (contact details are set forth above)).

D.   Any counterparty to a Transferred Contract that fails to file an Assignment Objection by the Assignment Objection Deadline (i) shall be deemed to have forever waived and released any right to assert an Assignment Objection, (ii) shall have consented to the assumption and assignment of, or sale and transfer of the Debtors' rights, title and interests in, to and under, their Transferred Contract, as the case may be, without the necessity of obtaining any further order of the Bankruptcy Court, and (iii) shall be forever barred and estopped from (a) objecting to the Cure Amount set forth on the Cure Schedule with respect to the Transferred Contract, (b) seeking additional amounts arising under the Transferred Contract prior to the closing from the Debtors, the Successful Bidder or the Back-Up Bidder, as the case may be, and (c) objecting to the assumption and assignment, or assignment, as the case may be, of its Transferred Contract to the Successful Bidder.

E.   If a timely objection is filed and cannot be resolved consensually, the Bankruptcy Court shall resolve such objection at a hearing to be held (i) prior to the Bid Deadline or (ii) on such other date as the Bankruptcy Court may designate prior to or after the Sale Hearing.

F.   Any Qualified Bidder may add to or remove contracts from its corresponding schedules at any time up to the conclusion of the Auction, and the Successful Bidder and Back-Up Bidder may add to or remove contracts from its corresponding schedules at any time prior to the Closing. If the Successful Bidder and/or Back-Up Bidder shall have done so, the Debtors shall file an amended or

14

supplemental Transferred Contract and Cure Schedule adding such contracts thereto (any such added contract, an "<u>Additional Contract</u>"), and shall, within two (2) calendar days thereafter, provide notice thereof (and in the case of an Additional Contract, provide the counterparty thereto with the Assignment and Rejection Notice along with the amended or supplemental Transferred Contract and Cure Schedule) to each affected counterparty. To the extent an executory contract or unexpired lease is not assumed and assigned to the Successful Bidder, the Debtors may, in their sole discretion, reject such an unassigned, executory contract or unexpired lease, or sell or transfer such unassigned, executory contract or unexpired lease in their reasonable discretion to the extent permitted by applicable law. In no event will the Successful Bidder be responsible for any unassigned executory contracts or unexpired leases.

G.    Objections from any counterparty to an Additional Contract (an "<u>Additional Assignment Objection</u>") must: (i) be made in writing and filed on the docket for the Chapter 11 Cases no later than ten (10) calendar days after the Debtors have sent notice to such counterparty of its intention to assume and assign, assign, or reject such Additional Contract (as applicable, the "<u>Additional Assignment Objection Deadline</u>"), (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such counterparty, and include contact information for such counterparty, (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and (iv) be served upon counsel to (a) the Debtors and the United States Trustee, and (b) the Successful Bidder, and the Back-Up Bidder (addresses for the foregoing may be obtained from counsel to the Debtors), so as to be actually received by them on or before 5:00 p.m. (E.T.) on the Additional Assignment Objection Deadline.

H.    Any counterparty to an Additional Contract that fails to file an Additional Assignment Objection by the Additional Assignment Objection Deadline (i) shall be deemed to have forever waived and released any right to assert an Additional Assignment Objection and (ii) shall have consented to the assumption and assignment of, or sale and transfer of the Debtors' rights and interests in, as the case may be, such Additional Contract, without the necessity of obtaining any further order of the Bankruptcy Court, and (iii) shall be forever barred and estopped from (a) objecting to the Cure Amount set forth on the Cure Schedule with respect to its Additional Contract, (b) seeking additional amounts arising under its Additional Contract at any time from the Debtors, the Successful Bidder or the Back-Up Bidder, as the case may be, and (c) objecting to the assumption and assignment, or assignment, as the case may be, of its Additional Contract to the Successful Bidder or the Back-Up Bidder, as the case may be.

I.    If a timely objection is filed, and cannot be resolved consensually, the Bankruptcy Court shall resolve such objection at a hearing to be held (i) on or before five (5) calendar days from the timely filing of the Additional Assignment Objection or (ii) such other date designated by the Bankruptcy Court. Unless the Bankruptcy Court orders otherwise, contemporaneously with the resolution of any such objection, the Additional Contract underlying such objection shall be deemed to

have been assumed and assigned, or assigned, as the case may be, to the Successful Bidder or the Back-Up Bidder, as the case may be, without the necessity of obtaining any further order of the Bankruptcy Court.

## IX.    Failure to Consummate Purchase

Following entry by the Bankruptcy Court of an order authorizing the Sale to a Successful Bidder, if a Successful Bidder fails to consummate the Sale, and such failure is the result of a breach by the Successful Bidder of its obligations under its Qualified Bidder Purchase Agreement, the Successful Bidder's (other than the Stalking Horse Bidder) Good Faith Deposit shall be forfeited to the Debtors as liquidated damages in accordance with the terms of such agreement, and if the Successful Bidder is the Stalking Horse Bidder, the Debtors shall have the right to pursue all of their rights and remedies against the Stalking Horse Bidder and its equity holders in accordance with the terms of the Stalking Horse Bidder Purchase Agreement, the equity holder commitment letters and applicable law. If the Back-Up Bidder is later designated by the Debtors to be the Successful Bidder, the foregoing shall be read to apply to the Back-Up Bidder (and its guarantors, if any) in its capacity as the Successful Bidder. For the avoidance of doubt, notwithstanding anything to the contrary in a Successful Bidder(s)' Qualified Bidder Purchase Agreement, the Debtors, in their sole discretion, may determine that a failure by a Successful Bidder(s) to close the Sale as a result of the Successful Bidder(s)' failure or inability to receive any necessary governmental approvals, whether related to the Regulatory Restrictions or otherwise, is a breach by the Successful Bidder and the Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors as liquidated damages.

## X.    Good Faith Deposits

The Debtors shall return the Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder, within five (5) Business Days following entry by the Bankruptcy Court of an order authorizing the Sale to the Successful Bidder.

Subject to Article IX, the Good Faith Deposit of the Successful Bidder shall be applied to, and deducted from, the Successful Bidder's obligations under the Successful Bid at the closing of the Sale.

The Good Faith Deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) Business Days following the date its bid is no longer required to be open and irrevocable as set forth in Article IV(J). If the Back-Up Bidder is subsequently designated by the Debtors as the Successful Bidder as a result of the failure of the Successful Bidder to close on the Sale within the time period set forth in Article IV(J), the Back-Up Bidder shall be deemed to be the Successful Bidder and the Debtors and the Back-Up Bidder shall close the Sale within ten (10) Business Days of the Back-Up Bidder becoming the Successful Bidder. Subject to Article IX, the Good Faith Deposit of the Back-Up Bidder shall be held in escrow until such closing and applied to its obligations at the closing of the Sale. The Debtors reserve all of their rights regarding the return of all Good Faith Deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

16

## XI.    Reservation of Rights

The Debtors, in the Debtors' Permitted Discretion, are authorized to amend and modify these Bidding Procedures to impose additional terms and conditions on the proposed Auction and Sale of the GalacticSky Assets (or non-GalacticSky Assets) and assumption of the Assumed Liabilities (including the assumption and assignment of the Transferred Contracts), or to modify or eliminate any of the terms and conditions contained herein if, (i) in the Debtors' Permitted Discretion, such modifications would be in the best interest of the Debtors' estates and promote an open and fair sale Auction and Sale process and (ii) such modifications and/or additional terms and conditions are not materially inconsistent with the provisions of the Bidding Procedures Order or are otherwise acceptable to counsel to the Committee. Notwithstanding anything herein to the contrary, the Debtors in the Debtors' Permitted Discretion may consider and accept bids from a single Qualified Bidder or from multiple Qualified Bidders for less than all or substantially all, or any combination, of the GalacticSky Assets or non-GalacticSky Assets. The rights of the Committee, and all other parties in interest with standing in the Chapter 11 Cases, to seek an order of the Bankruptcy Court extending the dates set forth herein and the Bidding Procedures Order for the Bid Deadline, Auction and Sale Hearing, and the rights of the Debtors and Bidding DIP Lender/Stalking Horse Bidder to contest any such requests, are preserved. The Committee reserves its rights with respect to the Debtors' determination that a Potential Bidder is not a Qualified Bidder. For the avoidance of doubt, the foregoing reservations of rights shall not be deemed to constitute consent of the Stalking Horse Bidder or any other Qualified Bidder to extend any of the deadlines contained in Section 5.10(a) or any other provision of the Stalking Horse Bidder Purchase Agreement or similar provisions of any Qualified Bidder Purchase Agreement or the waiver of any right or remedy of the Stalking Horse Bidder or any Qualified Bidder arising under such purchase agreement on account of a failure of the Debtors to meet any such deadline.

**EXHIBIT 2**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19-12670 (JTD) |
| Debtors. | (Joint Administration Requested) |

**NOTICE OF PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTORS, FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, OTHER
THAN ASSUMED LIABILITIES, AND SCHEDULING
FINAL SALE HEARING RELATED THERETO**

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On December 13, 2019, the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases") filed a motion (the "Sale Motion")[2] with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking entry of two orders, in stages: (i) first, an order (the "Bidding Procedures Order") (a) approving Bidding Procedures and Bid Protections for the Sale of certain of the Debtors' assets, (b) approving the Stalking Horse Bidder and the Stalking Horse Bidder Purchase Agreement, (c) approving procedures for the assumption, assignment and rejection of designated executory contracts and the sale and transfer of other designated contracts, (d) scheduling the Auction and Sale Hearing, and (e) approving forms and manner of notice of respective dates, times, and places in connection therewith ((a)-(e) collectively, the "Bidding Procedures Relief"), and (ii) second, an order (the "Sale Order") (a) authorizing the Sale of certain of the Debtors' assets free and clear of all liens, claims, interests and encumbrances, other than Assumed Liabilities, to the Stalking Horse Bidder or such other Qualified Bidder submitting the highest or otherwise best bid, (b) authorizing the assumption and assignment and rejection of designated executory contracts and authorizing the sale and transfer of other designated contracts, and (c) granting certain related relief.

The Debtors and Lockheed Martin Corporation, as the stalking horse bidder (the "Stalking Horse Bidder") have entered into the Stalking Horse Bidder Purchase Agreement, dated as of December 13, 2019, which, together with certain ancillary agreements, contemplates the sale of certain of the Debtors' assets, defined as the "GalacticSky Assets" in the Stalking Horse Bidder Purchase Agreement, to the Stalking Horse Bidder.

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc. [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is P.O. Box 14928, Long Beach, CA 90853-4928.

[2]  Capitalized terms used but not defined herein shall have such meanings ascribed to them in the Sale Motion.

Under the Stalking Horse Bidder Purchase Agreement, the Stalking Horse Bidder will assume certain specified liabilities of the Debtors that fall within the definition of "Assumed Liabilities" under the Stalking Horse Bidder Purchase Agreement.

Copies of the Sale Motion, Stalking Horse Bidder Purchase Agreement, and other Sale-related documents are available free of charge on the website established by the Debtors for this chapter 11 case at https://dm.epiq11.com/vectorlaunch. Alternatively, documents may be requested in writing (email and facsimile requests are acceptable) to the Debtors' counsel: Pillsbury Winthrop Shaw Pittman LLP, 909 Fannin Street, 20th Floor, Houston, Texas 77010, Attn: Hugh M. Ray, III (Telephone: (713) 276-7600, Facsimile: (713) 276-7673), hugh.ray@pilslburylaw.com; or those with PACER accounts may download copies from the Court's website at https://ecf.deb.uscourts.gov/. For Potential Bidders to obtain access to the Debtors' dataroom, each Potential Bidder must follow the requirements set forth in Article III of the Bidding Procedures.

## I.    Bidding Procedures

A hearing on the Bidding Procedures Relief was held before the Court on January 6, 2020, after which the Court entered the Bidding Procedures Order [Docket No. __], approving among other things, the Bidding Procedures Relief.

Copies of the Bidding Procedures Motion and its exhibits are available without charge at: https://dm.epiq11.com/vectorlaunch or for a fee on the Bankruptcy Court's electronic docket. To receive a confidentiality agreement to become a Potential Bidder or after a confidentiality agreement has been executed and delivered to the Notice Parties, a copy of the Stalking Horse Bidder Purchase Agreement, kindly submit a request in writing, preferably via email, to (a) the Debtors' counsel: Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp (email: hugh.ray@pillsburylaw.com and jason.sharp@pillsburylaw.com or Sullivan Hazeltine Allinson LLC, 901 North Market Street, Suite 1300, Wilmington, DE 19801, Attn: Elihu Ezekiel Allinson III (email: zallinson@sha-llc.com) or (b) the Debtors' chief restructuring officer: Winter Harbor LLC, 265 Franklin Street, 10th Floor, Boston, MA 02110, Attn: Shaun Martin (email: smartin@winterharborco.com).

**If a Qualified Bid is received prior the Bid Deadline, the Debtors may hold the Auction to determine the Successful Bidder on January 31, 2020, at 10:00 a.m. (Eastern Time) in accordance with the Bidding Procedures at the offices of Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019.**

## II.    Sale Hearing

The Sale Hearing is scheduled for February __, 2020, at __:__ _.m. (Eastern Time) at the United States Bankruptcy Court for the District of Delaware, United States Courthouse, 824 North Market Street, Wilmington, Delaware 19801. The Sale Hearing is being held to approve the highest or otherwise best offer received for the GalacticSky Assets at the Auction, or, if no Qualified Bids (other than the Stalking Horse Bidder's bid) are received prior to the Bid Deadline, to approve the sale of the GalacticSky Assets to the Stalking Horse Bidder. If the Stalking Horse Bidder is the

Successful Bidder, the Debtors will file a copy of the proposed Sale Order on the docket prior to the Sale Hearing. The Sale Hearing may be adjourned or rescheduled with prior notice filed on the docket or without prior notice by an announcement of the adjourned date at the Sale Hearing.

**THE DEADLINE TO OBJECT TO THE DEBTOR'S REQUEST TO APPROVE THE SALE OF THE GALACTICSKY ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES (OTHER THAN THE ASSUMED LIABILITIES) TO THE STALKING HORSE BIDDER OR OTHER SUCCESSFUL BIDDER (EACH, A "SALE OBJECTION") IS JANUARY 29, 2020 AT 5:00 P.M. (EASTERN TIME) (THE "SALE OBJECTION DEADLINE").**

Any person or entity wishing to submit a Sale Objection must do so in writing, which response or pleading shall conform to the Bankruptcy Rules, the Bankruptcy Local Rules, the Complex Chapter 11 Procedures, and the Uniform Rules, and which shall be filed with the Court and shall be served so as to be actually received by no later than the Sale Objection Deadline by (i) counsel to the Debtors: Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp (email: hugh.ray@pillsburylaw.com and jason.sharp@pillsburylaw.com) and Sullivan Hazeltine Allinson LLC, 901North Market Street, Suite 1300, Wilmington, DE 19801, Attn: Elihu Ezekiel Allinson, III (email: zallinson@sha-llc.com); (ii) The Office of the United States Trustee for Region 3, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Juliet Sarkessian, Esq; (iii) Counsel to the Committee; (iv) Counsel to the Bidding DIP Lender/Stalking Horse Bidder: Hogan Lovells US LLP, 390 Madison Avenue, New York, NY 10017, Attn: Christopher R. Donoho, III and John Beck; (v) Counsel to each Qualified Bidder (contact information should be obtained from the Debtors' counsel (contact details are set forth above)); and (vi) those parties who have filed notices of appearance or requested service of all motions and pleadings in the Debtor's case prior to the date of service thereof.

The failure of any person or entity to file and serve a Sale Objection on or before the Sale Objection Deadline (i) shall be deemed a consent to the Sale to the Stalking Horse Bidder or such other Successful Bidder and the other relief requested in the Sale Motion, and (ii) shall be a bar to the assertion, at the Sale Hearing or thereafter, to the Sale Motion, the Auction, the sale of the GalacticSky Assets, the Debtor's performance of the Stalking Horse Bidder Purchase Agreement or other agreement with a different Successful Bidder (including in any such case, without limitation, the transfer of the GalacticSky Assets free and clear of all liens, claims and encumbrances, other than the Assumed Liabilities); **PROVIDED, HOWEVER, THAT IF A DETERMINATION IS MADE AT THE SALE HEARING THAT THE SUCCESSFUL BIDDER IS A BIDDER OTHER THAN THE STALKING HORSE BIDDER, PARTIES IN INTEREST MAY OBJECT AT THE SALE HEARING AND ANY SUBSEQUENT HEARINGS SOLELY TO SUCH DETERMINATION.**

### III.    Debtors Contracts

The Stalking Horse Bidder Purchase Agreement contemplates, and the Sale Order, if approved, shall authorize the assumption and assignment of designated executory contracts of the Debtors (collectively, the "Transferred Contracts"). In accordance with the Bidding Procedures Order, individual notices setting forth the specific Transferred Contracts to be assumed by the

Debtors and assigned to the Stalking Horse Bidder (or other Successful Bidder), or sold and transferred to the Stalking Horse Bidder (or other Successful Bidder, as the case may be), and the proposed Cure Costs for such contracts will be given to all counterparties to the Transferred Contracts. Counterparties to the Transferred Contracts will be given the opportunity to object to the assumption and assignment, or sale and transfer, of their particular Transferred Contract.

This Notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict. The Debtors encourages all persons to review such documents and all other Sale related documents in their entirety and to consult an attorney if they have questions or want advice.

**EXHIBIT 3**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Vector Launch Inc., *et al.*,[1] | Case No. 19-12670 (JTD) |
| Debtors. | (Joint Administration Requested) |

## NOTICE OF PROPOSED (I) ASSUMPTION AND
## ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES AND (II) REJECTION OF CONTRACTS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On December 13, 2019, the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases") filed a motion (the "Sale Motion")[2] with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking entry of two orders, in stages: (i) first, an order (the "Bidding Procedures Order") (a) approving Bidding Procedures and Bid Protections for the Sale of certain of the Debtors' assets, (b) approving the Stalking Horse Bidder and the Stalking Horse Bidder Purchase Agreement, (c) approving procedures for the assumption, assignment and rejection of designated executory contracts and the sale and transfer of other designated contracts, (d) scheduling the Auction and Sale Hearing, and (e) approving forms and manner of notice of respective dates, times, and places in connection therewith ((a)-(e) collectively, the "Bidding Procedures Relief"), and (ii) second, an order (the "Sale Order") (a) authorizing the Sale of certain of the Debtors' assets free and clear of all liens, claims, interests and encumbrances, other than Assumed Liabilities, to the Stalking Horse Bidder or such other Qualified Bidder submitting the highest or otherwise best bid, (b) authorizing the assumption and assignment and rejection of designated executory contracts and authorizing the sale and transfer of other designated contracts, and (c) granting certain related relief.

The Debtors and Lockheed Martin Corporation, as the stalking horse bidder (the "Stalking Horse Bidder") have entered into the Stalking Horse Bidder Purchase Agreement, dated as of December 13, 2019, which, together with certain ancillary agreements, contemplates the sale of certain of the Debtors' assets, defined as the "GalacticSky Assets" in the Stalking Horse Bidder Purchase Agreement, to the Stalking Horse Bidder.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Vector Launch Inc. [4147] and Garvey Spacecraft Corporation [4794]. The Debtors' address is P.O. Box 14928, Long Beach, CA 90853-4928.

[2] Capitalized terms used but not defined herein shall have such meanings ascribed to them in the Sale Motion.

The Stalking Horse Bidder Purchase Agreement contemplates, and the Sale Order, if approved, shall authorize the assumption and assignment to the Stalking Horse Bidder (or other Successful Bidder) of designated executory contracts (collectively, the "Transferred Contracts").

## YOU ARE RECEIVING THIS NOTICE BECAUSE
## YOU ARE A PARTY TO ONE OR MORE OF THE TRANSFERRED CONTRACTS.

## TRANSFERRED CONTRACTS

Attached hereto as **Exhibit A** is a schedule of all Transferred Contracts the Debtors proposes to assume and assign to the Stalking Horse Bidder (or other Successful Bidder) listing the counterparties to such contracts (the "Contract Counterparties") and the amount, if any, proposed to be paid to cure any monetary defaults under the Transferred Contracts pursuant to Bankruptcy Code section 365 (the "Cure Amounts"). The Stalking Horse Bidder reserves the right to revise this list in accordance with the Stalking Horse Bidder Purchase Agreement and Bidding Procedures at any time prior to the closing on the GalacticSky Assets.

To the extent that any Transferred Contract is determined by an order of the Court, or as between the Debtors and the applicable Contract Counterparty, not to be an executory contract under and for purposes of Bankruptcy Code section 365, the Debtors shall instead sell, assign and transfer to the Stalking Horse Bidder (or other Successful Bidder) all of the Debtor's right, title and interest in, to and under such Transferred Contracts pursuant to Bankruptcy Code section 365. Prior to any such sale and transfer of a Transferred Contract, the Debtors shall cure any monetary defaults or pay other amounts due under such Transferred Contract which are capable of being cured or paid as if such Transferred Contract had been subject to Bankruptcy Code section 365.

IF YOU AGREE WITH THE PROPOSED CURE COSTS LISTED IN EXHIBIT A WITH RESPECT TO YOUR TRANSFERRED CONTRACT(S), YOU ARE NOT REQUIRED TO TAKE ANY FURTHER ACTION.

IF YOU DISAGREE WITH THE PROPOSED CURE COSTS LISTED IN EXHIBIT A WITH RESPECT TO YOUR CONTRACT(S), YOU MAY OBJECT TO THE PROPOSED CURE COST NO LATER THAN **JANUARY 27, 2020.**

Objections to the assumption and assignment any of the Transferred Contracts (including the Cure Amounts listed on Exhibit A) (an "Assignment Objection") must: (i) be made in writing and filed on the docket no later than the Assignment Objection Deadline, (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number and email address), (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and (iv) be served on the parties set forth in the Bidding Procedures, so as to be actually received on or before 5:00 p.m. (E.T.) on the Assignment Objection Deadline.

Copies of the Sale Motion, Stalking Horse Bidder Purchase Agreement, and other Sale-related documents are available free of charge at: https://dm.epiq11.com/vectorlaunch or for a fee on the Bankruptcy Court's electronic docket. To receive a confidentiality agreement to become a Potential Bidder or after a confidentiality agreement has been executed and delivered to the Notice

Parties, a copy of the Stalking Horse Bidder Purchase Agreement, kindly submit a request in writing, preferably via email, to (a) the Debtors' counsel: Pillsbury Winthrop Shaw Pittman LLP, Two Houston Center, 909 Fannin, Suite 2000, Houston, TX 787010, Attn: Hugh M. Ray, III and Jason S. Sharp (email: hugh.ray@pillsburylaw.com and jason.sharp@pillsburylaw.com or Sullivan Hazeltine Allinson LLC, 901 North Market Street, Suite 1300, Wilmington, DE 19801, Attn: Elihu Ezekiel Allinson III (email: zallinson@sha-llc.com) or (b) the Debtors' chief restructuring officer: Winter Harbor LLC, 265 Franklin Street, 10th Floor, Boston, MA 02110, Attn: Shaun Martin (email: smartin@winterharborco.com).

If you file an Assignment Objection satisfying the requirements herein, the Debtors and Stalking Horse Bidder will confer with you in good faith to attempt to resolve any such Assignment Objection without Court intervention. If the applicable parties determine that the Assignment Objection cannot be resolved without judicial intervention in a timely manner, the Court shall resolve such Assignment Objection at a hearing to be held prior to the Bid Deadline, or at a hearing on such other date as the Court may designate.

**IF YOU FAIL TO TIMELY FILE AND PROPERLY SERVE AN ASSIGNMENT OBJECTION AS PROVIDED HEREIN (I) YOU WILL BE DEEMED TO HAVE FOREVER WAIVED AND RELEASED ANY ASSIGNMENT OBJECTION AND CONSENTED TO THE ASSUMPTION AND ASSIGNMENT OR SALE AND TRANSFER OF SUCH TRANSFERRED CONTRACT ON THE TERMS SET FORTH IN THIS ASSIGNMENT NOTICE AND THE STALKING HORSE BIDDER PURCHASE AGREEMENT AND (II) YOU WILL BE BARRED AND ESTOPPED FOREVER FROM ASSERTING OR CLAIMING AGAINST THE DEBTORS OR THE STALKING HORSE BIDDER (OR OTHER SUCCESSFUL BIDDER) THAT ANY ADDITIONAL CURE AMOUNTS ARE DUE OR DEFAULTS EXIST, OR CONDITIONS TO ASSUMPTION AND ASSIGNMENT OR SALE AND TRANSFER MUST BE SATISFIED, UNDER SUCH TRANSFERRED CONTRACT.**

The Debtor's assumption and assignment or sale and transfer of a Transferred Contract is subject to approval by the Court, and consummation of the closing of the Sale. If there is no closing, the Transferred Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors.

The inclusion of any document on the list of Transferred Contracts shall not constitute or be deemed to be a determination or admission by the Debtors or the Stalking Horse Bidder (or other Successful Bidder) that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.

Any Assignment Objection shall not constitute an objection to any of the other relief requested in the Sale Motion to be approved by the Sale Order (*e.g.*, the sale of the GalacticSky Assets by the Debtors to the Stalking Horse Bidder (or other Successful Bidder) free and clear of claims, liens and encumbrances other than those assumed by the Stalking Horse Bidder (or other Successful Bidder)). Parties wishing to object to the other relief requested in the Sale Motion (excluding the Bidding Procedures) must timely file and serve a separate objection, stating with particularity such party's grounds for objection, in accordance with the objection procedures approved and set forth in the Bidding Procedures Order.

The dates set forth in this notice are subject to change, and further notice of such changes may not be provided except through announcements in open court and/or the filing of notices and/or amended agendas and/or in accordance with the Bidding Procedures Order. Parties in interest are encouraged to monitor the electronic court docket.

This Notice is subject to the full terms and conditions of the Sale Motion, the Bidding Procedures Order and the assignment and rejection procedures set forth in the Bidding Procedures Order, which shall control in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

**EXHIBIT 4**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

VECTOR LAUNCH INC.,

GARVEY SPACECRAFT CORPORATION,

and

LOCKHEED MARTIN CORPORATION

DATED AS OF DECEMBER 13, 2019

## TABLE OF CONTENTS

Page

**ARTICLE 1** DEFINITIONS AND CONSTRUCTION ................................................................1
    Section 1.1    Definitions ................................................................................1

**ARTICLE 2** THE TRANSACTION ......................................................................................9
    Section 2.1    Sale and Purchase of Purchased Assets ...........................9
    Section 2.2    Assumed Liabilities .......................................................10
    Section 2.3    Excluded Liabilities .......................................................10
    Section 2.4    Consideration .................................................................10
    Section 2.5    Closing ...........................................................................10
    Section 2.6    Closing Deliveries..........................................................10
    Section 2.7    Withholding ...................................................................11

**ARTICLE 3** REPRESENTATIONS AND WARRANTIES OF THE SELLERS .....................11
    Section 3.1    Organization...................................................................11
    Section 3.2    Authority and Enforceability .........................................12
    Section 3.3    No Conflict.....................................................................12
    Section 3.4    Title to Assets; Liens .....................................................12
    Section 3.5    Claims, Litigation and Disputes....................................12
    Section 3.6    Intellectual Property.......................................................13
    Section 3.7    Taxes .............................................................................16

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.................17
    Section 4.1    Organization and Good Standing....................................17
    Section 4.2    Authority and Enforceability .........................................17
    Section 4.3    No Conflict.....................................................................17

**ARTICLE 5** COVENANTS .................................................................................................17
    Section 5.1    Consents and Filings; Commercially Reasonable Efforts. ............17
    Section 5.2    Supplements to Seller Disclosure Schedule....................18
    Section 5.3    Public Announcements ...................................................19
    Section 5.4    Further Actions ..............................................................19
    Section 5.5    Bulk Transfer Laws........................................................19
    Section 5.6    Bankruptcy Court Matters..............................................19
    Section 5.7    Bankruptcy Court Approval; Break-Up Fee and Expense Reimbursement ....21
    Section 5.8    Back-Up Bidder .............................................................21
    Section 5.9    Post-Auction Supplement ..............................................22
    Section 5.10    Payments Received.........................................................22
    Section 5.11    Cessation of Use of the Purchased Assets ......................22
    Section 5.12    Transfer of Permits and Governmental Authorizations...................22

**ARTICLE 6** CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE.............................23
    Section 6.1    Conditions to the Obligation of the Purchaser................23
    Section 6.2    Conditions to the Obligations of the Sellers ...................24

**ARTICLE 7** TERMINATION..................................................................................24
    Section 7.1    Termination Events..................................................24
    Section 7.2    Effect of Termination..............................................25
    Section 7.3    Termination Payment..............................................25

**ARTICLE 8** NO SURVIVAL ...............................................................................26
    Section 8.1    No Survival of Representations and Warranties and Certain Covenants ........26
    Section 8.2    Limitation on Liability............................................26

**ARTICLE 9** TAX MATTERS ...............................................................................26
    Section 9.1    Transfer Taxes.......................................................26
    Section 9.2    Proration items......................................................27

**ARTICLE 10** MISCELLANEOUS ........................................................................27
    Section 10.1    Notices. ...............................................................27
    Section 10.2    Amendments; Waivers............................................29
    Section 10.3    Expenses .............................................................29
    Section 10.4    Assignment, Successors and No Third-Party Rights ...............29
    Section 10.5    Construction........................................................29
    Section 10.6    Entire Agreement..................................................30
    Section 10.7    Governing Law ....................................................30
    Section 10.8    Counterparts; Effectiveness ......................................30
    Section 10.9    Jurisdiction; WAIVER OF TRIAL BY JURY ...................31
    Section 10.10    Severability.........................................................31
    Section 10.11    Captions .............................................................31
    Section 10.12    Specific Performance and other Equitable Relief...................31
    Section 10.13    No Joint Venture...................................................32
    Section 10.14    Release ...............................................................32

**Exhibits**

    Exhibit A – Form of Intellectual Property Assignment

**Schedules**

    Schedule 2.1(a) – Intellectual Property
    Schedule 2.1(c) – Personal Property

**Seller Disclosure Schedule**

    Section 3.6(b) – IP Agreements
    Section 3.6(c) – Licensed Intellectual Property
    Section 3.6(g) – Infringements, Misappropriations or Other Violations
    Section 3.6(j) – Seller Source Code Licenses

EXECUTION VERSION

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of December 13, 2019, by and among Vector Launch Inc., a Delaware corporation ("Vector"), Garvey Spacecraft Corporation, a California corporation and wholly owned subsidiary of Vector ("Garvey" and collectively with Vector, the "Sellers"), and Lockheed Martin Corporation, a Maryland corporation (the "Purchaser").

## RECITALS

WHEREAS, on December 13, 2019, the Sellers filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and are operating and managing their businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, subject to and upon the terms and conditions herein, the Sellers desire to sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser (or its designated Affiliate), and the Purchaser desires, directly or through its designated Affiliate, to purchase and acquire from the Sellers, all of the Purchased Assets (as defined below);

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order (as defined below) approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order (as defined below); and

WHEREAS, the Sellers and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of the Assumed Liabilities (as defined below) and for certain bid protections in connection therewith, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1     Definitions.  For the purposes of this Agreement:

"Affiliate" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with,

1

the specified Person, and all Subsidiaries of such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, under no circumstance will the Purchaser and the Sellers be deemed Affiliates of one another notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Sellers.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means any transaction or series of related transactions (other than pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by the Sellers, pursuant to which the Sellers, or any one of them: (i) accept a Qualified Bid, other than that of the Purchaser or its Affiliates, as the highest or otherwise best offer; or (ii) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in any Seller or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, all or substantially all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser or its Affiliates.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Auction" means the bankruptcy auction of the Sellers' assets, conducted by the Sellers pursuant to the Bidding Procedures Order.

"Back-Up Bidder" has the meaning set forth in Section 5.8.

"Back-Up Period" has the meaning set forth in Section 5.8.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" means the procedures governing the solicitation of bids and the conduct of the Auction for the Purchased Assets under the supervision of the Bankruptcy Court which are attached to the Bidding Procedures Order.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court approving the Bidding Procedures, Break-Up Fee and Expense Reimbursement.

"Break-Up Fee" has the meaning set forth in Section 7.3.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in New York are closed either under applicable Law or action of any Governmental Authority.

"Cash Amount" has the meaning set forth in Section 2.4.

"Chapter 11 Cases" means the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code in the Bankruptcy Court jointly administered under Case No. 19-12670.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" has the meaning set forth in Section 2.5.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Contaminant" means any "malware," "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing, any of the following functions (i) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or enabling or providing unauthorized access to, Software, Technology or any other device on which such code is stored or installed; or (ii) damaging, destroying, encrypting, or rendering unusable any data or file without the consent of the owner of such data or file.

"Contract" means any contract, agreement, arrangement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation.

"Copyrights" means all copyrights (whether or not registered), works of authorship, copyrightable works and all other corresponding rights, including copyrights in Software and in the content contained on any website, and registrations and applications for any of the foregoing in any jurisdiction, and all derivative works, moral rights, renewals, extensions, reversions or restorations associated with any of the foregoing.

"DIP Obligations" means all obligations arising under that certain debtor in possession loan facility by and between the Purchaser and the Sellers and approved by the Bankruptcy Court.

"Domain Name" means any Internet domain name, web address, uniform resource locator, social media handle, user name or account identifier, and all goodwill associated with any of the foregoing.

"Executory Contract" means a Contract that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"Expense Reimbursement" has the meaning set forth in Section 7.3.

3

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed.

"Fundamental Representations" means each of the representations and warranties contained in Section 3.1, Section 3.2, Section 3.3, and Section 3.4.

"Governmental Authority" means any multinational, foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, Permit, registration or other authorization issued or granted by any Governmental Authority.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (i) all Patents; (ii) all Copyrights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all Trademarks; (v) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, Trade Secrets, confidential business information, manufacturing and production processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all Software; (vii) all databases and data collections; (viii) all licenses and permits to the extent transferable; (ix) websites and Domain Names including domain name registrations (x) all other intellectual property rights and proprietary rights in Technology; and (xi) all rights to assert, claim or sue and collect damages for the past, present or future infringement, misappropriation or other violation of any of the foregoing.

4

"Intellectual Property Rights" means all rights in and to any Intellectual Property.

"IP Agreements" means all Contracts (including outstanding decrees, orders, judgments, settlement agreements, or stipulations) to which any Seller is a party, a beneficiary or otherwise bound, that concern the Purchased Assets, including: (i) those Contracts which contain provisions granting to any Person rights or licenses in the Purchased Assets, granting to a Seller any rights or licenses in the Purchased Assets, consenting to another Person's use of the Purchased Assets, or covenanting not to sue any Person for infringement, misappropriation or any other violation of any such Purchased Assets, or restricting a Seller's use of the Purchased Assets; (ii) Contracts between any Person and any Seller relating to the acquisition, transfer, development, shared ownership, maintenance or use of the Purchased Assets (including any joint development agreement, technical collaboration agreement or similar agreement entered into by any of the Sellers), the development or transmission of data, or the use, modification, framing, linking, advertisement or other practices with respect to Internet websites; and (iii) consents, covenants not to assert or sue, settlements, decrees, orders, injunctions, judgments or rulings governing the use, validity or enforceability of any Purchased Asset.

"Judgment" means any Order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Sellers" or "the Sellers' Knowledge" means: (i) the actual knowledge of the Sellers after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms; and (ii) all such knowledge as would reasonably be obtained by any current executive officer of the Sellers, for the time period of his tenure, in the discharge of such officer's duties.

"Launch Vehicles" means the Sellers' rocket or launch vehicle-related products and services, including its launch vehicles known as Vector-R or Vector-H and those vehicles' components and related Intellectual Property.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Licensed Intellectual Property" means any and all Intellectual Property that relates to the Seller Offerings and that is (i) licensed to or otherwise made available to any Seller or (ii) the subject of a covenant not to assert in favor of any Seller.

"Lien" means any possessory or non-possessory lien, license, encumbrance or charge against or other interest in any property or assets, whether voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer or other arrangement, and including any agreement to give any of the foregoing.

"Material Adverse Effect" means any effect, event, change, circumstance, occurrence, state of facts, development or other matter that has, individually or in the aggregate, (a) has had or would reasonably be expected to result in a material adverse effect on (i) the business, financial condition or results of operations of the business of the Sellers, taken as a whole or (ii) the condition or value of any portion of the Purchased Assets or the Assumed Liabilities; or (b) has or would reasonably be expected to prevent, materially delay or materially impair the ability of the Sellers to consummate timely the transactions contemplated by this Agreement; provided, however, that in the case of clause (a), none of the following clauses (A)-(E), either alone or in combination, will constitute, or be considered in determining whether there has been a Material Adverse Effect, and that in the case of clause (b), the following clause (E) will not constitute, or be considered in determining whether there has been, a Material Adverse Effect: any effect, event, change, circumstance, occurrence, state of facts, development or other matter to the extent resulting from or related to: (A) any outbreak or escalation of war or major hostilities or any act of terrorism; (B) changes in Laws or United States generally accepted accounting principles; (C) changes that generally affect the industries and markets in which the Sellers operate; (D) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions; or (E) the filing or continuation of the Chapter 11 Case, in each of clauses (A), (B), (C) and (D) to the extent that such effect, event, change, circumstance, occurrence, state of facts, development or other matter does not disproportionately affect the Sellers in comparison to other participants in the industry in which the Sellers operate.

"Non-Proration Items" has the meaning set forth in Section 9.2.

"Open Source License" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative, or any Creative Commons License; for avoidance of doubt, Open Source Licenses include copyleft licenses.

"Open Source Materials" means any Software or content subject to an Open Source License.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Other Seller Taxes" has the meaning set forth in Section 9.2.

"Outside Date" has the meaning set forth in Section 5.6(b)(ii).

"Patent" means all national and multinational statutory invention registrations, invention disclosures, patents and patent applications of any type issued or applied for in any jurisdiction, including all industrial designs, utility models, plant and design patents, provisionals, non-provisionals, continuations, divisionals, continuations-in-part, continued prosecution applications, renewals, reissues, extensions, supplementary protection certificates,

reexaminations and the equivalents of any of the foregoing in any jurisdiction, and all inventions disclosed in each such registration, patent or patent application.

"Permit" means all permits, licenses, consents, approvals, franchises, accreditations, certifications, easements, rights of way and authorizations related to the operation of the business of the Sellers.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Petitions" has the meaning set forth in the Recitals.

"Petition Date" means December 13, 2019, the date the Petitions were filed with the Bankruptcy Court.

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Proration Items" has the meaning set forth in Section 9.2.

"Purchase Price" has the meaning set forth in Section 2.4.

"Purchased Assets" means (a) all Intellectual Property, Intellectual Property Rights and Technology related to the Seller Offerings, including the Intellectual Property set forth on Schedule 2.1(a); (b) any other Patents owned by the Sellers and their respective Affiliates that relate to the Seller Offerings but are not set forth on Schedule 2.1(a) and (i) are prepared but not filed or (ii) are currently pending before any Government Authority; (c) the assets set forth on Schedule 2.1(c); (d) all designs, technical information, Software, records and registrations relating to any of the foregoing; and (e) any of the Sellers' claims or causes of action of any kind or character related to the Seller Offerings.

"Purchaser" has the meaning set forth in the Preamble.

"Qualified Bid" means competing bids that are submitted in accordance with the Bidding Procedures and Bidding Procedures Order.

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance acceptable to the Purchaser and the Sellers: (i) approving the sale of the Purchased Assets (and the assumption and assignment of the Assumed Contracts) to the Purchaser free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, on the terms and conditions set forth in this Agreement; (ii) approving the Back-Up Bidder chosen at the Auction and the asset purchase agreement submitted by such Back-Up Bidder; (iii) authorizing

consummation of the transactions contemplated hereby; (iv) containing a finding that the transactions contemplated by this Agreement are undertaken by the Sellers and the Purchaser at arm's length, without collusion and in good faith by the Purchaser within the meaning of section 363(m) of the Bankruptcy Code; (v) assuring that the Purchaser and its Affiliates will not be subject to successor liability for any claims or causes of action of any kind or character against the Sellers, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement; (vi) authorizing the Purchaser to freely own and operate the Purchased Assets; (vii) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement, and (viii) permitting the Purchaser to waive, in its sole and absolute discretion, the fourteen (14)-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

"Sellers" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" has the meaning set forth in Article 3.

"Seller Offerings" means the Sellers' software-defined satellite products and services (*i.e.*, GalacticSky), together with all related products and service offerings that have been marketed, sold, distributed or otherwise provided, or that the Sellers intend to market, sell, distribute or otherwise provide. For the avoidance of doubt, "Seller Offerings" does not include the Sellers' Launch Vehicles.

"Seller Source Code" means all source code included in the Purchased Assets.

"Software" means computer software, systems and databases, firmware, data files, source and object codes, tools, user interfaces, manuals and all versions thereof and other specifications and all documentation, information, knowledge bases and know-how relating to any of the foregoing.

"Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to a specified Person, any corporation or other Person of which equity securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held directly or indirectly by the specified Person. When used in this Agreement without reference to a specified Person, "Subsidiary" means a Subsidiary of the Sellers. Notwithstanding the foregoing, under no circumstance will the Sellers be deemed a Subsidiary of the Purchaser notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Sellers.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures and Bidding Procedures Order.

"Supplement" has the meaning set forth in Section 5.9.

"Tax" means any and all federal, state, local or non-U.S. taxes, and any customs, charges, fees, levies, imposts or other assessments with respect thereto, including all gross receipts, income, sales, use, ad valorem, value added, capital stock, transfer, franchise, registration, license, withholding, payroll, social security (or similar), employment, unemployment, disability, excise, estimated, severance, stamp, occupation, premium, windfall profits, unclaimed property, escheat, alternative or add-on minimum and property (real and personal) taxes, tariffs and customs duties, together with any interest and any penalties, additions to tax or additional amounts imposed with respect to such amounts, whether disputed or not, and any interest in respect of such penalties or additions to tax, whether disputed or not.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means any and all technology, materials, or information, including inventions (whether patentable or not), improvements, trade secrets, proprietary information, know how, databases and data collections, invention disclosures, technical data and customer lists, subroutines, user interfaces, techniques, product designs, business plans, product roadmaps, works of authorship (whether copyrightable or not), and documentation relating to any of the foregoing (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries).

"Trademarks" means all trademarks, trade names, service marks, designs, logos, brand names, certification marks, corporate names, trade dress, emblems, signs or insignia, slogans, other similar designations of source or origin and general intangibles of like nature, any derivations of any of the foregoing, and all registrations and applications for registrations pertaining to any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing), and all goodwill associated with any of the foregoing.

"Trade Secrets" means trade secrets and confidential information, including all source code, documentation, know how, processes, technology, formulae, customer lists, business and marketing plans, inventions (whether or not patentable) and marketing information.

"Transfer Taxes" has the meaning set forth in Section 9.1.

## ARTICLE 2
## THE TRANSACTION

Section 2.1    Sale and Purchase of Purchased Assets.  In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at the Closing, the Sellers will sell, convey, assign, transfer and deliver to the Purchaser (or its designated Affiliate), and the Purchaser (or its designated Affiliate) will purchase and acquire from the Sellers, all Purchased Assets.

Section 2.2    Assumed Liabilities.  In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser (or its designated Affiliate) will assume and pay or perform and discharge when due only those Liabilities for Taxes borne by the Purchaser pursuant to Section 9.1 and no other Liabilities (the "Assumed Liabilities"), and, except for the Assumed Liabilities, the Purchaser shall not be deemed to have assumed any other Liabilities of the Sellers or any of their predecessors.

Section 2.3    Excluded Liabilities.    Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming any other Liability of the Sellers or any of their predecessors of whatever nature, whether presently in existence or arising hereafter, which shall be retained by and remain Liabilities of the Sellers (the "Excluded Liabilities").

Section 2.4    Consideration.  The consideration for the Purchased Assets (the "Purchase Price") consists of: (i) cash in the amount of $4,250,000 (the "Purchase Price"), subject to adjustment for a credit bid of some or all of the outstanding DIP Obligations and any pre-petition indebtedness owed to the Purchaser and any deductions pursuant to Section 9.2 (the Purchase Price less such adjustments, the "Cash Amount"); and (ii) the assumption of the Assumed Liabilities in accordance with this Agreement.

Section 2.5    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") will be conducted electronically, unless the parties hereto opt for an in-person Closing, in which case the Closing will take place at the offices of Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017, at 10:00 a.m., U.S. Eastern Time, as soon as practicable, but in no event later than two (2) Business Days after the date on which all the conditions set forth in Article 6 have been satisfied or (if permissible) waived by the party hereto entitled to waive such condition (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions).  The date on and time at which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 2.6    Closing Deliveries.

(a)    At the Closing, the Sellers will deliver or cause to be delivered to the Purchaser:

(i)    an Intellectual Property assignment agreement in the form of Exhibit A (the "Intellectual Property Assignment") executed by the Sellers;

(ii)    to the extent requested by the Purchaser, jurisdiction-specific Patent assignment agreements corresponding to the jurisdictions in which any Patents constituted a Purchased Asset granted or applied, each of which is in customary form reasonably acceptable to the Purchaser and capable of recordation with the applicable U.S. or foreign patent office, in each case executed by the Sellers;

(iii)    one or more bill of sale agreements conveying the assets set forth in Schedule 2.1(c), in form reasonably acceptable to the Purchaser, executed by the Sellers;

(iv)    possession of the assets set forth in <u>Schedule 2.1(c)</u>;

(v)    all Software and Technology included in the Purchased Assets and Seller Source Code, as stored in the Sellers' electronic data storage systems, digitally transferred to the Purchaser via a method reasonably acceptable to the Purchaser;

(vi)    a list of all Persons who worked on the Software and Technology included in the Purchased Assets and Seller Source Code;

(vii)    a certificate, dated as of the Closing Date, executed by each Seller confirming the satisfaction of the conditions specified in <u>Sections 6.1(a)</u> and <u>6.1(b)</u>;

(viii)    a certified copy of the Sale Order; and

(ix)    such other instruments as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

(b)    At the Closing, the Purchaser will deliver or cause to be delivered to the Sellers or for the Sellers' benefit:

(i)    the Cash Amount delivered to Vector (on behalf of the Sellers) by wire transfer of immediately available funds to an account designated by the Sellers prior to the Closing;

(ii)    a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in <u>Sections 6.2(a)</u> and <u>6.2(b)</u>; and

(iii)    such other instruments as the Sellers reasonably request for the purpose of consummating the transactions contemplated by this Agreement.

<u>Section 2.7</u>    <u>Withholding</u>.  The Purchaser and its Affiliates shall be entitled to deduct and withhold from any amount otherwise payable to the Sellers pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign Law.  If any amount is so withheld, such withheld amounts shall be treated for all purposes of the Agreement as having been paid to the Sellers.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows, except as set forth on the disclosure schedules delivered by the Sellers to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "<u>Seller Disclosure Schedule</u>"):

<u>Section 3.1</u>    <u>Organization</u>.  Each Seller is duly organized and validly existing and in good standing under the Laws of its jurisdiction of formation.  Except as a result of the filing of its Petition, each Seller has all requisite power and authority to conduct the business of the Seller

11

as presently conducted. Each Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not reasonably be expected to have a Material Adverse Effect. Each Seller has delivered to the Purchaser true and complete copies of the certificate of incorporation, bylaws and any other organizational or governing documents of the Seller as currently in effect.

Section 3.2   Authority and Enforceability. Subject only to the entry of the Bidding Procedures Order and the Sale Order, each Seller has all requisite corporate power, authority and capacity to execute and deliver this Agreement and the other agreements contemplated hereunder and to perform its obligations under this Agreement and such other agreements. Subject only to the entry of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the other agreements contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement and such other agreements by each Seller have been duly authorized by all necessary action on the part of the Seller. Each Seller has duly and validly executed and delivered this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

Section 3.3   No Conflict. Subject only to the entry of the Bidding Procedures Order and the Sale Order, and except in the case of clauses (b), (c), (d) and (e) that has not had, and would not reasonably be expected to have, a Material Adverse Effect, neither the execution, delivery and performance of this Agreement by each Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate such Seller's certificate of incorporation, bylaws or other organizational or governing documents; (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Contract or Governmental Authorization; (c) violate any Law or Judgment applicable to such Seller, its business or the Purchased Assets; (d) require such Seller to obtain any Governmental Authorization or make any filing with or provide any notice to, or, to the Knowledge of the Sellers, require any action by, any Governmental Authority (provided that, subject to Section 5.1 and Section 5.12, the transfer of any Permits will be the obligation of the Purchaser, provided further that each Seller shall provide commercially reasonable assistance regarding the transfer of such Permits); or (e) result in the creation of any Lien or Claim on any Purchased Asset.

Section 3.4   Title to Assets; Liens. Each Seller has good and marketable title to the Purchased Assets, free and clear of any Liens or Claims, and subject to the entry of the Sale Order, at Closing, the Purchaser will be vested with good and marketable title to all of the Purchased Assets, which Purchased Assets shall be conveyed free and clear of any Liens or Claims by order of the Bankruptcy Court. Except as set forth in Schedule 2.1(c), the Sellers do not own or lease any hardware, computers, network, servers, drives or other equipment or physical personal property related to, integrated with or necessary to the operation of the Seller Offerings or the Purchased Assets.

Section 3.5   Claims, Litigation and Disputes. There are currently no pending or, to the Knowledge of the Sellers, threatened, lawsuits, administrative or regulatory Proceedings, actions,

12

Orders, or reviews, or formal complaints or investigations or inquiries, including grand jury subpoenas by any Person, to which any of the Purchased Assets may be subject.

Section 3.6    Intellectual Property.

(a)    Schedule 2.1(a) sets forth a true and complete list of all (i) Patents; (ii) Trademarks; (iii) Domain Names; (iv) Copyrights; (v) Software and Technology; and (vi) material unregistered Intellectual Property, including Trade Secrets, in each case included in the Purchased Assets, and includes for each scheduled item of Intellectual Property, as applicable: (A) the jurisdiction in which each such item of Intellectual Property has been registered or filed and the applicable application, registration or serial number and date thereof; (B) the record owner and, if different, the legal owner and beneficial owner thereof (and if any other Person has an ownership interest in such item of such Intellectual Property, the nature of such ownership interest); (C) any proceedings or actions before any court, tribunal (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) related to any such Intellectual Property; and (D) any actions that must be taken within 180 days after the Closing Date for the purposes of obtaining, maintaining, perfecting or preserving or renewing any such Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any responses to office actions, documents, applications or certificates.

(b)    Section 3.6(b) of the Seller Disclosure Schedule sets forth a true and complete list of all IP Agreements related to the Seller Offerings. Each Seller has provided prior to the date hereof to the Purchaser true and complete copies of all such IP Agreements, together with all written notices and amendments relating thereto. No Seller is in default under or in breach of any such IP Agreement included in the Purchased Assets, and no Seller has received any notice of a default, alleged failure to perform or any offset or counterclaim with respect to any such IP Agreement that has not been fully remedied and withdrawn. No event has occurred, and no circumstance or condition exists, that, with notice, the passage of time or both, will or could reasonably be expected to (A) constitute a default under, or result in a violation or breach by a Seller of, any provision of any such IP Agreement; or (B) give any Person the right to declare a default or exercise any remedy under any such IP Agreement.

(c)    Section 3.6(c) of the Seller Disclosure Schedule sets forth a true and complete list of all Licensed Intellectual Property related to the Seller Offerings.

(d)    The Sellers solely and exclusively own all right, title and interest in and to the Purchased Assets, free and clear of all Liens and Claims, and none of such rights will be adversely affected by the consummation of the transactions contemplated by this Agreement. Without limiting the generality of the foregoing:

(i)    the Sellers exclusively own and have good title to all Trademarks that are used to designate the source or origin of the Seller Offerings and all Copyrights that are embodied in the Seller Offerings; and to the extent that any Patents would be infringed by the manufacture, use, sale or import of any Seller Offerings, the Sellers exclusively own such Patents, and all such Trademarks, Copyrights, and Patents are included in the Purchased Assets;

13

(ii)    each Person who is or was involved in the creation or development of any Purchased Assets has signed a valid and enforceable agreement containing (A) an irrevocable assignment to the Sellers of all Intellectual Property Rights pertaining to any Purchased Assets or that were created or developed by such Person in the course of that Person's activities with or for or otherwise for the benefit of any Seller, (B) confidentiality provisions protecting the Trade Secrets and other non-public elements of the Purchased Assets, and (C) to the extent not assignable by law, a waiver of such Person's moral rights in and to such Purchased Assets, and (1) no such Person has any obligation to any other Person with respect to such Purchased Assets and (2) there has been no breach of any such agreement;

(iii)    no funding, facilities or resources of any Governmental Authority or any university, college or other educational institution or government research center were used in the development of any Purchased Assets; and no Governmental Authority, university, college, or other educational institution or research center has any ownership in or rights to any Purchased Assets;

(iv)    no Person other than the Sellers has ownership rights or license rights, in either case granted by either of the Sellers in or to any Purchased Asset, or to any improvement thereto;

(v)    no current or former director, officer, employee, consultant, or contractor of any Seller has any right, license, claim, moral right, or interest in or with respect to any Purchased Asset.  No current or former director, officer, employee, consultant, or contractor of any Seller is in violation of any provision or covenant of any Contract with any Person by virtue of that director's, officer's, employee's, consultant's, or contractor's being employed by, performing services for, or serving on the board of directors (or equivalent governing body) of such Seller;

(vi)    the Sellers have taken all reasonable steps to maintain the confidentiality of and otherwise protect and enforce their rights in all Trade Secrets and other proprietary or confidential information pertaining to the Purchased Assets (including any confidential information owned by any Person to whom any Seller has a confidentiality obligation) and no such Trade Secret or proprietary or confidential information has been disclosed to any Person not bound by written confidentiality obligations with respect thereto;

(vii)    the Sellers own or otherwise have the unencumbered and unrestricted right to use, and after the Closing the Purchaser will own or have the unencumbered and unrestricted right to use, the Purchased Assets, which rights shall survive unchanged upon the consummation of the transactions contemplated by this Agreement.  The Purchased Assets constitute all of the rights and assets necessary for the conduct of the Sellers' business relating to the Seller Offerings, including the manufacture, use, marketing, distribution, provision, importation, sale and support thereof;

(viii)    no Seller is or was a member or promoter of, or a contributor to, any industry standards body or similar organization that could require or obligate any Seller to grant or offer to any other Person any license or right to any Purchased Assets; and

14

(ix)    neither the execution, delivery or performance of this Agreement or any other agreements referred to in this Agreement nor the consummation of the transactions contemplated by this Agreement will, with or without notice or lapse of time, result in, or give any other Person the right or option to cause or declare: (A) a loss of, or Lien on, any Purchased Assets; (B) a breach of or default under any IP Agreement included in the Purchased Assets; (C) the release, disclosure or delivery of any Purchased Assets by or to any escrow agent or other Person; (D) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any Purchased Assets; (E) a reduction of any royalties, revenue sharing or other payments to which a Seller (or, following the Closing, the Purchaser) would otherwise be entitled to with respect to any Purchased Assets; or (F) any Seller, Purchaser or any of its Affiliates, being (1) bound by, or subject to, any non-compete obligation, covenant not to sue, or other restriction on the operation or scope of its business, which such party was not bound by or subject to prior to the Closing, or (2) obligated to (x) pay any royalties, honoraria, fees or other payments to any Person in excess of those payable by such party prior to the Closing, or (y) provide or offer any discounts or other reduced payment obligations to any Person in excess of those provided to such Person prior to the Closing, in the case of each of clauses (x) and (y) pursuant to any contract, agreement, arrangement or understanding to which any Seller is a party.

(e)    There are no inquiries, investigations or Claims, and the Sellers have not received written notice from any third party: (i) alleging infringement, misappropriation or other violation by the Sellers or its business of the Purchased Assets of any Person; or (ii) challenging or threatening to challenge the Sellers' right, title, or interest with respect to its ownership or use of, or continued use or right to preclude others from using, any Purchased Assets as currently used, or the inventorship, validity, enforceability or registrability of any such Intellectual Property.

(f)    The Sellers have never infringed, misappropriated or otherwise violated or made unlawful use (directly, contributorily, by inducement or otherwise) of any Intellectual Property Right of any Person.  Without limiting the generality of the foregoing:  (i) neither the Purchased Assets, nor the manufacture, use, distribution, provision, importation, sale or support of the Seller Offerings, infringes, misappropriates, violates, or otherwise makes unlawful use of, or has infringed, misappropriated, violated, or otherwise made unlawful use of, any Intellectual Property Right of any other Person; (ii) no infringement, misappropriation or similar claim or Proceeding is pending or threatened against any Seller or against any other Person who is or may be entitled to be indemnified, defended, held harmless or reimbursed by any Seller with respect to such claim or Proceeding, and there are no circumstances that would give rise to any of the foregoing; and (iii) no Seller has received any notice or other communication (in writing or otherwise) relating to any actual, alleged or suspected infringement, misappropriation, violation or unlawful use of any Intellectual Property of another Person, including any letter or other communication suggesting or offering that any Seller obtain a license to any Intellectual Property of another Person and implying or suggesting that any Seller has been or is infringing, misappropriating, violating or making unlawful use of any such Intellectual Property.

(g)    No Person has infringed, misappropriated, made unlawful use of or violated, and no Person is currently infringing, misappropriating, making unlawful use of or

violating, any Purchased Asset, and the Sellers have not brought or threatened a Claim against any Person alleging infringement, misappropriation or other violation of any Purchased Asset. Section 3.6(g) of the Seller Disclosure Schedule accurately identifies (and the Sellers have delivered to Purchaser a complete and accurate copy of) each letter or other written or electronic communication or correspondence that has been sent by or to any Seller or any representative of any Seller regarding any actual, alleged or suspected infringement, misappropriation or other violation of any Purchased Asset, and provides a brief description of the current status of the matter referred to in such letter, communication or correspondence.

(h)     The Purchased Assets: (i) have been duly maintained; (ii) are subsisting, in full force and effect; (iii) have not been cancelled, expired or abandoned or adjudged invalid or unenforceable; and (iv) are valid and enforceable (except for invention disclosures, unfiled patent applications, or pending patent applications in various jurisdictions, which by their nature are not yet enforceable). No act has been done or omitted to be done by any Seller, which has, had or would reasonably be expected to have the effect of impairing or dedicating to the public, or entitling any Person to cancel, forfeit, modify or consider abandoned, any Purchased Assets or give any Person any rights to do so.

(i)     Each Seller has the right to use, pursuant to valid licenses, all Software development tools, library functions, compilers and all other third-party Software included in the Purchased Assets.

(j)     Section 3.6(j) of the Seller Disclosure Schedule lists all licenses granted to any Person with respect to the Seller Source Code. The Seller Source Code and all software in development related to GalacticSky was in a "beta" state of development, was not complete, and was not in a state ready for use by a customer. Sellers make no representations as to the state or condition of the Seller Source Code as it incomplete. No Seller Source Code has been delivered, licensed or made available to any escrow agent or other Person who is not, as of the date of this Agreement, an employee or consultant of any Seller. No Seller has any duty or obligation (whether present, contingent, or otherwise) to deliver, license or make available any Seller Source Code to any escrow agent or other Person. No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any Seller Source Code to any Person.

(k)     The Software and Technology included in the Purchased Assets, including the Seller Source Code, are incomplete and under development, and as such, Sellers cannot make any representations that such Software and Technology is free of material defects, bugs, or errors that would materially or adversely affect the use, functionality or performance of such Software or Technology. To the Knowledge of the Sellers, the Sellers have implemented and maintained, consistent with customary industry practices and all obligations to third parties, security and other measures to protect the Software and Technology included in the Purchased Assets from unauthorized access, use, or modification and there has not been any such unauthorized access, use, or modification of the Software or Technology by any Person.

Section 3.7     Taxes. (a) The Sellers, with respect to the Purchased Assets, have filed or caused to be filed on a timely basis all Tax Returns that are or were required to be filed; (b) all such Tax Returns accurately reflect all Liabilities required to be reflected thereon; (c) all Taxes

due and payable by the Sellers have been paid, other than those Taxes which have been stayed by the filing of the Petitions and, in the case of the Sellers, Taxes that do not relate to the Purchased Assets; (d) the Sellers, with respect to the Purchased Assets, have not requested or consented to extend to a date later than the Closing Date the time in which any Tax may be assessed or collected by any Governmental Authority; (e) no deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any Governmental Authority against the Sellers with respect to the Purchased Assets, and there is no action, suit, taxing authority Proceeding or audit now in progress, pending or, to the Knowledge of the Sellers, threatened against or relating to the Sellers with respect to the Purchased Assets; and (f) there are no Liens for Taxes (other than for current Taxes not yet due and payable or Liens for Taxes filed as a result of the Chapter 11 Case) upon the Purchased Assets.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Sellers as of the date hereof and as of the Closing Date as follows:

Section 4.1    Organization and Good Standing.    The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Maryland and has all requisite corporate power and authority to conduct its business as it is presently conducted.

Section 4.2    Authority and Enforceability.    The Purchaser has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser.    The Purchaser has duly and validly executed and delivered this Agreement.    Assuming the due authorization, execution and delivery of this Agreement by the Sellers and subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

Section 4.3    No Conflict.    Neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Purchaser's articles of incorporation or bylaws; (b) violate any Law or Judgment applicable to the Purchaser; or (c) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority.

## ARTICLE 5
## COVENANTS

Section 5.1    Consents and Filings; Commercially Reasonable Efforts.

(a)    Subject to the terms and conditions of this Agreement, each of the parties will use their respective commercially reasonable efforts: (i) to take promptly, or cause to be

17

taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement; and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waivers, approvals and other authorizations from, all other third parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

(b)    The Sellers, on the one hand, and the Purchaser, on the other hand, will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority. Neither the Sellers, on the one hand, nor the Purchaser, on the other hand, will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the transactions contemplated by this Agreement unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting. The Sellers, on the one hand, and the Purchaser, on the other hand, will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing. The Sellers, on the one hand, and the Purchaser, on the other hand, will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

(c)    The Sellers will promptly notify the Purchaser of any written communication it or any of its Affiliates receives from any Person (other than a Governmental Authority) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

(d)    The Sellers shall maintain the Seller Offerings in in their present condition. The Sellers shall not sell, dispose of or make any pledge of any of the Purchased Assets or permit any of the Purchased Assets to become subject to any Lien other than Liens granted to the Purchaser.

(e)    Provided that the Purchaser makes funds available for the Sellers' use under that certain debtor in possession loan facility in the Bankruptcy Case, the Sellers shall promptly take, or cause to be taken, all actions, and make all filings and payments, or cause to be made all filings and payments, with all Governmental Authorities (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) in respect of the Intellectual Property included in the Purchased Assets that have filing requirements, payments, renewals and/or deadlines prior to the Closing Date.

Section 5.2    Supplements to Seller Disclosure Schedule. The Sellers shall, from time to time prior to the Closing by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) to disclose any matter which, if occurring prior to the date of this

18

Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Sellers in this Agreement. None of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to the satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement.

Section 5.3    Public Announcements. Prior to the Closing, neither the Purchaser, on the one hand, nor the Sellers, on the other hand, will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party, unless required by applicable Law or by any listing agreement with any national securities exchange. Prior to issuing any such press release or making any such other public announcement as required by applicable Law or listing agreement with any national securities exchange and without the other party's prior written approval, the disclosing party will give the other party a copy of the proposed press release or other public announcement and reasonable opportunity to comment on the same.

Section 5.4    Further Actions.    Subject to the other express provisions of this Agreement, upon the request of either the Purchaser, on the one hand, or the Sellers, on the other hand, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing, the Sellers shall, and shall cause their Affiliates to, execute, acknowledge and deliver all such further assurances, deeds, assignments, consequences, powers of attorney and other instruments or papers as may be required to perfect the interest of the Purchaser in and to the Purchased Assets free and clear from any encumbrances, as contemplated by this Agreement. If, at any time after the date of this Agreement, any further action is reasonably determined by Purchaser to be necessary or desirable to carry out the purposes of this Agreement or to vest the Purchaser with full right, title and possession of and to all rights and interest in the Purchased Assets, the Purchaser shall be fully authorized (in the name of Sellers) to take such action.

Section 5.5    Bulk Transfer Laws. The Sellers shall ensure that the Sale Order shall provide either that (a) the Sellers have complied with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement or (b) compliance with such Laws described in clause (a) is not necessary or appropriate under the circumstances.

Section 5.6    Bankruptcy Court Matters.

(a)    The Purchaser and the Sellers will use their respective good faith and commercially reasonable efforts to cause (i) the Bidding Procedures Order to be entered by the Bankruptcy Court by January 6, 2020, and (ii) the Sale Order to become a Final Order as soon as practicable after its entry.

(b)    The Sellers shall:

(i)     cause the Bankruptcy Court to hold the Sale Hearing and enter the Sale Order by 11:59 p.m. U.S. Eastern Time on or before February 4, 2020; and

(ii)     consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than 11:59 p.m. U.S. Eastern Time on or before February 19, 2020, or at the option of the Purchaser, on the fifteenth (15th) day following entry of the Sale Order unless the Sale Order shall not be a Final Order, then within two (2) Business Days following the date the Sale Order shall have become a Final Order but in no event later than March 17, 2020 (the "Outside Date").

(c)     The Sellers will provide the Purchaser with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by the Sellers (including forms of Orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Case.  All motions, applications, petitions, schedules and supporting papers prepared by the Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of the Sellers after the date hereof must be reasonably satisfactory in form and substance to the Purchaser.  The Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order.  From and after the date hereof, the Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

(d)     The Sellers will promptly take such actions as are reasonably requested by the Purchaser to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Sellers of their obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that the Purchaser is a good faith buyer under section 363(m) of the Bankruptcy Code.

(e)     If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Sellers will promptly notify the Purchaser of such appeal, petition, motion or stay request and the Sellers, with input from the Purchaser, will take all reasonable steps to defend against such appeal, petition, motion or stay request.  Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole and absolute discretion, waives in writing the condition set forth in Section 6.1(d) that the Sale Order be a Final Order.

(f)     The Sellers and the Purchaser shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such order by the Bankruptcy Court).

(g)     The Sellers shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining

approval of the transactions contemplated by this Agreement.  The Sellers shall serve on all required Persons, including: (i) all Persons who are known to possess or assert a Claim or Lien against or interest in the Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; and (iv) using commercially reasonable efforts to serve any other Persons that the Purchaser reasonably may request, any notice of the motions, hearings, or orders necessary to comply with its obligations under this Section 5.6 and to consummate the transactions contemplated hereby.

Section 5.7    Bankruptcy Court Approval; Break-Up Fee and Expense Reimbursement.

(a)    The Purchaser and the Sellers acknowledge that, under the Bankruptcy Code, the sale of Purchased Assets is subject to approval of the Bankruptcy Court.  The Purchaser and the Sellers acknowledge that to obtain such approval, the Sellers must demonstrate that it has taken reasonable steps to obtain the highest or best value possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction and selling the Purchased Assets to another qualified bidder.

(b)    As consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Purchaser (solely in its capacity as such) in connection with the completion of its due diligence review of the Purchased Assets and the preparation, negotiation, and execution of this Agreement, the Sellers acknowledged and agreed that: (i) the Purchaser will be the stalking horse bidder at the Auction; (ii) the Sellers will not participate in any negotiations for the purpose of naming any Person other than the Purchaser as the stalking horse bidder in the Auction, and no Person other than the Purchaser will be the stalking horse bidder at the Auction; and (iii) the Sellers will actively oppose any effort by any other Person to be the stalking horse bidder; provided, however, that consistent with its fiduciary duties to elicit the highest and best offer for the Purchased Assets and to conduct the Auction, the Sellers and their representatives and Affiliates may solicit, encourage and negotiate higher or better offers for the Purchased Assets under the terms of the Bidding Procedures Order.

(c)    The Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to Section 7.3 shall survive termination of this Agreement and shall constitute an administrative expense of the Sellers under section 503(b) of the Bankruptcy Code.

Section 5.8    Back-Up Bidder.  If an Auction is conducted, and the Sellers do not choose the Purchaser as the Successful Bidder, but instead choose the Purchaser as the bidder as having submitted the next highest or otherwise best bid at the conclusion of such Auction (the "Back-Up Bidder"), the Purchaser shall be the Back-Up Bidder.  If the Purchaser is chosen as the Back-Up Bidder, the Purchaser shall be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (and without regard to any improvements thereto by the Purchaser prior to or at the Auction) open and irrevocable until the earlier of: (i) the date of closing on the sale of the Purchased Assets to the Successful Bidder; and (ii) fifteen (15) days following the date the order approving the sale of

the Purchased Assets to the Successful Bidder shall have become a Final Order (such date, the "Back-Up Period"); provided, however, that if the Successful Bidder shall fail to close on its purchase of the Purchased Assets within the period set forth above, the Back-Up Bidder shall be deemed to be the Successful Bidder and the Sellers will be authorized, without further order of the Bankruptcy Court, to, and the Back-Up Bidder shall, consummate the transactions contemplated by this Agreement within ten (10) Business Days of becoming the Successful Bidder on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction).

Section 5.9    Post-Auction Supplement. Following the conclusion of the Auction, the Sellers will promptly file with the Bankruptcy Court a supplement (the "Supplement") that will inform the Bankruptcy Court of the results of the Auction. The Supplement will identify, among other things: (a) the Successful Bidder as the proposed purchaser of the Purchased Assets; (b) the amount and form of consideration to be paid by the Successful Bidder for the Purchased Assets; (c) the Assumed Liabilities, if any, to be assumed by the Successful Bidder; (d) the Executory Contracts, if any, to be assumed by the Sellers and assigned to the Successful Bidder, or the Sellers' rights and interests therein to be sold and transferred to the Successful Bidder, as the case may be; and (e) the Executory Contracts, if any, designated to be rejected by the Sellers. The Supplement will also include similar information relating to the Back-Up Bidder and its bid. In addition, the Sellers will attach to the Supplement: (i) the proposed or revised proposed Sale Order, with any revisions necessary to reflect the results of the Auction, approving the sale to the Successful Bidder; (ii) a copy of this Agreement, with any amendments necessary to reflect the results of the Auction; and (iii) any additional information or documentation relevant to the Successful Bidder. The Sellers will file the Supplement on the docket for the Chapter 11 Case as promptly as is reasonably practicable prior to the Sale Hearing but will not be required to serve the same on any parties-in-interest in the Chapter 11 Case.

Section 5.10    Payments Received. The Sellers, on the one hand, and the Purchaser, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

Section 5.11    Cessation of Use of the Purchased Assets. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, (a) the Sellers acknowledge and agree that, from and after the Closing, the Sellers shall not have any right, title or interest in or to any Purchased Assets (including any Trademarks and names) and (b) from and after the Closing, the Sellers shall cease and discontinue any and all use or other exploitation of any and all Purchased Assets (including any Trademarks and names).

Section 5.12    Transfer of Permits and Governmental Authorizations. From and after the date hereof, the Sellers, on the one hand (subject to the availability of funds for such purpose), and the Purchaser, on the other hand, shall, and shall cause their respective Affiliates to, reasonably cooperate to transfer to Purchaser as of the Closing (or as soon as reasonably practicable thereafter) all Governmental Authorizations included in the Purchased Assets; provided that (a) any reasonable, documented out-of-pocket costs associated with such

cooperation by the Sellers after the Closing (including the *pro rata* portion of the costs of any employee directly providing such cooperation after the Closing, as determined by the amount of time dedicated by such employee to such cooperation as a proportion of all time dedicated by such employee to the Sellers) shall be borne by the Purchaser and (b) nothing in this Section 5.12 shall be deemed to require the Sellers to remain a debtor in the Chapter 11 Case or maintain its corporate existence for any period of time beyond thirty (30) days after the Closing Date.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

Section 6.1    Conditions to the Obligation of the Purchaser.    The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Successful Bidder failing to close) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

(a)    Accuracy of Representations and Warranties. (i) Each of the Fundamental Representations (disregarding all materiality and "Material Adverse Effect" or similar qualifiers contained therein for this purpose) must be true and correct in all material respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all material respects as of such date), and (ii) the representations and warranties of the Sellers in Article 3 (other than the Fundamental Representations) must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except in the case of this clause (ii) where the failure of such representations and warranties to be so true and correct (disregarding all materiality and "Material Adverse Effect" or similar qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b)    Performance of Covenants.    All of the covenants and obligations that the Sellers are required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects.

(c)    No Action.    There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(d)    Sale Order.    The Sale Order must be a Final Order and must be in form and content satisfactory to the Purchaser.

(e)    No Material Adverse Effect.    There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of the Sellers under this Agreement) after the date of this Agreement which has had, or would reasonably be expected to have, a Material Adverse Effect.

(f)    Third-Party Consents.    All consents, waivers, approvals and other authorizations of third parties required to sell, assign, transfer, convey and deliver the Purchased Assets to the Purchaser (or its designated Affiliate) shall have been obtained.

23

Section 6.2    Conditions to the Obligations of the Sellers. The obligation of the Sellers to perform any obligations hereunder, including to consummate the transactions contemplated by this Agreement, is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Successful Bidder failing to close) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Sellers, in whole or in part):

(a)    Accuracy of Representations and Warranties. The representations and warranties of the Purchaser in Article 4 must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a material adverse effect on the Purchaser's ability to timely complete the transactions contemplated by this Agreement.

(b)    Performance of Covenants. All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects.

(c)    No Action. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(d)    Sale Order. The Sale Order must be a Final Order and must be in form and content satisfactory to the Sellers.

## ARTICLE 7
## TERMINATION

Section 7.1    Termination Events.

(a)    This Agreement may, by written notice given before the Closing, be terminated:

(i)    by mutual consent of the Purchaser and the Sellers;

(ii)    by the Purchaser (so long as the Purchaser is not then in material breach of any of the provisions in this Agreement), if there has been a breach by the Sellers of any of the provisions in this Agreement which would result in the failure of the condition set forth in Section 6.1(a) or Section 6.1(b), as applicable, to be satisfied, and which breach has not been cured within five (5) days after written notice of such breach has been delivered to the Sellers from the Purchaser or cannot be cured by the Outside Date;

(iii)    by the Sellers (so long as any Seller is not then in material breach of any of the provisions in this Agreement), if there has been a breach by the Purchaser of any of the provisions in this Agreement which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), as applicable, to be satisfied, and which breach has

24

not been cured within five (5) days after written notice of such breach has been delivered to the Purchaser from the Sellers or cannot be cured by the Outside Date;

(iv)     by either the Purchaser or the Sellers, if there is in effect a nonappealable Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(a)(iv) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 7.1(a)(iv) occurring;

(v)     by the Purchaser, if the Bidding Procedures Order is not entered by the Bankruptcy Court by January 6, 2020; or

(vi)     by the Purchaser if (a) the Chapter 11 Cases are dismissed or converted into cases under chapter 7 of the Bankruptcy Code or (b) an examiner with expanded powers or trustee is appointed in the Chapter 11 Cases.

(b)     This Agreement shall terminate automatically in the event that (i) an Alternative Transaction has been consummated following approval by the Bankruptcy Court, (ii) the Purchaser is not chosen at the Auction to be the Successful Bidder or the Back-Up Bidder or (iii) the Purchaser is chosen at the Auction to be the Back-Up Bidder, upon the expiration of the Back-Up Period.

Section 7.2     Effect of Termination.

(a)     If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 5.3 (*Public Announcements*), Section 5.8 (*Back-Up Bidder*), Section 7.3 (*Termination Payment*), Article 10 (*Miscellaneous*)) and this Section 7.2 shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing and subject to Section 7.3, in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

Section 7.3     Termination Payment.  In consideration of the substantial commitment of time and resources by the Purchaser to the preparation, negotiation, execution and performance of this Agreement, in the event that any Seller consummates an Alternative Transaction, subject to the Purchaser having complied with its obligations as Back-Up Bidder under Section 5.12 (if applicable), the Sellers at the closing of such Alternative Transaction shall pay to the Purchaser the amount of $210,000 (the "Break-Up Fee") and all reasonable and documented costs and out of pocket expenses incurred by the Purchaser in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $350,000 (the "Expense Reimbursement"), subject to the Expense Cap (as defined in that certain Bridge Loan and

Security Agreement, dated as of November 20, 2019 and as amended, by and among the Sellers and the Purchaser). Pursuant to the Bidding Procedures Order, the Break-Up Fee and Expense Reimbursement, upon the Sellers' agreement to enter into an Alternative Transaction, the Purchaser shall be entitled to have a first priority administrative expense claim status without the need for any further application or motion of the Sellers or the Purchaser, or the entry of any further order of the Bankruptcy Court.  The parties agree that the amount of actual damages which the Purchaser would suffer as a result of a termination of this Agreement as contemplated by this Section 7.3 would be extremely difficult to determine and have agreed that the amount of the Break-Up Fee and Expense Reimbursement is a reasonable estimate of the Purchaser's damages and is intended to constitute a fixed amount of liquidated damages in lieu of other remedies available to the Purchaser and is not intended to constitute a penalty.

## ARTICLE 8
## NO SURVIVAL

Section 8.1    No Survival of Representations and Warranties and Certain Covenants. Each of the representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement in connection with the transactions contemplated by this Agreement shall terminate at the Closing or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2.

Section 8.2    Limitation on Liability.  Notwithstanding any other provision of this Agreement to the contrary, in no event will any party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the conduct of such party pursuant to this Agreement, regardless of whether the nonperforming party was advised of the possibility of such damages or not.

## ARTICLE 9
## TAX MATTERS

Section 9.1    Transfer Taxes.   Any sales, use, *ad valorem*, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering the Purchased Assets in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Sellers, shall be borne by the Purchaser.  The amount of Transfer Taxes shall be estimated as of the Closing Date and if any Transfer Taxes are due, the party hereto not responsible for paying to the applicable Tax authorities such Transfer Taxes shall pay their share (as determined under the first sentence of this Section 9.1) to the other party hereto at the Closing, who shall in turn provide to the other party hereto evidence of timely payment of such Transfer Taxes; provided, however that final payments with respect to the Transfer Taxes that are not able to be calculated as of the Closing Date shall be calculated promptly after the Closing, and the party hereto not responsible for paying to the applicable Tax

authorities such additional Transfer Taxes shall, as soon as practicable after such calculation has been determined, pay their share (as determined under the first sentence of this Section 9.1) to the other party hereto, who shall in turn provide to the other party hereto evidence of timely payment of such additional Transfer Taxes.  Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date. The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

Section 9.2     Proration items.  Personal property Taxes and other Taxes (the "Proration Items") with respect to the Purchased Assets for any Taxable period beginning before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Sellers as of the Closing Date.  The amount of the Proration Items attributable to the Sellers shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period.  For purposes of allocating all other Taxes ("Non-Proration Items") with respect to the Purchased Assets for any Straddle Period, such Taxes shall be allocated between the pre-Closing portion of such Straddle Period and the post-Closing portion of such Straddle Period based on an interim closing of the books at the end of the day on the Closing Date.  The Sellers shall bear any Non-Proration Items allocable to the pre-Closing portion of any Straddle Period and any other unpaid Taxes with respect to the Purchased Assets for Tax periods ending on or prior to the Closing Date (such Non-Proration Items and other pre-Closing Taxes, "Other Seller Taxes").  The amount of all such Proration Items attributable to the Sellers and the amount of any Other Seller Taxes shall be estimated as of the Closing Date and deducted from the Purchase Price at the Closing; provided, however that final payments with respect to the Proration Items or Other Seller Taxes that are not able to be calculated as of the Closing Date shall be calculated and the Sellers (or any successor thereof or any estate) shall pay over any additional amount as soon as practicable after the Closing Date, but no later than five (5) Business Days after determination of such additional amounts.

## ARTICLE 10
## MISCELLANEOUS

Section 10.1     Notices.   All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail) and shall be given,

if to any Seller:

Vector Launch Inc.
Attention: John Garvey
15261 Connector Ln.
Huntington Beach, CA

Email: john.garvey@vector-launch.com

with a copy (which shall not constitute notice) to:

Pillsbury Winthrop Shaw Pittman LLP
Attn: Hugh M. Ray, III
2 Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Email: hugh.ray@pillsburylaw.com

if to the Purchaser:

Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817
Attention: Senior Vice President, General Counsel and
Corporate Secretary
Email: maryanne.lavan@lmco.com

with copies (which shall not constitute notice) to:

Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817
Attention: Michael A. Elliott, Director & Associate
General Counsel
Email: michael.a.elliott@lmco.com

Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Attention: Elizabeth M. Donley
Email: elizabeth.donley@hoganlovells.com

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attention: Christopher R. Donoho, III
Email: chris.donoho@hoganlovells.com

or to such other address or email and with such other copies, as such party may hereafter specify
for such purpose by notice to the other party. Each such notice, request or other communication
shall be effective (a) on the day delivered (or if that day is not a Business Day, or if delivered
after 11:59 p.m., U.S. Eastern Time, on a Business Day, on the first following day that is a
Business Day) when (i) delivered personally against receipt or (ii) sent by overnight courier,
(b) on the day sent if sent by email with delivery confirmation or no receipt of delivery failure

28

and (c) if given by any other means, upon delivery or refusal of delivery at the address specified in this Section 10.1.

Section 10.2    Amendments; Waivers.

(a)    This Agreement may be amended, and any provision of this Agreement may be waived if, and only if, such amendment or waiver, as the case may be, is in writing and signed, in the case of an amendment, by the Sellers and the Purchaser, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Except as otherwise provided herein, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. Any term, covenant or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but only by a written notice signed by such party expressly waiving such term or condition. The waiver by any party hereto of a breach of any provision hereunder shall not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder.

Section 10.3    Expenses. Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby shall be paid by the party incurring such cost or expense.

Section 10.4    Assignment, Successors and No Third-Party Rights. This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Sellers under chapter 11 or chapter 7 of the Bankruptcy Code and any entity appointed as a successor to any Seller pursuant to a confirmed chapter 11 plan). No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation. The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to the Purchased Assets or any portion thereof and operate the business going forward, and upon written notice to the Sellers of any such designation by the Purchaser, the Sellers agree to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, the Purchaser's designees. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this Section 10.4 or the Releasees under Section 10.14.

Section 10.5    Construction. As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and the

singular shall include the plural. Unless the context otherwise requires, the term "party" when used in this Agreement means a party to this Agreement. References in this Agreement to a party or other Person include their respective successors and assigns. The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" unless such phrase otherwise appears. Unless the context otherwise requires, references in this Agreement to Articles, Sections, Exhibits, and Schedules shall be deemed references to Articles and Sections of, and Exhibits, and Schedules to, this Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision hereof. Except when used together with the word "either" or otherwise for the purpose of identifying mutually exclusive alternatives, the term "or" has the inclusive meaning represented by the phrase "and/or". Unless the context otherwise requires, the term "material" shall be measured relative to the Purchased Assets taken as a whole, as the business of the Sellers is being conducted on the date of this Agreement. With regard to each and every term and condition of this Agreement, the parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which party actually prepared, drafted or requested any term or condition of this Agreement. All references in this Agreement to "dollars" or "$" shall mean United States dollars. Any period of time hereunder ending on a day that is not a Business Day shall be extended to the next Business Day. Unless the context otherwise requires, any reference to time shall be deemed to be U.S. Eastern Time.

Section 10.6    Entire Agreement.

(a)    This Agreement, the Intellectual Property Assignment and any other agreements contemplated hereby or thereby (including the Confidentiality Agreement), constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter hereof. If there is any conflict between the Confidentiality Agreement and this Agreement, the terms of this Agreement shall govern.

(b)    Except as expressly provided herein, neither this Agreement nor any provision hereof is intended to confer upon any Person other than the parties hereto (and their successors and permitted assigns) any rights or remedies hereunder.

Section 10.7    Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York (without regard to the choice of law provisions thereof), except as governed by the Bankruptcy Code.

Section 10.8    Counterparts; Effectiveness.  This Agreement may be signed in any number of counterparts (including by facsimile or PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

Section 10.9    Jurisdiction; WAIVER OF TRIAL BY JURY.  Any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated by this Agreement shall be brought in the United States District Court for the Southern District of New York until commencement of the bankruptcy cases, and thereafter in the Bankruptcy Court (for so long as the Bankruptcy Court has jurisdiction), and each of the parties hereby consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such Proceeding and waives any objection to venue laid therein.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the State of New York.  Without limiting the foregoing, the Sellers and the Purchaser agree that service of process upon such party at the address referred to in Section 10.1, together with written notice of such service to such party, shall be deemed effective service of process upon such party.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

Section 10.10    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  The application of such invalid or unenforceable provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.  To the extent any provision of this Agreement is determined to be prohibited or unenforceable in any jurisdiction, The Sellers and the Purchaser agree to use commercially reasonable efforts to substitute one or more valid, legal and enforceable provisions that, insofar as practicable, implement the purposes and intent of the prohibited or unenforceable provision.

Section 10.11    Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

Section 10.12    Specific Performance and other Equitable Relief.  The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, may occur in the event that the parties do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breach such provisions.  The parties acknowledge and agree that, prior to the valid termination of this Agreement pursuant to Article 7, both the Sellers and the Purchaser shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which such party is entitled at law or in equity.  Each of the parties agrees that it will not oppose the

31

granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. Any party seeking an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction. The pursuit of injunctive, specific performance or other equitable relief by any party will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy (whether at law or in equity) to which such party may be entitled at any time. Any and all rights and remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other right or remedy conferred hereby or by law or equity upon such party, and the exercise by a party of any one right or remedy will not preclude the exercise at any time of any other right or remedy.

Section 10.13 No Joint Venture. Nothing in this Agreement creates a joint venture or partnership between the parties. This Agreement does not authorize any party hereto (a) to bind or commit, or to act as an agent, employee or legal representative of, any other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of any other party. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.13.

Section 10.14 Release. Each of the Sellers, for itself and its respective Affiliates and successors and assigns (collectively, the "Releasing Persons"), does hereby and forever irrevocably release and discharge the Purchaser and each of its past, present and future Affiliates, predecessors, successors and assigns and officers, directors and agents (each a "Releasee"), from any and all Proceedings (including without limitation any claims of patent infringement against Purchaser and any claims regarding Purchaser's use of the "Vector" name for any purpose), judgments, debts, rights, interests, obligations, liabilities and all other losses and damages of whatsoever kind or character, known or unknown, suspected to exist or not suspected to exist, anticipated or not anticipated, whether or not heretofore brought, whether in law or in equity, whether in contract or in tort or otherwise, that such Releasing Person now has, has ever had or may hereafter have against any Releasee, in each case, which arises out of or relates to events, circumstances or actions occurring, existing or taken prior to the Closing in respect of the Purchased Assets or the use, operation or business thereof (each, a "Released Claim"). Each Releasing Person further covenants and agrees (i) that it will not, and will cause its Affiliates not to, take any action inconsistent with this Section 10.14 (including commencing any Proceeding in respect of, or directly or indirectly transferring to another Person, any Released Claim) and (ii) to indemnify and hold harmless each Released Person from and against and in respect of any and all such Proceedings, judgments, debts, rights, interests, obligations, liabilities and all other losses and damages whatsoever, of every name and nature, incurred by any Released Person as a result of any action by the Purchaser or any of its Affiliates that is inconsistent with this Section 10.14. This Section 10.14 shall survive the Closing, is intended for the benefit of and may be enforced directly by each of the Released Persons and is binding on all successors and assigns of the Releasing Person. Each Seller represents and warrants that no portion of any Released Claim has been assigned or transferred to any other person or entity, either directly or by way of subrogation or operation of law. Furthermore, each Seller also represents and warrants that it

32

will not fund, support, or cooperate with any claims by third parties against the Releasees related to the Released Claims.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be duly executed by their respective authorized representatives on the day and year first above written.

**SELLERS:**

VECTOR LAUNCH, INC.

By: _Shaun Martin_
Name: Shaun Martin
Title:   Chief Restructuring Officer

GARVEY SPACECRAFT
CORPORATION

By: _Shaun Martin_
Name: Shaun Martin
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be duly executed by their respective authorized representatives on the day and year first above written.

**PURCHASER:**

LOCKHEED MARTIN CORPORATION

By: _____

Name:   Adam J. Broecker

Title:   Director - Mergers & Acquisitions